1    George F. Allen SBN 145357
2    1903 21st Street
3    Sacramento, CA 95811
4    (916) 444-8765
5    (916) 444-1983 – (facsimile)
6    Attorney for Relator Herren
7
8    **JOSEPH, GREENWALD & LAAKE, P.A.**
9
10   Brian J Markovitz, *pro hac vice*
11   Matthew M. Bryant, *pro hac vice*
12   6404 Ivy Lane, Suite 400
13   Greenbelt, MD  20770
14   (301) 220-2200
15   (301) 220-1214 (facsimile)
16   Attorneys for Relator Herren
17

> **FILED**
>
> **Apr 05, 2013**
>
> CLERK, U.S. DISTRICT COURT
> EASTERN DISTRICT OF CALIFORNIA

# SEALED

18              **UNITED STATES DISTRICT COURT FOR THE**
19                  **EASTERN DISTRICT OF CALIFORNIA**
20                      **SACRAMENTO DIVISION**
21
22   UNITED STATES OF AMERICA, AND
23   THE STATE OF CALIFORNIA
24   ex  rel. COLLEEN HERREN,
25   8895 Bluff Lane
26   Fair Oaks, CA 95628
27
28                  Plaintiffs/Relator,
29
30   v.                                    **CASE NO. 2:12-CV-0098 KJM KJN**
31                                         **FILED UNDER SEAL**
32                                         Pursuant to 31 U.S.C. § 3730
33                                         (False Claims Act) and
34                                         California Government Cod
35                                         § 12650 et seq.(California False Claims Act)
36   MARSHALL MEDICAL CENTER
37   P.O. Box 872
38   Placerville, CA 95667
39
40   Serve:  JAMES WHIPPLE
41              RESIDENT AGENT
42              1100 Marshall Way
43              Placerville, CA 95667
44
45              AND
46
47
48

                                    -1-

EL DORADO HEMATOLOGY
& MEDICAL ONCOLOGY II, INC.
3102 Ponte Morino Drive # 100
Cameron Park, CA 95682

Serve:  VAUGHN JOHNSON
        RESIDENT AGENT
        4120 Cameron Parke Drive, Suite 400
        Cameron Park, CA 95682

        AND

DR. LIN H. SOE
4031 Alamo Court
El Dorado Hills, CA 95762-7646

        AND

DR.  TSUONG TSAI
11457 Huntington Village Lane, #L
Gold River, CA 95670

        AND

JAMES F. WHIPPLE
621 Cold Springs Road
Placerville, CA 95667

        AND

SHANNON TRUESDELL
2749 Paddle Pass PA
Pollock Pines, CA 95726

        AND

KATHRYN B. KREJCI
4570 Buckeye Road
Shingle Springs, CA 95682

        AND

RICK VANCE
428 Trowbridge Lane
Folsom, CA 95630

        Defendants.

# AMENDED COMPLAINT

1.      Relator-Plaintiff Colleen Herren, by and through undersigned counsel, brings this False Claims Act Amended Complaint on behalf of the United States of America and the State of California against Defendants Marshall Medical Center ("Marshall"), El Dorado Hematology & Oncology II, Inc. ("El Dorado II"), Dr. Lin Soe, Dr. Tsuong Tsai, James Whipple, Shannon Truesdell, Kathy Krejci, and Richard Vance.  This action is brought by plaintiffs to recover civil penalties and treble damages under the Federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), and the California False Claims Act, CAL.GOV'T CODE §§ 12650-12656. ("CFCA").

2.      Defendants intentionally defrauded the United States of America by knowingly submitting fraudulent reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq*., Medicaid, 42 U.S.C. §1396 *et seq*., TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, and other federally-funded government healthcare programs (hereinafter collectively referred to as "Government Healthcare Programs").  Defendants defrauded the Government by billing Medicare, Medicaid, TRICARE/CHAMPUS, and other federally-funded government healthcare programs: (a) for services and supplies that Defendant Marshall was not authorized to bill for as such practices compromised patient safety and violated conditions of payment under those Government Healthcare Programs; (b) for performing treatments at the Marshall Hematology Oncology Infusion Center without the requisite physician supervision necessary to ensure proper safety of patients such that these Government Healthcare Programs were illegally billed in violation of their conditions of payment; and (c) for physician office visits in the hospital that did not occur.

3.      Through these same actions that defrauded the federal government, Defendant Marshall Medical Center fraudulently deprived the State of California of state monies through its respective Medicaid programs under Medi-Cal.

1    4.    Relator is the former Clinical Nursing Director for Specialty Clinics.[1]  That

2    position allowed Relator to have first-hand knowledge of Defendant Marshall Medical Center's

3    fraudulent practices and to review documents related to the treatment and billing of patients on

4    these Government Healthcare Programs.  These documents included internal audits and

5    memoranda written by and to the highest-level officers at Defendant Marshall Medical Center

6    that detailed the illegal billings to the Government Health Care Programs.

7    5.    Additionally, Relator-Plaintiff brings this action as a *qui tam* action for herself

8    pursuant to 31 U.S.C. § 3730(h), CAL. CODE § 12653, as well as other State of California

9    causes of action for being retaliated against by Defendant Marshall Medical Center.  Relator was

10   retaliated against, including by being terminated from employment, for both refusing to be

11   complicit in illegal activities and attempting to have Defendants stop illegal practices and come

12   into compliance with the billing and safety requirements of the Government Health Care

13   Programs.

14                              **JURISDICTION AND VENUE**

15   6.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C.

16   § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732,

17   including state law claims under 31 U.S.C. § 3732(b).  This court also has supplemental

18   jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

19   7.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C.

20   § 3732(a) because: (1) Defendant Marshall Medical Center is a doing business in this district, (2)

21   and/or many acts by Defendant Marshall Medical Center proscribed by 31 U.S.C. § 3729

22   occurred in this district; (3) and/or some of the individual Defendants reside in this district.

---

[11] At the time of the filing of this Complaint, Relator is on medical leave status but has been informed that her last day of work was December 29, 2011 and that she will be officially terminated upon concluding her medical leave.

## THE PARTIES

8.      The Plaintiffs are the United States of America and the State of California.

9.      Relator-Plaintiff Colleen Herren ("Relator") is an adult citizen and resident of the State of California.  Relator holds a Masters of Business Administration, a Bachelors of Science in nursing, and is a registered and oncology-certified nurse.  Relator was hired on or about June of 2010 as the Clinical Nursing Director for Specialty Clinics, meaning that she was the supervisor of all nurses at Defendant Marshall's clinics, including the Hematology/Oncology Center of Defendant Marshall in Cameron Park, California.  In December of 2011, as a direct result of and after making repeated attempts to have Defendant Marshall come into compliance with patient safety and billing requirements and reporting such infractions to the highest-level officers at Defendant Marshall, Relator was informed that she was being terminated and that her last day of work was December 29, 2011.  Relator discovered Defendant Marshall's fraudulent practices while working in this position.  Relator has direct knowledge of Defendant Marshall's fraudulent billing practices, having been in meetings with the fraudulent agents of Defendant Marshall while discussions of the fraudulent acts occurred, directly witnessed fraudulent acts, and reviewed patient records.

10.     Defendant Marshall is a California Corporation with its principal place of business (main hospital) located at 1100 Marshall Way, Placerville, CA 95667.  Defendant Marshall is an independent, nonprofit community healthcare provider that includes Marshall Hospital, a facility with 105 beds located in Placerville, CA, several outpatient facilities, including the Hematology/Oncology Center located at 3102 Ponte Merino Drive, Suite 100, Cameron Park, CA 95682 that is the subjects of this complaint, and Marshall Physician Clinic Services.  Defendant Marshall has approximately 200 affiliated physicians, including Defendants Soe and Tsai, and over 1200 employees providing healthcare services to more than 150,000

1    residents of El Dorado County, CA.  Defendant Marshall is a participant in the Government

2    Healthcare Programs mentioned above and bills to those programs, including for services

3    provided at the Hematology/Oncology Center.

4         11.    Defendant El Dorado Hematology & Medical Oncology II, Inc., is the medical

5    corporation owned, operated, and managed by Defendant Dr. Lin Soe and Defendant Dr. Tsuong

6    Tsai. It is through this company that Defendants Soe and Tsai contract with Defendant Marshall.

7         12.    Defendant Dr. Lin Soe is a physician who runs Defendant Marshall's

8    Hematology/Oncology Center along with Defendant Dr. Tsuong Tsai.  Drs. Soe and Tsai are

9    employed via contracts between El Dorado II and Defendant Marshall and have clinical

10   privileges at Defendant Marshall.  They are not employees of Defendant Marshall.  In 2001, Dr.

11   Soe, along with Dr. Tsai, founded El Dorado Hematology and Medical Oncology, a Medical

12   Corporation ("El Dorado I") performing the same services, including chemotherapy and

13   infusions, now performed at Defendant Marshall's Hematology/Oncology Center.  Defendants

14   Soe and Tsai also performed the same fraudulent acts that are the subject of this complaint while

15   operating El Dorado I.  In 2007, El Dorado Hematology and Medical Oncology was dissolved

16   and merged into Defendant Marshall, and Defendants Soe and Tsai, as agents of the newly

17   formed El Dorado II, became contractual workers of Defendant Marshall.

18        13.    Defendant James Whipple is the Chief Executive Officer of Defendant Marshall,

19   having held that position since 2003. Defendant Whipple, while working at Defendant Marshall,

20   was repeatedly made aware through written memoranda and oral conversations that Defendant

21   Marshall was illegally billing the Government Healthcare Programs for services provided at the

22   Hematology/Oncology Center.  But Defendant Whipple took no steps to stop such billing and

23   allowed it to continue.  Defendant Whipple conspired with the other Individual Defendants to

1  falsely and fraudulently bill these Government Healthcare Programs in the manner described

2  above and below.

3        14.     Defendant Shannon Truesdell is the former Assistant Administrator of Defendant

4  Marshall, having held that position from 2000-2011 until her promotion in 2011 to the current

5  Chief Operating Officer.  She also was a direct supervisor to Relator. Defendant Truesdell, while

6  working at Defendant Marshall, was repeatedly made aware through written memoranda and oral

7  conversations that Defendant Marshall was illegally billing the Government Healthcare

8  Programs for services provided at the Hematology/Oncology Center.  But Defendant Truesdell

9  took no steps to stop such billing and allowed it to continue.  Defendant Truesdell conspired with

10  the other Individual Defendants to falsely and fraudulently bill these Government Healthcare

11  Programs in the manner described above and below.

12        15.     Defendant Kathryn Krejci, is the former Director of Patient Care Services, having

13  held that position from approximately 2001-2010 until her promotion in 2010 to the current

14  Chief Nursing Officer.  She also was a direct supervisor to Relator.  Defendant Krejci, while

15  working at Defendant Marshall, was repeatedly made aware through written memoranda and oral

16  conversations that Defendant Marshall was illegally billing the Government Healthcare

17  Programs for services provided at the Hematology/Oncology Center.  But Defendant Krejci took

18  no steps to stop such billing and allowed it to continue.  Defendant Krejci conspired with the

19  other Individual Defendants to falsely and fraudulently bill these Government Healthcare

20  Programs in the manner described above and below.

21        16.     Defendant Rick Vance is the Vice President of Specialty Care Services at

22  Defendant Marshall, having held that position since 2001.  He also was a direct supervisor to

23  Relator.  Defendant Vance, while working at Defendant Marshall, was repeatedly made aware

24  through written memoranda and oral conversations that Defendant Marshall was illegally billing

1   the Government Healthcare Programs for services provided at the Hematology/Oncology Center.

2   But Defendant Vance took no steps to stop such billing and allowed it to continue.  Defendant

3   Vance conspired with the other Individual Defendants to falsely and fraudulently bill these

4   Government Healthcare Programs in the manner described above and below.

5   **THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS**

6   *Federal False Claims Act*

7           17.     The False Claims Act (FCA) provides that any person who knowingly presents, or

8   causes to be presented, a false or fraudulent claim for payment or approval, knowingly makes,

9   uses or causes to be made or used, a false record or statement material to a false or fraudulent

10  claim, to the Government is liable for a civil penalty of between $5,500 and $11,000 per claim

11  plus three times the amount of damages the Government sustained.  31 U.S.C. § 3729(a); 28

12  C.F.R. § 85.3.

13          18.     For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a

14  person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the

15  truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

16  information."  *Id.* at § (b).  "[N]o proof of specific intent to defraud is required" for a successful

17  claim under the FCA.  *Id.*

18  *California False Claims Act*

19          19.     The California False Claims Act ("CFCA") is modeled after the Federal False

20  Claims Act.  The CFCA works very much like its Federal model in that it provides that any

21  person who causes a false claim to be submitted to the State of California is liable for a civil

22  penalty of up to $10,000 per claim plus three times the amount of damages the state sustained.

23  California Government Code § 12651(a).  For purposes of the CFCA, "the terms 'knowing' and

24  'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in

1    deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

2    the truth or falsity of the information."  *Id.* at § 12650(b)(1)(B)(ii)(3).  "[N]o proof of specific

3    intent to defraud is required" for a successful claim under the California FCA.  *Id.*

4              **FEDERAL AND STATE GOVERNMENT HEALTHCARE PROGRAMS**

5    *MEDICARE*

6
7              20.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* establishes the

8    Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare

9    program.

10             21.     The Medicare program is a federally operated and funded program.  It is

11   administered by the Secretary of Health and Human Services ("HHS") through the Health Care

12   Financing Administration ("HFCA"), a department of HHS now known as the Centers for

13   Medicare and Medicaid Services ("CMS").

14             22.     The Medicare program is comprised of four parts, but only Parts A and B are

15   involve in this action.  Part A provides basic insurance for the costs of hospitalization and post-

16   hospitalization care.  42 U.S.C. §§ 1395c-1395i-2 (1992).  Part B is a federally subsidized,

17   voluntary insurance program that covers a percentage (typically eighty percent) of the fee

18   schedule amount of physician and laboratory services.  42 U.S.C. §§ 1395k, 1395l, 1395x(s).

19             23.     To participate in Medicare, providers must certify that their services are provided

20   economically and only when, and to the extent they are, medically required, or "reasonable and

21   necessary."  42 U.S.C. § 1395n; 42 USCS § 1395y(a)(1)(A).  Medicare will only pay for

22   "reasonable and necessary" services and for diagnoses that are covered, and not expressly

23   excluded, under the Medicare program.

24             24.     A service is expressly excluded from coverage if it is "not reasonable and

25   necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a

1   malformed body member."  42 C.F.R. 411.15(k).  In other words, the treatment sought under

2   Medicare must be medically necessary, which is a condition of payment that is critical for billing

3   Medicare properly while seeking payment.  *Id.*

4        25.    A participant billing Medicare for medically unnecessary treatment is illegal,

5   fraudulent, and violates a condition of payment.  42 C.F.R. § 411.15 (delineating that

6   "[p]articular services excluded from coverage"); *id.* at § 411(b)(1) (stating that "[t]his subpart

7   identifies: (1) The particular types of services that are excluded" from coverage); 42 C.F.R.

8   Subpart 411 (titled "Exclusions From Medicare and Limitations on Medicare Payment").

9

*Medicare's Requirements For Physician Supervision For Therapeutic Services*

26.      "Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner)".  42 C.F.R. § 410.26(b).  "[D]rugs or biological that are not usually self-administered" such as chemotherapy, infusions, and certain injections are considered "services and supplies for Medicare.  *Id.* §(a)(7) "**Services and supplies must be furnished under the <u>direct supervision</u> of the physician** (or other practitioner)".  *Id.* (emphasis added).

27.      The Hematology/Oncology Center at Defendant is an "off campus" facility as defined by 42 C.F.R. § 413.65.  "Direct supervision" for services at an "off-campus" facility is defined as:

> For services furnished in the hospital or CAH, or in an outpatient department of the hospital or CAH, both on and off-campus, as defined in § 413.65 of this subchapter, **'direct supervision' means that the physician** or nonphysician practitioner **must be <u>immediately available</u> to furnish assistance and direction throughout the performance of the procedure**.  It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed;

42 CFR 410.27(a)(1)(iv)(A).

28.      In this respect, physicians must be "immediately available" to assist patients receiving services such as chemotherapy, infusions, or certain injections.  Further guidance on what constitutes "immediately available" for off-campus facilities like Hematology/Oncology Center is explained in Medicare Benefit Policy Manual, Pub. 100-02, Chapter 6, §20.5.2.

> Immediate availability requires the immediate physical presence of the *supervisory* physician or nonphysician practitioner.  CMS has not specifically defined the word 'immediate' in terms of time or distance; however, an example of a lack of immediate availability would be situations where the supervisory physician or nonphysician practitioner is performing another procedure or service that he or she could not interrupt. Also, for services furnished on-campus, the supervisory physician or nonphysician, practitioner may not be so physically far away on-campus from the location where hospital/CAH outpatient services are being furnished that he or she could not intervene right away.  *The hospital or supervisory practitioner must judge the supervisory practitioner's relative location to ensure that he or she is immediately available.*

*Id.*  (emphasis in original).

1    29.    In this respect, Medicare Part B cannot be billed if the physician is somewhere or

2    is doing something that does not allow him or her to render assistance immediately. *Id.* For

3    instance, availability by telephone does not suffice.

4    With respect to telecommunication, we note that direct supervision requires the ability to
5    be physically present immediately, and to be able to furnish assistance and direction
6    throughout the performance of the procedure (74 FR 60580). **We do not see how a**
7    **practitioner who is only remotely available by phone or other means of**
8    **telecommunication could fulfill these requirements and, therefore, we do not**
9    **consider availability by means of telecommunication to be an acceptable means of**
10   **providing direct supervision**.
11
12   2011 OPPS Final Rule, published in Federal Register, 75 FR 71800, 72008, (Nov. 24, 2010)

13   (emphasis added).

14    30.    Therefore, a condition of payment for Medicare Part B is that the physician be in

15   a position to be "immediately available" to furnish assistance to the patient receiving

16   chemotherapy or an infusion should they need it in an on-campus setting like Defendant

17   Marshall's Hematology/Oncology Center.  If a physician is not "immediately available" by not

18   being anywhere in the area, then such services rendered are not eligible for Medicare payment.

19   ***Medicare's Requirements For Single Use Vials Of Drugs And Biologicals***

20    31.    For single use vial or single use packages ("SDV") of drugs, including

21   chemotherapy and other drugs used to treat cancer, Medicare will cover the amount of drug that

22   was administered and that portion of the remainder of the drug is to be discarded as "waste".

23   Medicare Claims Processing Manual, Chapter 17, Section 40, Discarded Drugs and Biologicals.

24   If, after administering a dose of SDV to a Medicare patient, a provider must discard the

25   remainder, Medicare will provide payment for the amount of SDV discarded as "waste," up to

26   the total amount of the drug or biological as indicated on the vial or package label. *Id.* Medicare

27   will not pay for more than the total amount in the SDV nor will it pay for unused amounts as

28   "waste" that exceed the dose administered (*i.e.* billing unit). *Id.*; *CMS Transmittal 1962* ("the

1   program provides payment for the amount of drug or biological discarded as well as the dose

2   administered, up to the amount of the drug or biological as indicated on the vial or package

3   label"); *id.* ("when the billing unit is equal to or greater than the total actual dose and the amount

4   discarded, the use of JW Modifier (code for billing waste) is not permitted").

5       32.     Specifically, the Medicare guidance provides examples and states:

6       When a physician, hospital or other provider or supplier must discard the remainder of a
7       single use vial or other single use package after administering a dose/quantity of the drug
8       or biological to a Medicare patient, the program provides payment for the amount of drug
9       or biological discarded as well as the dose administered, up to the amount of the drug or
10      biological as indicated on the vial or package label.
11
12      [L]ocal contractors may require the use of the modifier JW to identify unused drug or
13      biologicals from single use vials or single use packages that are appropriately discarded.
14      This modifier, billed on a separate line, will provide payment for the amount of discarded
15      drug or biological.  For example, a single use vial that is labeled to contain 100 units of a
16      drug has 95 units administered to the patient and 5 units discarded.  The 95 unit dose is
17      billed on one line, while the discarded 5 units may be billed on another line by using the
18      JW modifier.  Both line items would be processed for payment.
19
20      The JW modifier is only applied to the amount of drug or biological that is discarded.  A
21      situation in which the JW modifier is not permitted is when the actual dose of the drug or
22      biological administered is less than the billing unit.  For example, one billing unit for a
23      drug is equal to 10mg of the drug in a single use vial.  A 7mg dose is administered to a
24      patient while 3mg of the remaining drug is discarded.  The 7mg dose is billed using one
25      billing unit that represents 10mg on a single line item. The single line item of 1 unit
26      would be processed for payment of the total 10mg of drug administered and discarded.
27      Billing another unit on a separate line item with the JW modifier for the discarded 3mg of
28      drug is not permitted because it would result in overpayment.  Therefore, when the billing
29      unit is equal to or greater than the total actual dose and the amount discarded, the use of
30      the JW modifier is not permitted.
31
32   ***Medicare Claims Processing Manual, Chapter 17, Section 40, Discarded Drugs and***

33   ***Biologicals.***

34       33.     To this end, once an SDV has been used, if the amount that remains is not usable

35   and is below a "billing unit," it can only be billed under the JW modifier as "waste" to Medicare

36   and cannot be billed as anything else.  *Id.*

34.     Additionally, Medicare requires that hospitals provide "pharmaceutical services that meet the needs of the patients." *Medicare State Operations Manual – Appendix A- Survey Protocol, Regulations and Interpretive Guidelines for Hospitals*, § 482.25 (2011).  In order to meet patient needs, the hospital must "have a pharmacy directed by a registered pharmacist or a drug storage area under competent supervision." *Id.*  These pharmaceutical services "must meet the needs of the patients' therapeutic goal[s] by promoting a safe medication use process that ensures optimal selection of medications, dose, dosage form, frequency, route, duration of therapy and that substantially reduces or eliminates adverse drug events and duplication of treatment." *Id.*  Each hospital must develop policies and procedures that are based on "accepted professional principles" to ensure the minimization of medication errors.  *Id.*

35.     "Accepted professional principles" include, among others, all applicable Federal and State laws and regulations, "as well as standards or recommendations promoted by nationally recognized professional organizations." *Id.* at § 482.25(a).  The Centers for Disease Control and Prevention (the "CDC") have made recommendations concerning single-dose and single-use vial medications.  The CDC recommends that single-dose or single-use vial medications should be discarded when the "vial has been opened or accessed (e.g., needle-punctured), [and] the vial should be discarded according to the time that manufacturer specifies for the opened vial or at the end of the case/procedure for which it is being used, whichever comes first. **It should not be stored for future use.**" CDC, *Questions about Single-dose/ Single-Use Vials*, *available at* www.cdc.gov. (Emphasis added.)

36.     The Medicare Interpretive Guidelines for Hospitals also gives specific examples of professional principles that a hospital may use to maintain standards.  One of those principles is "maintaining control over drugs and medications including the floor stock and those of the pharmacy or drug room." *Medicare State Operations Manual* at § 482.25(a).  Additionally,

1   "[t]he hospital must have a pharmacy labeling, inspection, and inventory management system

2   that ensures that outdated, mislabeled, or otherwise unusable drugs and biologicals are not

3   available for patient use." *Id.* at § 482.25(b)(3).  As such, a hospital must maintain control over

4   drugs both in the pharmacy and on the hospital floor such that the hospital must ensure that no

5   patient receives expired medications both in the pharmacy or administered by a physician.  *Id.*

6   ***Medicare's Requirements for Physician Office Visits ("Established Outpatient Visit")***

7       37.    Physician office visits (established outpatient visits) are billed under the CPT

8   codes in the 99211-215 range.  The CPT codes at issue in this case are 99214 and 99215.  Both

9   codes require that a physician see the patient in order to be legally billed to Medicare.  If the

10  physician does not see the patient, then neither code can be legally billed to Medicare for

11  payment.

12      38.    CPT code 99214 is appropriately used when the physician spends approximately

13  twenty-five (25) minutes with the patient to treat a moderate or high severity problem, and when

14  the physician can identify two out of the three following components: the physician performed a

15  detailed patient medical history, the physician performed a detailed exam on the patient, or the

16  treatment of the patient requires a medical decision of moderate complexity.

17      39.    CPT code 22915 is appropriately used when the physician spends approximately

18  forty (40) minutes with the patient to treat a moderate to high severity medical problem, and

19  when the physician can identify two out of the three following components: the physician

20  performed a comprehensive patient medical history, the physician performed a comprehensive

21  exam on the patient, or the treatment of the patient requires a medical decision of high

22  complexity.

1 | ***MEDICAID***

2 |     40.    In 1965, Congress established Medicaid when it enacted title XIX of the Social

3 | Security Act.  *See* 42 U.S.C. §§ 1396–1396v; *Schweiker v. Gray Panthers* 453 U.S. 34, 36,

4 | (1981).  Medicaid is a joint federal-state program that provides health care benefits for certain

5 | groups; primarily the poor and disabled

6 |     41.    Medicaid is a cooperative venture where the Federal Government provides

7 | financial assistance to participating States to assist them in providing health care to needy

8 | persons.  Each state administers its own Medicaid program while CMS monitors the state-run

9 | programs and establishes requirements for service delivery, quality, funding, and eligibility

10 | standards.

11 |     42.    The federal government portion provided is known as the Federal Medical

12 | Assistance Percentage ("FMAP"), and is based on the state's per capita income compared to the

13 | national average. 42 U.S.C. § 1396d(b).  In some states Medicaid is subcontracted to private

14 | health insurance companies, while other states pay providers (*i.e.*, doctors and hospitals) directly.

15 | Participation in Medicaid is voluntary, however "once a State elects to participate, it must

16 | comply with the requirements of Title XIX." *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 809,

17 | 69 P.3d 927, 935 (2003) (quoting *Harris v. McRae*, 448 U.S. 297, 308 (1980)).

18 |     43.    Like Medicare, a "claim" under Medicaid is only "covered" if it is "reasonable

19 | and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of

20 | a malformed body member".  42 C.F.R.§ 402.3.  Services "excluded from Medicare Part B" or

21 | that are "not a defined Medicare Part B benefit" are not covered by Medicaid.  *Id.*

22 | *MEDI-CAL*

23 |     44.    In 1966, California elected to participate in Medicaid and California's program

24 | eventually became known as Medi-Cal.  *Medi-Cal Overview* available

1    at:http://www.dhcs.ca.gov/dataandstats/statistics/Pages/RASS_Medi-Cal_Overview.aspx

2    Currently, Medi-Cal provides health insurance for 6.8 million low-income and disabled

3    Californians.

4          45.      In order for California to receive Medicaid funding, Medi-Cal must "'comply

5    with requirements imposed both by the [Social Security] Act itself and by the Secretary[of

6    Health and Human Services]. . . .'" *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 810, 69 P.3d

7    927, 935 (2003) (quoting *Elizabeth Blackwell Health Center v. Knoll*, 61 F.3d 170, 172 (3d

8    Cir.1995)).

9          46.      Accordingly, providers receiving Medi-Cal reimbursements are required to

10   comport with Federal regulations, including those that regulate physician care.  To this end,

11   California has enacted requirements for Medi-Cal, including that a service is "medically

12   necessary" or a "medical necessity" when it is "reasonable and necessary to protect life, to

13   prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst.

14   Code § 14059.5   Similarly, California's regulations make clear that "Outpatient physician

15   services are covered if they are medically necessary to protect life, to prevent significant illness

16   or significant disability, or to alleviate severe pain."   22 CCR § 51305.

17   ***TRICARE/CHAMPUS***

18         47.      In 1967, the Department of Defense created the Civilian Health and Medical

19   Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical

20   program created by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active

21   military personnel, retired personnel, and dependents of both active and retired personnel.  *Id.*

22         48.      In 1995, the Department of Defense established TRICARE, a managed healthcare

23   program, which operates as a supplement to CHAMPUS.  *See* 32 C.F.R. §§ 199.4, 199.17(a*).*

1  Since the establishment of TRICARE in 1995, both programs are frequently referred to

2  collectively as TRICARE/CHAMPUS, or just "TRICARE."

3       49.     The purpose of the TRICARE program is to improve healthcare services to

4  beneficiaries by creating "managed care support contracts that include special arrangements with

5  civilian sector health care providers."  32 C.F.R. § 199.17(a)(1).  The TRICARE Management

6  Activity ("TMA") oversees this program.

7       50.     The TRICARE managed healthcare programs are created through contracts with

8  managed care contractors in three geographic regions: North, South, and West.   Defendant

9  Marshal currently serves patients from the West region.  TRICARE health services are provided

10 through both network, and non-network, participating providers.  Providers who are Medicare-

11 certified providers are considered TRICARE-authorized provider.  TRICARE-authorized

12 providers are either "Network Providers" or "Non-Network Providers."

13      51.     "Network Providers" include hospitals, other authorized medical facilities,

14 doctors and healthcare professionals, who enter into an agreement with the region's managed

15 care contractor, and provide services for an agreed reimbursement rate.  32 C.F.R. § 199.14(a).

16 "Non-Network Participating Providers" include hospitals, other authorized medical facilities,

17 doctors and healthcare professionals who do not enter an agreement with the region's managed

18 care provider, and are reimbursed at rates established by TRICARE regulations.  *Id.*

19      52.     The TRICARE managed care contractor for the West region is TriWest Health

20 Alliance.  TriWest Health Alliance currently lists Defendant Marshall as a Network Provider.  To

21 obtain status as a TRICARE Network Provider, Defendant signed a contract with this managed

22 care contractor accepting TRICARE's negotiated rates.

53.     Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."  32 C.F.R. § 199.6(a)(5).

### OVERVIEW OF FRAUDULENT ACTIONS BY DEFENDANT MARSHALL AND ITS AGENTS

54.     At Defendant Marshall's Hematology Oncology Infusion Center, Defendant Marshall, on a daily basis and as a matter of course, committed the following fraudulent acts in violation of the Federal and California False Claims Acts and conditions of payment for services under the Government Healthcare Programs:

a.   Chemotherapy and infusion procedures and certain injections [such as injections of procrit, neupogen, neulasta, and xgeva that cannot be self-administered] were performed daily on multiple patients without the presence of a physician in the area, let alone anywhere near the facility, such that such services were provided and billed to the Government Healthcare Programs without physician supervision and without a physician being immediately available to furnish assistance and direction throughout the performance of those procedures;

b.   SDVs of drugs were routinely double billed to the Government Healthcare Programs by rounding up the amounts used for such drugs when billing them, *i.e.* a 100 MG vial of a drug was split between two patients but the Government Healthcare Programs were billed twice, once for each patient at 100 MG, for a total of 200 MG;

c.   SDVs of drugs were routinely double billed to the Government Healthcare Programs by billing remaining amounts properly as "waste" but then illegally billing a second patient for the remaining amount again, *i.e.* 460 MG of a 500MG vial of a drug was used on one patient and the remaining 40 MG were billed as

1    "waste" for the first patient, but the Government Healthcare Programs were also

2    then billed a second time for the remaining 40MG for use on a second patient.

3    This means that a total of 540 MG was billed for the 500MG vial;

4    d.  SDVs of drugs were allowed to expire (go beyond their date and/or time after

5    being used on one patient) and then were used on another patient(s) and billed as

6    if viable instead of being billed as "waste;"

7    e.  After initially having an office visit with patients, Defendants Drs. Tsai and Soe,

8    as agents of Defendant Marshall, billed a second physician visit for patients

9    referred to Defendant Marshall's hospital for performance of blood transfusion

10    treatments, despite the fact that no physician actually saw those patients at the

11    hospital while the treatments were occurring there; and

12    f.  Defendant's agents —both physician and non-physician corporate

13    officers—purposefully failed to correct the inappropriate billings that were and

14    are direct threats to patient safety and that were and are resulting in illegal higher

15    charges to the Government Healthcare Programs.  They failed to correct the

16    fraudulent billing and practices despite being warned multiple times, not only by

17    Relator, but by Defendant Marshall's highest level compliance official, Gloria

18    McNeil, and by managers at Defendant Marshall's pharmacy.

19    **FACTS COMMON TO ALL CLAIMS**

20    *El Dorado Hematology and Medical Oncology*

21    55.    In 2001, Defendants Drs. Soe and Tsai founded El Dorado Hematology and

22    Medical Oncology ("El Dorado I"), a Medical Corporation in Cameron Park, California.   El

23    Dorado I ran as a single specialty group of physicians who practiced in the same areas of

24    specialization — namely, hematology and oncology.  Dr. Soe was the President and Dr. Tsai was

1    the Secretary.  At El Dorado, Defendants Soe and Tsai performed and had staff perform the same

2    types of services, including chemotherapy, infusions, and certain types of non self-administered

3    injections that are now performed at Defendant Marshall's Hematology Oncology Infusion

4    Center and billed these services to the Government Healthcare Programs.

5          56.      Unfortunately, Defendants Soe and Tsai also committed the same illegal conduct

6    while operating El Dorado I that is now occurring at Defendant Marshall's Oncology

7    Hematology Center.[2]  From 2001 through 2007, at El Dorado I, on a routine basis, chemotherapy

8    and infusions, as well as certain injections [such as procrit, neupogen, neulasta, and xgeva that

9    cannot be self-administered], were performed without a physician on site on patients such that

10   they were not immediately available to furnish assistance and direction.  These procedures, that

11   lacked adequate physician coverage, were then billed to the Government Healthcare Programs.

12   Additionally, at El Dorado I on a routine basis, expired SDVs of drugs, including for

13   chemotherapy, were used on patients and billed to the Government Healthcare Programs as

14   good, viable drugs instead of waste.  Also, at El Dorado I on a routine basis, SDVs of drugs were

15   routinely double billed to the Government Healthcare Programs by rounding up the amount used

16   on such drugs such that a vial of a drug that was used between two patients was billed at twice

17   the total amount.

18         57.      In 2007, the corporation and operations at El Dorado I were merged into

19   Defendant Marshall.  At that time, El Dorado I ceased operations, and as agents of the newly

20   formed corporate entity El Dorado II, Drs. Soe and Tsai signed contracts with Defendant

21   Marshall for physician privileges, and operations began to run at the Hematology/Oncology

22   Center of Defendant Marshall at its Cameron Park, California facility.

_____

[2] Relator is aware of these prior practices because Defendants Soe and Tsai would routinely justify their current illegal actions by explaining that they were performing procedures and services and billing the Government Healthcare Programs in the same manner that they had previously while operating El Dorado.

1    *Operations at Defendant Marshall's Hematology/Oncology Center*

2    *Overview*

3        58.    From 2007 until the present, at the Hematology/Oncology Center of Defendant

4    Marshall at its Cameron Park, California facility, Defendants Tsai and Soe, as agents of

5    Defendant Marshall and Defendant El Dorado II, illegally billed or ordered Defendant

6    Marshall's staff to illegally bill the Government Healthcare Programs as explained below.

7    Specifically, these acts were violations of conditions of payment for infusions and chemotherapy

8    treatments, as well as injections [such as procrit, neupogen, neulasta, xgeva injections that cannot

9    be self-administered], as these procedures occurred without physicians being present nor

10   immediately available to furnish assistance and direction throughout the performance of those

11   procedures.

12       59.    Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El

13   Dorado II, also illegally double billed or ordered Defendant Marshall's staff to illegally double

14   bill the Government Healthcare Programs in violation of conditions of payment for SDVs of

15   drugs by rounding up the amounts of such drugs, [*i.e.* a 100 MG vial of a drug was split between

16   two patients but the Government Healthcare Programs were billed twice, once for each patient at

17   100 MG for a total of 200 MG].

18       60.    Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El

19   Dorado II, also illegally billed or ordered staff to illegally bill the Government Healthcare

20   Programs in violations of conditions of payment for SDVs of drugs that were allowed to expire

21   (go beyond their date and/or time after being used on one patient) and then were used on another

22   patient(s) and billed as if good, viable drugs instead of being billed as "waste".

23       61.    Finally, Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant

24   El Dorado II, also routinely, illegally billed or ordered staff to illegally bill the Government

1    Healthcare Programs in violations of conditions of payment for a second office visit for infusions

2    performed at Defendant Marshall's hospital even though no physician saw those patients for the

3    procedure performed at the hospital.

4            62.    Importantly, by Defendants Drs. Soe's and Tsai's own account, the operations at

5    the Hematology Oncology Infusion Center in Cameron Park, California threaten patient safety

6    and health.  In one memo written in May of 2010 to Defendant Vance, Defendants Soe and Tsai

7    state there is:

> [A]n alarming frequency of errors in various aspect[s] of chemotherapy administration at
> Marshall Oncology infusion room in Cameron Park.  The incidents ranging from charting
> errors to serious chemotherapy extravasations [escape of a chemotherapy drug into the
> extravascular space] at concerning frequency.  Some errors are direct threat to patients'
> safety and others like documentation errors which could lead to wrong medical decisions
> and endanger patient's care.
>
> We have discussed about this issue previously in board meetings . . . but incidences have
> increased rather than decreased.  . . .  [W]e feel correcting this in urgent manner before
> patients' health and lives are endangered.  . . .
>
> We urge the administration to look at this seriously in urgent manner.  At this rate of
> increasing frequency of errors, we as physicians will have to make decision about safe
> chemotherapy administration quickly.

23           63.    In a follow up memo written in July 2011 and titled "Chemotherapy errors at

24   Marshall Oncology outpatient infusion clinic", Defendants Drs. Soe and Tsai wrote to Defendant

25   Vance, with courtesy copies to Defendants Whipple, Truesdell, and Krejci, that

> We are experiencing number mistakes since the end of 2010. . . . Unfortunately, the
> medication errors have continued and in the month of June alone, we had four medication
> errors. . . . Some are major errors potentially endangering the patient's health and life.

***Lack of Physician Presence at the Hematology Oncology Infusion Center in Cameron Park***

32           64.    Relator's tenure at Defendant began in June 2010.  She immediately noticed and

33   was told by several nurses that physicians often were not only absent from the Center during

34   procedures, but were routinely miles away during chemotherapy sessions, infusion treatments,

35   and certain injections [such as procrit, neupogen, neulasta, and xgeva injections that are not self-

1   administered] being performed on patients at the Hematology Oncology Infusion Center in

2   Cameron Park, California.  Relator recognized that this failure to have physicians immediately

3   available was a violation of conditions of payment under the Government Healthcare Programs

4   and threatened patient safety for these procedures.

5          65.     As part of Relator's job duties, she reviewed internal audits from prior years,

6   detailing how physicians were not present in those years to perform the chemotherapy sessions,

7   infusions, and certain injections that cannot be self-administered.  Concerned that illegal billing

8   and threats to patient safety were occurring, at the Center's February 2011 "Board of Directors"

9   meeting in which Defendants Soe, Tsai, and Vance attended, among others, Relator insisted that

10  physicians be present or at least within the area to supervise and provide assistance to patients.

11  Relator also stated that employees and agents of Defendant Marshall, including her, should not

12  be part of a practice that did not follow regulations.  At this meeting, Defendant Dr. Soe openly

13  and loudly objected to Relator's comments and the auditor's findings, arguing that physicians did

14  not need to be present or available and that he and Dr. Tsai had been practicing in that manner

15  for years at their prior practice.  Relator was stunned by Defendants Soe's and Tsai's objections

16  to being present for these procedures.  This was especially shocking  as these same doctors  had

17  repeatedly stated, including in writing, that the facility was not operating in a safe manner for

18  patients, making their immediate availability all the more urgent.

19         66.     Despite receiving an unwelcome response at the February 2011 meeting when

20  trying to get the Center to come into compliance, Relator continued to insist that physicians be

21  present for those procedures.  In 2011, Relator had several meeting with Defendant Vance, her

22  supervisor and the Vice President of Specialty Care Services, in which she insisted that

23  physicians be present for those procedures.

67.     Relator's persistence resulted in Defendant Vance researching the legal requirements for proper billing of the Government Healthcare Programs.  On or about July 17, 2011, Defendant Vance sent an email to Defendants Krejci and Truesdell, Gloria McNeill, the compliance officer, and Relator, among others, titled "oncology compliance issues."  Defendant Vance specifically noted, "we have reconfirmed with the infusion department that they cannot start infusions unless a physician is in the office."

68.     In response to the July 17, 2011 email, on July 18, 2011, the compliance officer, Ms. McNeill, sent an email to Defendants Vance, Krejci, Truesdell and Relator, among others, reconfirming that "the reg states that these practitioners must be immediately available and interruptible in order to step in."

69.     Approximately a week later, on or about July 25, 2011, Ms. McNeill sent Relator an email in which she attached multiple-pages of billing requirements under Medicare for physician availability from the "Medicare Manual."  Ms. McNeill noted in the email that she left Relator a voicemail message regarding the same and wrote "[a]ttached is the excerpt from the Federal Register.  In a nutshell, physician must provide direct supervision, by being readily available.  The preamble discusses that communication via telephone is not meeting this requirement."

70.     Relator and Ms. McNeill continued to have discussions in writing and orally over the next few months regarding the need for physicians to be immediately available during the chemotherapy sessions, certain injections, and infusions.  Relator also continued to receive complaints from nurses under her supervision who worked at the Center that on a daily basis no physicians were present, nor were they immediately available for many of the infusions and chemotherapy sessions and the injections that could not be self-administered that were being performed on patients.

1    71.    In August of 2011 (from approximately August 8-18, 2011), the pharmacy, in

2  large part due to the persistence of Relator, performed an announced audit of the Center.  During

3  this very limited time period of about ten days, Defendant Marshall briefly stopped the practice

4  of providing patients with chemotherapy, infusions,  and certain injections without the proper

5  physician coverage.  The pharmacy issued "Pharmacy Finding and Recommendations" on or

6  about September 28, 2011, however, and did find that "patients should not be scheduled to

7  receive chemotherapy earlier in the morning because a physician must be onsite" because

8  "[t]here were instances of patients arriving for chemo at 0900, but waited until 1030 to receive it

9  because there was not a physician onsite."

10    72.    Shortly after the completion of the pharmacy's audit, the Center resumed its

11  illegal practices of performing those procedures without having adequate physician coverage

12  instead of making a patient wait for the doctor to arrive.  In fact, one of the infusion nurses at the

13  Center, Vickie Bomar, explained to Relator a conversation she had with Defendant Dr. Soe with

14  respect to physician coverage.  Defendant Dr. Soe stated to Nurse Bomar that "We'll [Dr. Soe

15  and Dr. Tsai] just do what they want until the fire dies down and then return to the way we've

16  always practiced."

17    73.    On or about August 25, 2011, after going to the Center and personally witnessing

18  a Medicare patient receiving an infusion without any physician available, Relator voiced her

19  concerns in an email to Ms. McNeill and courtesy copied Defendants Krejci, Truesdell, and

20  Vance, stating:

21      I am very concerned with the inconsistency of physician oversight when we have patients
22      being treated.  Today is the second time recently I have witnessed Dr. Tsai leave early
23      when he was the only physician on site and we still had patient infusing.  I was told he
24      was going to the bank.  He did not stop thru the infusion room to check nor did he return.
25      We still had one pt who did not finish her infusion until 4:08pm, Dr. Tsai left at 3:39pm.
26
27      . . .  I do not know about the other times nor do I think there is a discrepancy in the
28      regulations.  I was on the understanding there is to be direct or immediate physician

coverage during infusion, then a handoff – 'to another physician' qualified if not
immediately available- not a nurse.

This has been a concern with staff and compliance for some time.  There was a meeting
with the physicians about this with [Defendant Vance] and myself and they both agreed
to their contracted hours of being here onsite during treatment hours.  The staff do their
diligence to complete patients by 5pm, however – the physicians are not necessarily
staying till 5pm or the hours they agreed.

Please advise.

74.     On August 30, 2011, a "Cancer Strategic Planning Meeting" was held at the

Center with Relator and Defendants Vance, Truesdell, and Soe, among others, in attendance.

The lack of physician coverage was discussed.  The meeting minutes note that Relator "stated

that there continues to be issues with physician coverage during patient treatments" and "her

biggest concern was in the afternoon and the physicians leaving while patients are in the middle

of treatment."  Importantly, Defendant Vance admitted "that the physicians interpreted the

regulations as they could leave once treatment has begun."  Another attendee noted that "[t]he

physicians take 3-week vacations" resulting in "chaos" at the Center and "not enough coverage

for Infusion".  The minutes note that Defendant Vance "will review the regulations and follow-

up with the physicians."

75.     On or about August 31, 2011, Ms. McNeil responded to Relator's August 25,

2011 email.  Ms. McNeill "clarify[ied] the regs" and that "non-chemo infusions require direct

supervision by physician, but once the physician deems that it is safe to hand off, this must be

documented in the patient's chart, and then the patient is under 'general supervision." (Emphasis

in original.)  She then specifically noted that physicians, however, cannot just "go home."

76.     On or about September 1, 2011, Relator responded to Ms. McNeill via email

noting that Dr. Tsai "walked out and we saw him drive away" with respect to the prior day.  She

then requested that Ms. McNeill check the regulations because the physicians believe they can

leave the facility without any physician available.  Relator also specifically relayed another

1   instance that she witnessed where Dr. Tsai left the facility to go to the bank without any

2   physician available and a patient who was receiving chemotherapy was left without physician

3   coverage for "over 60 minutes" until the treatment was completed.  Relator, concerned for her

4   staff, also relayed that she was worried that nursing licenses could be in jeopardy.

5      77. That same day, on September 1, 2011, Ms. McNeill responded by email to

6   Relator stating:

7     **Nursing licensing is not in jeopardy, but billing for service is**.  **I've been instructed**
8     **by [Defendant Truesdell] to write a letter to the docs giving them the regs.**  As far as
9     confusion of the hand off, it can be to a nurse but the doc has to be there for initiating,
10    and then documenting when the patient is stabilized for hand off.  **Your example was**
11    **RN initiating non-chemo injections.  Those are not part of the extended services**
12    **where hand off is possible.  That still requires supervision.**

14  (emphasis added.)

16     78. On September 9, 2011, in response to Relator's constant pressure regarding the

17  failure of physician coverage at the Center, a "Memorandum" titled "Physician Supervision of

18  Therapeutic Services" was provided to Defendants Drs. Soe and Tsai from Ms. McNeill with

19  courtesy copies to Defendants Whipple, Truesdell, Krejci, and Vance.  The memorandum begins

20  by stating "Marshall's Executive Leadership has requested that I provide you some regulatory

21  information regarding Medicare's conditions for coverage and payment of therapeutic services

22  provided in the Hematology/Oncology clinic and the corresponding requirement for physician

23  supervision of these services."  It then goes into exhaustive detail for several pages citing and

24  quoting regulations and Medicare guidance explaining that physicians need to be "immediately

25  available" for the procedures occurring at the Center.  The memorandum concludes by stating:

26    As you can see from the sources I have quoted, **supervision of outpatient services is an**
27    **important payment requirement for hospitals**.  **Medicare believes that this is one**
28    **way to ensure it is purchasing a minimum level of safe, quality care for its**
29    **beneficiaries.**

31    I would be happy to meet with you to discuss this matter further should you require
32    further clarification of the regulation.

(emphasis added.)

79.     On or about September 20, 2011, Defendants Soe and Tsai sent a memorandum to Cancer Strategic Planning Committee, including Relator, and courtesy copied Defendants Whipple, Truesdell, and Krejci.  In this memorandum, Defendants Soe and Tsai detail several serious mistakes that occurred at the Center, including "chemotherapy dose errors", "chemotherapy extravasations occurring at an alarming rate", "giving wrong drugs", and setting infusion pumps incorrectly such that patients received chemotherapy in "half [the] time" of physician's orders.  Remarkably, Defendants Soe and Tsai explained that "[n]one of the mistakes were caused by lack of adequate physician coverage" and instead blamed the nurses.  In this memorandum, **Defendants Drs. Soe and Tsai reveal that the lack of physician coverage for these procedures is occurring because their concern is really about the money and not patient safety**, writing:

> We have had discussions about this numerous times in the past 8-10 months; with various people-Colleen Leger, Rick Vance, Shannon Truesdell, Cathy Krejci, at various forums-board meetings, post Root Cause Analysis (RCA) meeting, and now at cancer committee.
>
> Our response has always been the same.  Infusion room has twelve chairs.  If fully staffed and efficiently scheduled it can easily be used to treat three to four patients per chair, totaling 36 to 48 patients a day at current level of physician coverage.  **Our chemotherapy infusion volume is averaging only 6-10 day currently.  So we are utilizing less than one-third of its capacity.  Therefore, our conclusion is that it is not a coverage issue, it is efficiency issue.**
>
> **We hope that this letter will once and for all put a stop on this issue.  We will be open for discussing physician coverage when the infusions clinic starts treating larger numbers of patients in infusions room, i.e. more than 36 patients per day.**
>
> (emphasis added)

80.     At the beginning of October 2011, Nurse Bomar, who was frustrated with the lack of physician coverage, began to keep a calendar of infusions and chemotherapy treatments that she personally witnessed where the physicians were not immediately available.  She kept this

1 | calendar through October, November, and the beginning of December 2011, which she then

2 | provided to Relator.

3 |       81.    On or about October 7, 2011, Gloria McNeill, as a compliance officer, clearly

4 | worried about the Defendant Marshall's wrongful conduct with respect to not having proper

5 | physician coverage at the Center and recognizing the liability Defendant Marshall faced, wrote

6 | an email to Relator and Defendants Vance and Truesdell entitled "recent development".  In the

7 | email, Ms. McNeill wrote **"Hospital Settles False Claims Act Case Re: Physician**

8 | **Supervision.**"  (emphasis in original.)  The email then contained details about a hospital in

9 | Michigan that had settled a False Claims Act case where "chemotherapy had been administered

10 | at an oncology center without appropriate supervising practitioner present."

11 |       82.    During the coming months, up to her termination in December of 2011, Relator

12 | continued to bring complaints and concerns to her supervisors, including Defendants Truesdell

13 | and Vance, about the inadequate physician coverage.  As she continued to complain, Relator's

14 | relationship with Defendants Drs. Soe and Tsai deteriorated rapidly.  As Relator tried to get

15 | Defendants Drs. Soe and Tsai comply with the legal requirements, they began to voice louder

16 | complaints to her superiors about her job performance.

17 |       83.    On or about November 29, 2011, Vickie Bomar, the infusion nurse, sent Relator

18 | an email titled "Dr. turning over chemo infusions to RN."  In this email, Nurse Bomar explained

19 | that on Wednesday, November 21, 2011, Defendant Dr. Soe left a patient treating with

20 | chemotherapy with a nurse and no physician immediately available.  That same day, November

21 | 29, 2011, Relator forwarded the email complaint by Nurse Bomar to Defendants Truesdell and

22 | Vance and to Ms. McNeill.  Relator also wrote:

23 |       It is my understanding that a physician can only 'transfer supervision' to another
24 |       qualified provider - not a nurse.  A physician is to be 'immediately' available during
25 |       treatments - meaning in the building.  A nurse is NOT a qualified provider.
26 |

1    Please advise.

2

3    (emphasis in original.)  That same day, November 29, 2011, Defendant Truesdell, the Chief

4    Operating Officer, responded to Relator and courtesy copied Defendant Vance and Ms. McNeill,

5    writing "That is my understanding also. Gloria, Rick comments?"

6         84.    On or about December 5, 2011, Relator had a routine meeting with Defendant

7    Vance.  She again discussed her and the staff's concerns with doctors illegally leaving the

8    facility while patients were being treated.  She specifically discussed the calendar that had been

9    kept of the physicians' absences by Nurse Bomar.  Defendant Vance became upset and told

10   Relator that she "shouldn't have done that" because it would "make the doctors angry at [her]"

11   and would "destroy [her] relationship with [the physicians]."  He specifically noted that keeping

12   track of physician absences was above both of their "pay grades" and instructed her to follow up

13   with Defendant Truesdell, the COO.

14        85.    On the morning of December 6, 2011, Relator sent a longer email complaint to

15   Defendant Truesdell, per Defendant Vance's instructions, about the illegal absence of physician

16   coverage at the Center and attached a synopsis of the absence of coverage documented on Nurse

17   Bomar's calendar.  Specifically Relator wrote:

18       Physicians oversight is an increasing problem.  As we had discussed it has filtered into
19       how they manage their schedules which in return affects patient care and satisfaction.
20       Per our discussion, below are a number of dates where there was no physician coverage
21       when patients were scheduled.  If the clinic is scheduled to be open for service at 8:30am
22       and the physicians state per their contract they do not have to be there until 9am but don't
23       arrive even much later; how is this providing good patient service?

24

25       [A]ttached is a short breakdown of the 1st physician arrival times on site which is the go
26       ahead that infusion can start to treat pts.  There are a number of pt complaints due to pts
27       having to reschedule or be delayed in getting their treatments because there was no doctor
28       on site. These are not all my observations, however, I have spoken with a number of
29       patients regarding their complaints.  The infusion staff try very hard to keep pts happy
30       while they wait, bring them in so they are more comfortable, explain the doctor is 'still at
31       the hospital seeing pts' but it is frustrating and has caused nursing staff overtime because
32       of treatment length, having all the pts needing to be started at once and not getting the pt
33       started in a timely manner in relation to their scheduled time.

please advise

do you think we need to consider bringing Dr. Rice [Medical Director at Defendant Marshall] in this matter?

86.     Later that same day, December 6, 2011, in the evening and after not getting a response from Defendant Truesdell, Relator followed up with an email to Defendant Truesdell, writing:

Have you discussed patient concerns and data with Drs Soe & Tsai?  I know it's challenging when one MD is on vacation as it only leaves one to manage call, inpatients, clinic, etc.  We may need to look at patient scheduling and staffing differently when one of the MDs is off.

87.     Around this time in early December 2011, Nurses at the Center became increasingly frustrated with the physicians not properly covering procedures and some voiced those concerns to Relator during staff interviews, which were documented on a monthly basis on an internal document called a "staff log" or "staff rounding".  On or about December 1, 2011, Nurse Bomar, when asked "[d]o you have the basic tools and equipment to do your job?", responded, "No" and said "we need the doctors here when we treat patients" and "they need to be here on time and until all patients are done."  Approximately a week later, on or about December 8, 2011, another infusion nurse, Jeannie Tice, when interviewed and asked the same question, said "No" and that the nurses "need the doctors to be here during scheduled treatment" and that patients were getting upset because doctors were not present.

88.     On December 8, 2011, two days after sending the emails and the calendar synopsis to Defendant Truesdell and despite receiving a good performance review from Defendant Vance only a few months earlier, Relator was called into a meeting with Defendants Truesdell and Vance and terminated.  Relator noted in the meeting that she was being terminated for trying to get the physicians to comply with the legal requirements.

89.     On the morning of December 9, 2011, Relator memorialized her frustration to

Defendant Truesdell about being terminated for retaliatory reasons, writing in an email string

titled "Dr. turning over chemo infusions to RN":

> I discussed this with [Defendant Vance] and was told it was above my pay grade and I
> was to go thru you Shannon.
>
> This [lack of physician coverage] was on my topics for discussion yesterday which we
> did not discuss.  I wanted permission and support to build that relationship back up.  I
> was told many times by [Defendant Vance] not to approach them [the physicians]
>
> now I'm bring (sic) let go for it.

(brackets added.)

**_Improper Billing of Single Use Vials of Drugs and Biologicals ("SDVs") at the Hematology_**
**_Oncology Infusion Center in Cameron Park, California_**

90.     In 2011 and as part of her duties, Relator began to review Defendant Marshall's

practices with respect to using and billing the Government Healthcare Programs for SDV drugs

used on patients at the Center.  Relator found a series of what had become routine, illegal billing

practices that violated conditions of payment.  These violations of conditions of payment

occurred first at the El Dorado I facility and then continued upon its merger into Defendant

Marshall in 2007.

91.     For instance, Relator found that the Center was illegally billing more than the

allotted amount of SDV drugs on patients in violation of conditions of payment as stated above.

Relator found that SDVs of drugs were routinely double billed to the Government Healthcare

Programs by rounding up the amount used between two patients.  This resulted in the

Government Healthcare Programs being billed twice, once for each patient at the full amount of

the vial, such that twice the amount of the vial was billed.  She also found that SDVs of drugs

were routinely double billed to the Government Healthcare Programs by billing remaining

1   amounts as "waste" and then billing for a second patient for the remaining amounts that had

2   already been billed to the first patient as "waste."

3          92.     Relator also found unsafe practices that directly threatened the safety of

4   chemotherapy patients.  Relator checked the "redbook," an internal drug log book that recorded

5   the national drug code[3], patient names, and the stock numbers of SDVs dating back to 2003.

6   Most disturbing was that her review of the "redbook" and patient records demonstrated that

7   SDVs of drugs were allowed to expire (go beyond their date and/or time after being used on one

8   patient) and then were used on another patient(s) and billed as if viable instead of being billed as

9   waste.  This meant that not only were the Government Healthcare Programs paying for expired

10  drugs as if they were good but that chemotherapy patients were receiving medicine that was

11  expired and potentially not effective and/or harmful to them.

12         93.     Relator interviewed nurses at Marshall about these billing practices with the

13  SDVs, and the nurses confirmed that they were routinely occurring.

14         94.     In part, because of these illegal billing practices and patient safety issues with

15  respect to SDVs, Relator pushed for the pharmacy to perform an audit of the Center, which

16  occurred in August of 2011.  Both Dr. Robert DiPonti, Director of Pharmacy Services for

17  Marshall Medical Center Pharmacy, and Arthur Gonzalez, Clinical and Ambulatory Care

18  Pharmacist, were involved in the audit of the Center that was announced and pre-arranged and

19  lasted from approximately August 8-18, 2011.  On or about September 28, 2011, the pharmacy

20  management issued a report titled "Pharmacy Finding and Recommendations."  The pharmacy

21  found that the SDVs were being billed illegally and in violation of regulations, constituting a

22  "critical" failure.  With respect to SDVs, the pharmacy specifically wrote in the report:

---

[3] The national drug code ("NDC") is an eleven-digit number that identifies drugs, including their
properties, vendor, and package size.

1  Issue: **CONFUSION WITH SINGLE DOSE VIALS** (SDV) **VS. MULTIPLE DOES**
2  **VIALS (MDV)**. Found single dose vials saved and reused after initial use.  <u>PRIORITY</u>
3  <u>CRITICAL</u>
4
5  .   <u>RECOMMENDATION</u>: Re-educate staff on policy and differences between SDV
6  and MDV use.  This is a regulatory mandate.  This practice must cease.
7
8  (emphasis in original.)
9
10  95.   Throughout 2011, Relator kept checking the "redbook" and patient records and

11  found numerous patients had SDVs improperly billed or patients being given expired drugs that

12  were then illegally billed as viable.

13  96.   Throughout 2011, Relator reported these problems to both her supervisors and

14  members of the pharmacy, as well as to Melanie Hadsell, Director of Physician Clinical Billing.

15  Ms. Hadsell explained to Relator that she was correct that the Center's billing practices with

16  respect to "waste" for SDVs was not consistent with regulatory requirements.  In fact, on or

17  about December 9, 2011, the day after Relator was terminated, Ms. Hadsell, as part of their

18  ongoing dialogue, sent Relator an email detailing how to properly bill SDVs for "waste" under

19  "Medicare guidelines."

20  97.   As of late December 2011, Relator reviewed documents and saw SDVs sitting out

21  past their expiration date that were being used on patients.

22  ***Billing For a Second Physician Office Visit For Blood Transfusions Without Patients Seeing***
23  ***a Physician***
24
25  98.   On or about November 28, 2011, the Marshall Hematology Oncology Infusion

26  Center management had a meeting, which included Defendants Tsai, Soe, and Vance, as well as

27  Melanie Hadsell, Director of Physician Clinic Billing for Defendant Marshall.  During this

28  meeting, it was discussed that Defendants Tsai and Soe, as agents for Defendant Marshall, had

29  been illegally and fraudulently billing the Government Healthcare Programs for a second

30  physician office visit at the hospital when referring patients they had seen in the Center to

1    Defendant Marshall's hospital for blood transfusions.  The blood transfusions were not

2    performed with a physician seeing the patient at all, but were billed as if the patients had seen a

3    physician for a second visit.

4         99.    Specifically discussed at this meeting were situations where Defendants Drs. Soe

5    and Tsai saw patients in the Center prior to the patient's receipt of the blood transfusion

6    treatment at the hospital.  In addition to billing the Government Healthcare Programs for the

7    office visit at the Center, Defendants Drs. Soe and Tsai routinely charged the Government

8    HealthCare Programs for an "E&M" [evaluation and management] office visit for the transfusion

9    despite no physician seeing those patients at the hospital.

10        100.    At the meeting, Ms. Hadsell explained that Defendants Drs. Soe and Tsai

11   frequently used CPT codes 99214 and 99215 when billing Medicare for the blood transfusions

12   and that such actions were wrong as physician visits never occurred.  Dr. Soe responded that

13   even though he did not visit the patient, he was on call and responsible for the patient's care if

14   anything went wrong during the procedure, and that he was not going to remain on call if he was

15   not getting paid for it because "it was not worth it."  Dr. Soe continued to argue with Ms.

16   Hadsell, giving no indication that he intended to stop the practice of illegally billing under CPT

17   codes 99214 and 99215 for the transfusions.  Ms. Hadsell explained that Medicare had to be

18   refunded money but Dr. Soe objected to self-reporting and refunding the money.

19        101.    For both CPT code 99214 and code 99215 a physician must spend some amount

20   of time (approximately 25 minutes and 40 minutes respectively) with a patient as a condition of

21   payment.  As Defendants Drs. Soe and Tsai spent no minutes on those infusions performed, and

22   the procedures did not meet any of the medical necessity requirements of these CPT codes, those

23   charges were fraudulent.

1    102.    To the best of Relator's present knowledge, to date, a refund for this illegally

2    upcoding of CPT codes 99214 and 99215 has not occurred.

3    **SPECIFIC PATIENT EXAMPLES OF DEFENDANT MARSHALL'S ILLEGAL**
4                                        **BILLING**
5
6    *Billing of Patients Without A Physician Immediately Available*

7    103.    On or about the end of July 2011, patient G.R., a Medicare recipient, with medical

8    record #047860 was provided chemotherapy for approximately one and half hours until

9    completion without any physician present at the Center nor anywhere in the vicinity such that a

10   physician was not immediately available for this procedure that was billed to Medicare.

11   104.    On or about August 25, 2011, patient J.M., a Medi-Cal recipient with medical

12   record #246252, was given both chemotherapy and an infusion of Zometa, and Dr. Tsai left the

13   facility before completion, leaving no doctor immediately available for this procedure that was

14   billed to Medi-Cal.

15   105.    On or about December 6, 2011, patient D.B., a Medicare and Tricare recipient

16   with medical record #197481, was initially treated by Defendant Dr. Soe for an infusion but Dr.

17   Soe left the facility leaving no doctor immediately available such that patient D.B. completed his

18   treatment for at least a total of 20 minutes without proper physician supervision of the procedure.

19   This procedure was billed to Medicare and Tricare.

20   *Illegal Billing of SDVs*
21
22   106.    On or about April 5, 12, and 18, 2011, patient E.G., a Medicare recipient with

23   medical record #50004, was provided rituxan[4] as chemotherapy at 560MG.  Defendant Marshall

24   billed Medicare for 560MG for patient E.G. and then billed Medicare for 40MG of "waste" for a

25   total of 600MG billed to Medicare for patient E.G. for each time stated above.  Defendant

_____

[4] Rituxan (Rituximab) is a chemotherapy drug that is supplied in 100mg/10ml and 500mg/50ml single dose vials.  Once opened, it has a shelf life of twenty-four hours before the drug's stability is compromised and it expires.  Rituxan is billed in 100MG increments under code J9310.

1   Marshall then illegally billed a second patient for 40MG of the remaining rituxan on each

2   treatment stated above, that had already been billed as waste for patient E.G., such that for each

3   of the dates above 640MG total between the two patients was billed to Medicare for only

4   600MG.

5       107.    On or about January 5, 2011, February 1, 2011, March 2, 2011, and April 28,

6   2011, patient G.B., a Medicare recipient with medical record #0044127, was provided rituxan as

7   chemotherapy at 690MG.  Defendant Marshall billed Medicare for 690MG for patient G.B. and

8   then billed Medicare for 10MG of "waste" for a total of 700MG billed to Medicare for patient

9   G.B. for each time stated above.  Defendant Marshall then illegally billed a second patient for

10  10MG of the remaining rituxan on each treatment stated above, that had already been billed as

11  "waste" for patient G.B., such that for each of the dates above 710MG total between the two

12  patients was billed to Medicare for only 700MG.

13      108.    On or about March 16, and 23, 2011, and April 6, 2011, patient F.S., a Medicare

14  recipient with medical record #071535, was provided rituxan as chemotherapy at 573MG.

15  Defendant Marshall billed Medicare for 573MG for patient F.S. and then billed Medicare for

16  27MG of "waste" for a total of 600MG billed to Medicare for patient F.S. for each time stated

17  above.  Defendant Marshall then illegally billed a second patient for 27MG of the remaining

18  rituxan, that was already billed for patient F.S. as waste, such that for each of the dates above

19  627MG total between the two patients was billed to Medicare for only 600MG.

20      109.    On or about April 27, 2011, and May 4, 11, and 18, 2011, patient C.R., a

21  Medicare recipient with medical record #146835, was provided rituxan as chemotherapy at

22  710MG.  Defendant Marshall billed Medicare for 710MG for patient C.R. and then billed

23  Medicare for 90MG of "waste" for a total of 800MG billed to Medicare for patient C.R. for each

24  time stated above.  Defendant Marshall then illegally billed a second patient for 90MG of the

1    remaining rituxan, that was already billed for patient C.R. as waste, such that for each of the

2    dates above 890MG total between the two patients was billed to Medicare for only 800MG.

3        110.    On or about February 14, 2011 and March 28, 2011, patient G.R., a Medicare

4    recipient, with medical record #200945, was provided rituxan as chemotherapy at 810MG.

5    Defendant Marshall billed Medicare for 810MG for patient G.R. and then billed Medicare for

6    90MG of "waste" for a total of 900MG billed to Medicare for patient G.R. for each time stated

7    above.  Defendant Marshall then illegally billed a second patient for 90MG of the remaining

8    rituxan, that was already billed for patient G.R., such that for each of the dates above 990MG

9    total between the two patients was billed to Medicare for only 900MG.

10       111.    On or about February 3 and 8, 2011, March 16, 2011, and May 24, 2011, patient

11   L.S., a Medicare recipient, with medical record #187565, was provided rituxan as chemotherapy

12   at 710MG.  Defendant Marshall billed Medicare for 710MG for patient L.S. and then billed

13   Medicare for 90MG of "waste" for a total of 800MG billed to Medicare for patient L.S. for each

14   time stated above.  Defendant Marshall then illegally billed a second patient for 90MG of the

15   remaining rituxan, that had already been billed as "waste" for patient L.S. such that for each of

16   the dates above 890MG total between the two patients was billed to Medicare for only 800MG.

**COUNT I**
**False Claims Act 31 U.S.C. §3729(a)(1)(a)**

20       112.    Relator realleges and incorporates by reference the allegations contained in the

21   foregoing paragraphs of this Complaint.

22       113.    By virtue of the acts described above, Defendants Marshall, Tsai, and Soe

23   knowingly presented or caused to be presented, false or fraudulent claims to the United States

24   Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

**COUNT II**
**False Claims Act 31 U.S.C. §3729(a)(1)(b)**

114.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

115.   By virtue of the acts described above, Defendants Marshall, Tsai, and Soe knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b).

**COUNT III**
**False Claims Act 31 U.S.C. §3729(a)(1)(c)**

116.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

117.   By virtue of the acts described above, all Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(a), (b) in violation of 31 U.S.C. § 3729(a)(1)(c).

**COUNT IV**
California **False Claims Act CAL.** GOV. **CODE § 12651(a)(1)**

118.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

119.   By virtue of the acts described above, Defendants Marshall, Tsai, and Soe knowingly presented or caused to be presented, false or fraudulent claims to the State of California for payment or approval in violation of Cal. Gov. Code § 12651(a)(1)

**COUNT V**
California **False Claims Act CAL.** GOV. **CODE § 12651(a)(2)**

120.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

1      121.    By virtue of the acts described above, Defendants Marshall, Tsai, and Soe

2    knowingly made, used, or caused to be made or used false records and statements, to get the false

3    or fraudulent claims paid or approved by the State of California in violation of Cal. Gov. Code §

4    12651(a)(2).

5                                        **COUNT VI**
6                     California **False Claims Act CAL.** GOV. **CODE § 12651(a)(3)**
7
8      122.    Relator realleges and incorporates by reference the allegations contained in the

9    foregoing paragraphs of this Complaint.

10     123.    By virtue of the acts described above, all Defendants conspired to commit

11   violations of Cal. Gov. Code §§ 12651(a)(1), (2) in violation of Cal. Gov. Code §§ 12651(a)(3).

12                                       **COUNT VII**
13                                     False Claims Act
14                     **WRONGFUL TERMINATION FOR RELATOR**
15                                  (31 U.S.C. § 3730(h))
16
17     124.    Relator realleges and incorporates by reference the allegations contained in the

18   foregoing paragraphs of this Complaint.

19     125.    As set forth in the preceding paragraphs, Defendants knowingly violated 31

20   U.S.C. §§ 3729(a)(1)(a), (b), and (c) and have damaged the United States by their actions in an

21   amount to be determined at trial.

22     126.    Defendant Marshall wrongfully terminated Relator.  Relator was a dependable,

23   hard working, skilled, and committed employee.  Relator received no reprimands, complaints or

24   negative evaluations of her employment performance and received a good performance

25   evaluation only a few months prior to her termination.

26     127.    Defendant Marshall terminated Relator because she actively took steps to stop

27   Defendant Marshall from illegally billing the Government Healthcare Programs in violation of

1   the FCA and to stop the remaining Defendants from assisting Defendant Marshall in its illegal

2   billing schemes, also violations of the FCA.

3       128.    31 U.S.C. § 3730(h) protects any employee whose employment is adversely

4   affected as a result of taking actions to further the FCA.

5       129.    Relator is "entitled to all relief necessary to make the employee whole" including

6   "2 times the amount of back pay, interest on the back pay, and compensation for any special

7   damages sustained as a result of the discrimination, including litigation costs and reasonable

8   attorneys' fees."

9       WHEREFORE, the Relator demands judgment against Defendant Marshall in the sum of

10  Two Million Dollars ($2,000,000.00) including actual and punitive (special) damages, and that

11  the Court award the Relator reasonable attorneys' fees and the costs of this matter, and that the

12  Court award such other and further relief as the cause of justice may require.


13                          **COUNT VIII**
14                   **California False Claims Act**
15              **WRONGFUL TERMINATION FOR RELATOR**
16                 (**CAL.** GOV. **CODE § 12653**)
17

18      130.    Relator realleges and incorporates by reference the allegations contained in the

19  foregoing paragraphs of this Complaint.

20      131.    As set forth in the preceding paragraphs, Defendants knowingly violated Cal.

21  Gov. Code §§ 12651(a)(1), (2) and (3) and have damaged the State of California by their actions

22  in an amount to be determined at trial.

23      132.    Defendant Marshall wrongfully terminated Relator.  Relator was a dependable,

24  hard working, skilled, and committed employee.  Relator received no reprimands, complaints or

25  negative evaluations of her employment performance and received a good performance

26  evaluation only a few months prior to her termination.

1    133.    Defendant Marshall terminated Relator because she actively took steps to stop

2    Defendant Marshall from illegally billing the Government Healthcare Programs, including the

3    State of California's Medi-Cal program, in violation of the CFCA and to stop the remaining

4    Defendants from assisting Defendant Marshall in its illegal billing schemes, also violations of the

5    CFCA.

6    134.    Cal. Gov. Code §§ 12653 protects any employee whose employment is adversely

7    affected as a result of taking actions to further the CFCA.

8    135.    Relator is entitled to "all relief necessary to make [her] whole" including "two

9    times the amount of back pay, interest on the back pay, compensation for any special damage

10   sustained as a result of the discrimination", "punitive damages" , and "litigation costs and

11   reasonable attorneys' fees".

12   WHEREFORE, the Relator demands judgment against Defendant Marshall in the sum of

13   Two Million Dollars ($2,000,000.00) including actual, special, and punitive damages, and that

14   the Court award the Relator reasonable attorneys' fees and the costs of this matter, and that the

15   Court award such other and further relief as the cause of justice may require.

16                                        **COUNT IX**
17                                **WRONGFUL TERMINATION**
18                              **(CAL.** LABOR CODE § **1102.5)**
19
20   136.    Relator realleges and incorporates by reference the allegations contained in the

21   foregoing paragraphs of this Complaint.

22   137.    As set forth in the preceding paragraphs, Defendants knowingly violated both the

23   FCA and the CFCA and have damaged the Government and the State of California by their

24   actions in an amount to be determined at trial.

25   138.    Defendant Marshall wrongfully terminated Relator.  Relator was a dependable,

26   hard working, skilled, and committed employee.  Relator received no reprimands, complaints or

1  negative evaluations of her employment performance and received a good performance

2  evaluation only a few months prior to her termination.

3       139.   Defendant Marshall terminated Relator because she actively took steps to stop

4  Defendant Marshall from illegally billing the Government Healthcare Programs at both the

5  federal and state level in violation of the FCA and the CFCA and to stop the remaining

6  Defendants from assisting Defendant Marshall in its illegal billing schemes, also violations of the

7  FCA and CFCA.  Relator also objected to agents and employees of Defendant Marshall,

8  including herself, participating in Defendants' illegal billing scheme and reported her reasonable

9  suspicions about illegal, non-compliant, and unsafe care and conditions of patients at Defendant

10 Marshall's Hematology Oncology Infusion Center to her supervisors, including Defendants

11 Vance and Truesdell.

12      140.   Cal. Lab. Code §§ 1102.5 protects any employee whose employment is adversely

13 affected "for refusing to participate in an activity that would result in a violation of state or

14 federal statute, or a violation or noncompliance with a state or federal rule or regulation."

15      141.   As detailed above, Relator engaged in a protected activity when she noted her

16 objection to participating in Defendants' illegal billing schemes, tried to get Defendant Marshall

17 to comply with federal and state billing and safety requirements for the Government Healthcare

18 Plans, and when she reported her reasonable suspicions about illegal, non-compliant, and unsafe

19 care and conditions of patients at Defendant Marshall's Hematology Oncology Infusion Center

20 to her supervisors.

21      142.   As a result of Relator's refusal to participate in the illegal billing schemes of

22 Defendants and reporting her reasonable suspicions about illegal, non-compliant, and unsafe care

23 and conditions of patients at Defendant Marshall's Hematology Oncology Infusion Center to her

24 supervisors, Relator was terminated by Defendant Marshall.

1    WHEREFORE, the Relator demands judgment against Defendant Marshall for damages

2  and civil penalty brought against it in the sum of Two Million Dollars ($2,000,000.00) pursuant

3  to Labor Code §1102.5, including statutory penalties and fines as further defined by California

4  Labor Code Section 2699 et seq., actual, special, and punitive damages, including loss of income

5  and future income loss, and that the Court award the Relator reasonable attorneys' fees and the

6  costs of this matter and such other and further relief as the cause of justice may require.


7                                   **COUNT X**
8                          **WRONGFUL TERMINATION**
9                   **(CAL. HEALTH & SAFETY CODE § 1278.5)**
10
11    143.    Relator realleges and incorporates by reference the allegations contained in the

12  foregoing paragraphs of this Complaint.

13    144.    As set forth in the preceding paragraphs, Defendants knowingly violated both the

14  FCA and the CFCA and have damaged the Government and the State of California by their

15  actions in an amount to be determined at trial.  Defendant Marshall also took actions that have

16  caused unsafe care and conditions of patients at Defendant Marshall's Hematology Oncology

17  Infusion Center.

18    145.    At all material times herein, Health & Safety Code § 1278.5 provided protection

19  from discrimination and retaliation for health care workers, like Relator, who reported suspected

20  unsafe care and conditions of patients in health care facilities like Defendant Marshall's

21  Hematology Oncology Infusion Center.

22    146.    As recently as December of 2011, Relator reported her reasonable suspicions

23  about illegal, non-compliant, and unsafe care and conditions of patients at Defendant Marshall's

24  Hematology Oncology Infusion Center to her supervisors, including Defendants Vance and

25  Truesdell, who called Relator into a meeting that same month and terminated her.

1    147.    Defendant Marshall violated Section 1278.5 of the Health and Safety Code by

2   engaging in a continuous and ongoing pattern and practice of discrimination and retaliation

3   against Relator, culminating in her termination because she engaged in whistleblowing activity

4   protected by Section 1278.5 of the Health and Safety Code.

5    148.    Because Relator was terminated during the month when she made reports of

6   unsafe conditions for patients, and certainly within one hundred and twenty days (120) of

7   making such reports, there is a rebuttable presumption that her termination is retaliatory.

8    WHEREFORE, the Relator demands judgment against Defendant Marshall for damages

9   against it in the sum of Two Million Dollars ($2,000,000.00), including lost wages and work

10   benefits caused by the acts of Defendant Marshall pursuant to Section 1278.5(g) of the Health

11   and Safety Code, and that the Court award the Relator reasonable attorneys' fees and the costs of

12   this matter and such other and further relief as the cause of justice may require.

13                                    **PRAYER FOR RELIEF**

14

15    WHEREFORE, Relator prays, on behalf of the United States and herself that, on final

16   trial of this case, judgment be entered in favor the United States, the State of California, and

17   Relator and against Defendants as follows:

18    1.    On the First Cause of Action under the False Claims Act, as amended, for the

19   amount of the United States' damages, multiplied as required by law, and for such civil penalties

20   as are allowed by law;

21    2.    On the Second Cause of Action under the False Claims Act, as amended, for the

22   amount of the United States' damages, multiplied as required by law, and for such civil penalties

23   as are allowed by law;

1       3.      On the Third Cause of Action under the False Claims Act, as amended, for the

2   amount of the United States' damages, multiplied as required by law, and for such civil penalties

3   as are allowed by law;

4       4.      On the Fourth Cause of Action under the California False Claims Act for the

5   amount of the State of California's damages, multiplied as required by law, and for such civil

6   penalties as are allowed by law;

7       5.      On the Fifth Cause of Action under the California False Claims Act for the

8   amount of the State of California's damages, multiplied as required by law, and for such civil

9   penalties as are allowed by law;

10      6.      On the Sixth Cause of Action under the California False Claims Act for the

11  amount of the State of California's damages, multiplied as required by law, and for such civil

12  penalties as are allowed by law;

13      7.      On the Seventh Cause of Action under the False Claims Act, as amended, for the

14  amount of the Relator's damages, including economic damages, as are allowed by law;

15      8.      On the Eighth Cause of Action under the California False Claims Act for the

16  amount of the Relator's damages, including economic damages, as are allowed by law;

17      9.      On the Ninth Cause of Action under the California Labor Code for the amount of

18  the Relator's damages, including economic damages, as are allowed by law;

19      10.     On the Tenth Cause of Action under the California Health and Safety Code for the

20  amount of the Relator's damages, including economic damages, as are allowed by law; and

21      11.     For the costs or this action, prejudgment interest, interest on the judgment and for

22  any other and further relief to which Plaintiffs, the United States and the State of California, and

23  Relator may be justly entitled.

24

Respectfully submitted,

LAW OFFICE OF GEORGE ALLEN


By:     /S/ Brian J. Markovitz
        George F. Allen (Bar No. 145357)
        looga@looga.com
        1903 21st Street
        Sacramento, CA  95811
        916/444-8765
        (916) 444-1983 – (facsimile)



        JOSEPH, GREENWALD & LAAKE, P.A.
        Brian J. Markovitz
        bmarkovitz@jgllaw.com
        *(pro hac vice admission anticipated)*
        Matthew M. Bryant
        mbryant@jgllaw.com
        *(pro hac vice admission anticipated)*
        6404 Ivy Lane, Suite 400
        Greenbelt, MD  20770
        (301) 220-2200
        (301) 220-1214 (facsimile)
        *Attorneys for Relator Herren*

1
2
3                          **DEMAND FOR JURY TRIAL**
4
5         Relator demands a trial by jury on all issues of triable fact in the foregoing Amended

6    Complaint.

7

8                                    /S/ Brian J. Markovitz
9                                    Brian J. Markovitz, Esq.
10
11   DATED: April 5, 2013