1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA AND      No.  2:12-cv-00098-JAM-KJN
    THE STATE OF CALIFORNIA ex
12  rel. COLLEEN HERREN,

13            Plaintiffs/Relator,     **ORDER GRANTING IN PART AND
                                      DENYING IN PART DEFENDANTS'
14       v.                           MOTIONS TO DISMISS**

15  MARSHALL MEDICAL CENTER;
    MARSHALL FOUNDATION FOR
16  COMMUNITY HEALTH; EL DORADO
    HEMATOLOGY & MEDICAL ONCOLOGY
17  II, INC.; LIN H. SOE, M.D.;
    TSUONG TSAI, M.D.,
18
              Defendants.
19

20       Colleen Herren brings this action against the hospital where

21  she worked as a registered nurse and two of the hospital's

22  affiliated physicians alleging that these defendants knowingly

23  double billed Medicare and Medi-Cal, billed for services never

24  rendered, and improperly billed for contaminated and expired

25  chemotherapy drugs.  Defendants now move to dismiss her Second

26  Amended Complaint ("SAC") on the bases that the allegations lack

27

28
                                    1

specificity and that their billing procedures were proper.[1]
Defendants' motions are granted in part and denied in part for
the reasons discussed below.

## I.   FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Ms. Colleen Herren ("Relator") worked as Clinical Nursing
Director for Specialty Clinics at Marshall Medical Center in
Placerville, California ("Defendant Marshall" or "the hospital")
in 2010 and 2011.  SAC ¶ 9.  At that time, Defendant Marshall had
approximately 200 "affiliated physicians," including Drs. Lin Soe
and Tsuong Tsai ("Physician Defendants" or "the physicians").
SAC ¶ 10.  Drs. Soe and Tsai ran Defendant Marshall's
Hematology/Oncology Center ("the Center"), where they and other
staff performed services including chemotherapy infusions.  SAC
¶ 13.

Within her first months on the job, Relator alleges that she
noticed problems with the Center's practices, including lack of
physician oversight, double billing for drugs in single-dose
vials ("SDVs"), allowing SDV drugs to expire and become
contaminated, and billing for physician visits that never
occurred.  See SAC ¶¶ 53, 64, 65.  The SAC details alleged
efforts by Relator and others to bring these concerns to the
attention of the physicians and the hospital administration.  See
SAC ¶¶ 53, 62-63, 65-101.  When the physicians insisted that the
practices would continue, Relator claims she made further
attempts to coerce compliance.  See id.  Relator contends that

---

[1] This motion was determined to be suitable for decision without
oral argument.  E.D. Cal. L.R. 230(g).  The hearing was
scheduled for March 25, 2015.

1   the hospital retaliated against her for these actions by

2   terminating her employment.   SAC ¶¶ 88-89, 133, 139, 145, 153.

3       After her termination, Relator sued the hospital, the

4   Marshall Foundation for Community Health ("Defendant

5   Foundation"), the Physician Defendants, and the physicians'

6   medical practice-- El Dorado Hematology and Medical Oncology

7   ("Defendant El Dorado").   SAC ¶¶ 10-13.   Her SAC (Doc. #39)

8   asserts causes of action for wrongful termination and for

9   violations of the False Claims Act ("FCA") and the California

10  False Claims Act ("CFCA") for retaliation and improperly billing

11  Medicare and Medi-Cal.   Neither the United States nor the state

12  of California has intervened (Docs. ##27, 30).

13      All Defendants have moved to dismiss in two separate motions

14  based on Federal Rules of Civil Procedure 9(b) and 12(b)(6)

15  (Docs. ##54 ("Marshall Mot."), 48 ("El Dorado Mot.")).   Relator

16  opposes both motions (Docs. ##57 ("Opp. to Marshall"), 59 ("Opp.

17  to El Dorado")).

18

19                      II.   OPINION

20      A.   Judicial Notice

21      Each motion and opposition requests judicial notice of

22  numerous documents.   No party contested or objected to any of

23  these documents.

24      Generally, the Court may not consider material beyond the

25  pleadings in ruling on a motion to dismiss.   However, the Court

26  may take judicial notice of matters of public record, provided

27  that they are not subject to reasonable dispute.   Fed. R. Evid.

28  201; see Santa Monica Food Not Bombs v. City of Santa Monica, 450

                                3

1  F.3d 1022, 1025 n.2 (9th Cir. 2006); Lee v. City of Los Angeles,

2  250 F.3d 662, 689 (9th Cir. 2001).

3      The Court takes judicial notice of the parties' exhibits

4  containing official publications as well as those exhibits

5  available on government websites (Marshall Defendants' Exhs. 1-

6  15, Physician and El Dorado Defendants' Exhs. 1-7, Relator's

7  Exhs. 1-4 in Doc. #60 and Exhs. 1-7 in Doc. #58). See Cactus

8  Corner, LLC v. U.S. Dept. of Agriculture, 346 F. Supp. 2d 1075,

9  1097 (E.D. Cal. 2004) (agency publications); Paralyzed Veterans

10  of Am. v. McPherson, 2008 U.S. Dist. LEXIS 69542, at *7 (N.D.

11  Cal. Sept. 9, 2008) (government websites).  The Court also takes

12  judicial notice of the remaining documents: two FDA-approved

13  labels for chemotherapy drugs.  See Relator's RJN (Doc. #58)

14  Exhs. 8-9; Ramirez v. Medtronic Inc., 961 F. Supp. 2d 977, 984

15  (D. Ariz. 2013) (noticing an FDA-approved label); In re Epogen &

16  Aranesp Off-Label Mktg. & Sales Practices Litig., 590 F. Supp. 2d

17  1282, 1286 (C.D. Cal. 2008) (same).

18      B.   Analysis

19          1.   Wrongful Termination Claims Against the Physician
                 and El Dorado Defendants
20

21      The Physician and El Dorado Defendants assert that the Court

22  should dismiss the wrongful termination claims against them

23  (claims VII-X) because there is no allegation that any of these

24  Defendants employed Relator.  El Dorado Mot. at 13.  Relator

25  acknowledges that these claims should be dismissed as to these

26  Defendants.  Opp. to El Dorado at 15 n.12.  Because Relator

27  cannot allege that she was these Defendants' "employee,

28  contractor, or agent," or that they were a "health facility" or

4

"operate[d] a health facility," the Court dismisses causes of action VII through X against the Physician and El Dorado Defendants with prejudice.  See 31 U.S.C. § 3730(h)(1); Cal. Gov't Code § 12653(a); Cal. Labor Code § 1102.5(c); Cal. Health & Safety Code § 1278.5(b)(1)-(2); United States v. Kiewit Pac. Co., 41 F. Supp. 3d 796, 814 (N.D. Cal. 2014).

> ## 2.   Sufficiency of Allegations Under Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) governs allegations of making or conspiring to make false claims in violation of the FCA and CFCA.  Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Kiewit Pac. Co., 41 F. Supp. 3d at 801, 810.  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  For purposes of the pleading a false claim, "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 999-1000 (9th Cir. 2010) (citation and quotation marks omitted).

Rule 8(a) governs wrongful termination claims under the FCA and CFCA.  Mediondo v. Centinela Hosp. Medical Center, 521 F.3d 1097, 1102-03 (9th Cir. 2008).  These claims must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007).

> ### a.   Claims Against Defendant Foundation

The Marshall Defendants argue that the Court should dismiss Defendant Foundation, because the allegations against it do not

1  comply with Rule 9(b).  Marshall Mot. at 2-3.  Relator does not

2  contest the insufficiency of the allegations against the

3  Foundation, but instead requests that the Court dismiss the

4  Foundation without prejudice.  Opp. to Marshall at 4:21-22.

5      Relator's allegations meet neither the 9(b) or 8(a)

6  standard.  The only mention of acts by Defendant Foundation is in

7  paragraph 11 of the SAC, which alleges that the Foundation

8  "partners with" Defendant Marshall and "contract[s] with"

9  Defendant El Dorado.  SAC ¶ 11.  These allegations fall far short

10  of the specificity required by Rule 9(b), in that they do not

11  state any circumstances of Defendant Foundation's involvement in

12  any fraud.  See Bly-Magee, 236 F.3d at 1018 (holding that

13  allegations did not meet 9(b)'s standard where complaint stated

14  that "'[defendant] concealed the fraudulent submission of false

15  claims . . . to avoid repayment of funds to the United States'

16  and . . . conspired with the CDR and the OAG to 'defraud the

17  United States by obtaining payment of fraudulent claims'").  Even

18  when evaluated under the more lenient Rule 8(a) standard, these

19  allegations are too vague to state a claim, because they do not

20  explain the Foundation's role in any wrongful conduct.

21      Because Relator has not complied with the pleading

22  requirements with respect to Defendant Foundation, the

23  allegations against the Foundation are dismissed.  If discovery

24  reveals grounds for holding the Foundation liable in this case,

25  Realtor may move to amend her complaint at the appropriate time.

26          b.   Blood Transfusion Allegations

27      The Physician and El Dorado Defendants next attack the

28  allegations that they billed for physician visits (incident to

6

1  blood transfusions) that never occurred.  Defendants argue that
2  the blood transfusion allegations lack specificity because the
3  SAC "does not . . . allege how [Relator] received the information
4  related regarding [sic] the meeting [described in SAC ¶¶ 99-
5  101]."  El Dorado Mot. at 11:19-20.  Relator responds that the
6  SAC "amply identifies the false claims submitted by Soe and Tsai
7  and the circumstances under which they submitted such claims."
8  Opp. to El Dorado at 12:19-20.

9      Relator's allegations are sufficient under Rule 9(b). This
10  Rule does not require a complaint to explain how the relator knew
11  of each and every fact.  Defendants cite Ninth Circuit authority,
12  stating that allegations "ma[de] on information and belief must
13  state the factual basis for the belief."  El Dorado Mot. at
14  11:20-21 (quoting Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir.
15  1993)).  But "factual basis" does not mean basis of personal
16  knowledge, as Defendants urge.  "Factual basis" means that the
17  complaint must contain facts, rather than general circumstances.
18  See Neubronner, 6 F.3d at 672 ("[Plaintiff] has alleged no more
19  than 'suspicious circumstances'; those circumstances – i.e., that
20  [defendant] was an investment banker for Gibralter and that
21  Gibralter eventually sank into financial trouble – do not
22  constitute a sufficient factual basis for allegations of insider
23  trading.").  In fact, the Neubronner court noted that in some
24  circumstances "plaintiffs can not [sic] be expected to have
25  personal knowledge of the relevant facts."  Id.

26      Relator here has provided sufficient facts to support the
27  transfusion allegations.  In particular, she alleges that Drs.
28  Soe and Tsai billed under CPT codes 99214 and 99215, which

7

require a physician to visit with the patient for approximately 25 and 40 minutes respectively.  SAC ¶ 102.  She alleges that the doctors in fact spent no minutes visiting with patients when they billed under these codes, such that the claims billed were false. Id.  She also alleges that this was not simply an innocent mistake; rather, the doctors were specifically informed that their billing methods using these codes were illegal and the doctors expressed that they would nonetheless continue billing in that illegal manner and would not refund any money.  SAC ¶¶ 99-101.  Because these allegations provide a factual basis for a finding of fraud, the Court denies the motion to dismiss them.

### c.  Physicians' Involvement in SDV Practices

The Physician and El Dorado Defendants further argue that the allegations regarding SDVs are insufficient, because the SAC "makes no allegations that the physician defendants were involved in the billing of SDVs or the decision of how to use SDVs, or that they had knowledge of any alleged regulatory violation."  El Dorado Mot. at 12:10-13; see El Dorado Reply at 5.  In response, Relator points to multiple paragraphs of the SAC implicating the physicians.  Opp. to El Dorado at 14.

Defendants' argument focuses on one portion of the SAC while ignoring other important allegations.  Specifically, Defendants' brief states that there is no allegation that the physicians "were involved in submitting [false claims relating to SDVs] to the government."  El Dorado Mot. at 12:14-15; see El Dorado Reply at 5:19-20 ("Relator has not pled . . . that the Physician Defendants were involved in decisions regarding administration or billing of [SDVs].").  But in fact the SAC contains allegations

8

concerning the physicians' involvement at length: "Defendants

Tsai and Soe . . . illegally double billed or ordered Defendant

Marshall's staff to illegally double bill the Government

Healthcare Programs in violation of conditions of payment for

SDVs"; "Defendants Tsai and Soe . . . illegally billed or ordered

staff to illegally bill the Government Healthcare Programs in

violations [sic] of conditions of payment for SDVs of drugs by

using them on multiple occasions [and] improperly bill[ing]

[contaminated SDVs]"; and "Defendants Tsai and Soe . . .

illegally billed or ordered staff to illegally bill the

Government Healthcare Programs for [SDV] drugs after they

expired[.]"  SAC ¶¶ 58-62.  The SAC then provides further

clarification of why these billing practices were improper and

details instances of particular occasions of improper billing.

See SAC ¶¶ 58-61, 108-117.  These allegations, when read

together, adequately identify the physicians' roles in improper

SDV billing.

     Defendants also contend that the allegations are conclusory

because the SAC does not provide "further explanation of the

[alleged] agency relationship" between the physicians and the

Marshall and El Dorado Defendants.  El Dorado Mot. at 13:10-11

(citing Harris v. Harris, 2012 U.S. Dist. LEXIS 58147 (E.D. Cal.

Apr. 24, 2012)).  As a result, Defendants claim, they do not have

"sufficient notice to determine which allegations apply to [which

Defendants]."  El Dorado Mot. at 13:11-12.

     Harris, held that a "[p]rolix, confusing" complaint did not

give fair notice to each defendant where it named "a laundry list

of defendants" and alleged that "'the defendants' engaged in

1   certain conduct, making no distinction among the[m][.]"  2012

2   U.S. Dist. LEXIS 58147, at *25, *29.  The court noted that it

3   would have been impossible for each defendant to have actually

4   engaged in the alleged acts.  <u>Id.</u> at *27 ("[G]eographic and

5   temporal realities make plain that all defendants could not have

6   participated in every act complained of.") (quoting <u>Magluta v.</u>

7   <u>Samples</u>, 256 F.2d 1282, 1284 (11th Cir. 2001)) (quotation marks

8   omitted).

9        Unlike the <u>Harris</u> complaint, the SAC here provides adequate

10  notice; it makes clear each defendant's role.  Namely, as

11  described above, the SAC explains how the SDV billing happened,

12  who did it and/or directed it, and how the billing practices

13  violated the rules.  And unlike the <u>Harris</u> plaintiff, Relator has

14  sued defendants who each could have played – and allegedly did

15  play – a role in the billing practices.  The allegations provide

16  adequate notice and so Defendants' argument fails.

17            3.   <u>CMS Non-enforcement Instruction</u>

18       The Court now turns to the merits of Defendants' 12(b)(6)

19  arguments.  Both sets of Defendants contend that they could not

20  have violated Medicare's physician supervision requirements

21  because the hospital was exempt as a matter of law.

22  Specifically, Defendants point to guidance from the Centers for

23  Medicare and Medicaid Services ("CMS") that "small rural

24  hospitals" need not comply with supervision requirements.  The

25  parties agree that CMS renewed this directive yearly in the time

26  period relevant to the complaint.

27       But the parties disagree about whether Marshall qualifies

28  as either "small" or "rural."  The parties put forth several

1    different authorities defining these terms.  Defendants first

2    argue that Marshall is rural under 42 U.S.C. section

3    1395ww(d)(8)(E), because that statute recognizes California's

4    designation of the hospital as "rural."  Marshall Mot. at 5; El

5    Dorado Mot. at 5.  Relator argues that California's designation

6    does not automatically apply to the Medicare context and directs

7    the Court to regulations that discuss the term "rural."  See

8    Opp. to El Dorado at 5-6 (citing 42 C.F.R. §§ 412.64(b),

9    419.43(g)(1)).

10       CMS "define[s] 'small rural hospital' for the notice of

11   nonenforcement of direct supervision" as "hospitals with 100 or

12   fewer beds and either geographically located in a rural area or

13   paid under the hospital [Outpatient Prospective Payment System,

14   "OPPS"] with a rural wage index[.]"  76 Fed. Reg. 74122, 74363-

15   64.  This is "the same definition of small rural hospital that

16   Congress recognizes for [Transitional Outpatient Payments,

17   "TOPs"] under section 1833(t)(7) of the [Social Security] Act

18   [codified at 42 U.S.C. § 1395*l*]."  Id.  Section 1395*l* considers

19   a hospital to be "rural" if it is "being treated as being

20   located in a rural area under [42 U.S.C.] section

21   1395ww(d)(8)(E)[.]"  42 U.S.C. § 1395*l*(t)(16)(A).  Section

22   1395ww(d)(8)(E) in turn designates a hospital "rural" if the

23   state so designates it.  42 U.S.C. § 1395ww(d)(8)(E)(ii)(II).

24   But, as Relator points out, to receive this federal designation,

25   the hospital must submit an "application."  42 U.S.C.

26   § 1395ww(d)(8)(E)(i).

27       Defendants here provided a judicially noticed document

28   indicating that California considers Marshall to be rural.  See

Marshall RJN Exh. 1.  Yet they have provided no evidence that they made any application, or that the federal government had otherwise designated Marshall a rural hospital during the relevant period.  As a result the Court denies Defendants' request that it find as a matter of law at this early stage of the proceedings that Marshall was "rural" for Medicare purposes and therefore exempt from the supervision requirements as a "small rural hospital."

The Court need not, and does not, reach the parties' further disagreements about how to count the number of beds, whether the Court could invalidate CMS's non-enforcement guidance, and whether lack of supervision was "material" despite this guidance.

### 4.   Applicability of Direct Supervision Requirements

Defendants next argue that even if Marshall was not exempt as a small rural hospital, they need not have complied with the requirements for various other reasons.  First, the Marshall Defendants argue that the direct supervision requirements do not apply to them because the Center is "an outpatient department" and therefore "is not subject to [42 C.F.R. § 410.26]."  Marshall Mot. at 6:13-14.  Defendants cite no authority for this proposition, but indicate that section 410.27 applies instead.  Defendants also contend that the direct supervision requirements did not become a condition of payment for Medicare until 2010 and that Medi-Cal never required direct supervision.  El Dorado Mot. at 4; Marshall Mot. at 9-10.  Each argument is unpersuasive.

Defendants' first argument fails, even assuming that they

are correct that section 410.27, not 410.26, applies.  Indeed,

section 410.27 also requires "direct supervision" as the default

supervision level.  See 42 C.F.R. § 410.27(a)(1)(iv) ("Medicare

Part B pays for . . . services and supplies . . . if [] [t]hey

are furnished . . . [u]nder [] direct supervision . . . .").

This regulation allows only "[c]ertain therapeutic services and

supplies" to be rendered under a "lower level" of supervision.

42 C.F.R. § 410.27(a)(1)(iv)(B).

Defendants appear to argue that the procedures referenced

in the complaint are among these services permitted under lower

level supervision.  See Marshall Mot. at 6-7.  Defendants rely

on Exhibit 8 of their request for judicial notice, entitled

"Hospital Outpatient Therapeutic Services That Have Been

Evaluated for a Change in Supervision Level."  Defendants point

to numerous procedures listed as "General" or "NSEDTS" in the

column entitled "CMS Decision."  See Marshall Mot. at 7.

Two problems arise from Defendants' reliance on this

document.  First, for the Court to dismiss the SAC pursuant to

Defendants' theory, the Court would have to find that each

procedure referenced in the SAC appears on this list.  It would

further have to determine what level of supervision was actually

achieved for each procedure alleged in the SAC.  But which

procedures were performed at Marshall in the relevant period and

what level of supervision was achieved are factual questions

that cannot be resolved at the motion to dismiss stage.

A second problem is that the "Effective Dates" in the

document are between 2012 and 2014.  The supervision level

during 2012 through 2014 is irrelevant to the SAC's alleged

wrongdoing, which occurred in 2011 and before.  The Court therefore declines Defendants' invitation to adjudicate the direct supervision claims on this basis.

Turning to Defendants' next argument, the Physician and El Dorado Defendants state that any alleged failure to supervise prior to 2010 is not actionable because the direct supervision requirement was "only made a condition of payment in the 2010 [OPPS] Final Rule, which applies only to services furnished on or after January 1, 2010." El Dorado Reply at 4:15-17.  Defendants cite 75 Fed. Reg. 71800, 71999-2000.  However, this Federal Register section in fact states that the 2010 amendments to the regulations only "reiterated" the already existing physician supervision requirements.  Id. at 71999.  Indeed, these supervision requirements have been a condition of payment since 2000.  See id. at 72010 (discussing "payment regulations requiring direct supervision for payment of outpatient services"); 65 Fed. Reg. 18434, 18524 (Apr. 7, 2000) (discussing requirement that outpatient services "must be [rendered] under the direct supervision of a physician" under the heading "Requirements for Payment").  The Court therefore denies Defendants' motion as to any pre-2010 violations of the Medicare supervision requirement alleged in the SAC.

Finally, the Marshall Defendants argue that Medi-Cal did not require direct supervision.  Marshall Mot. at 8-9.  Relator responds that all Medi-Cal providers agree to comply with the Medi-Cal Provider Manuals, which explicitly state that the procedures are only reimbursable if done by a physician or under direct supervision.  Opp. to Marshall at 6.  Defendants' reply

1   does not confront the Provider Manual statements, but instead

2   argues that CMS's non-enforcement directive would preempt any

3   state agency rules.  Marshall Reply at 2-3.

4         Relator is correct that Medi-Cal conditions payment on

5   direct supervision.  The SAC alleges that Defendants were Medi-

6   Cal providers.  SAC ¶¶ 10, 13.  As Medi-Cal providers,

7   Defendants agreed to comply with the Medi-Cal Provider Manuals.

8   Relator's RJN (Doc. #58) Exh. 1 ¶ 23 ("Provider and any billing

9   agent agree that it shall comply with all the requirements set

10  forth in the Welfare and Institutions Code and its implementing

11  regulations, and the Medi-Cal Provider Manuals . . . .").  The

12  Manuals provide in part that chemotherapy infusions, such as

13  those discussed in the complaint, "are reimbursable only when

14  performed by a physician or by a qualified assistant under a

15  physician's <u>direct</u> supervision."  <u>Id.</u> Exh. 2 at 2 (emphasis in

16  original).  Defendants were therefore required to provide direct

17  supervision in order to bill the services to Medi-Cal.

18        The Court does not consider Defendants' argument that the

19  non-enforcement directive preempts the Provider Manual, because,

20  as discussed above, the directive does not apply to Defendants.

21              5.  <u>Knowledge of Falsity</u>

22        Both sets of Defendants argue that the SAC does not plead

23  the requisite scienter for liability under the FCA or CFCA.

24  Marshall Mot. at 11, 14-15; El Dorado Mot. at 8-12.  The

25  Physician and El Dorado Defendants take the more extreme

26  position, arguing that they cannot be liable because they

27  "reasonably believed" that they were acting in compliance with

28  the relevant statutes and regulations.  El Dorado Mot. at 9.

1   Relator counters that the SAC's facts plausibly show that

2   Defendants were at least reckless with regard to the truth of

3   the claims submitted.  Opp. at El Dorado at 10.

4       Relator is correct.  The FCA establishes liability for a

5   person who:

6       (A) knowingly presents, or causes to be presented, a false

7           or fraudulent claim for payment or approval;

8       (B) knowingly makes, uses, or causes to be made or used, a

9           false record or statement material to a false or

10          fraudulent claim; [or]

11      (C) conspires to commit a violation of subparagraph (A) [or]

12          (B) . . . .

13  31 U.S.C. § 3729(a).  The Act defines "knowingly" as having

14  "actual knowledge of the information" or "act[ing] in deliberate

15  ignorance of" or "in reckless disregard for the truth or falsity

16  of the information[.]"  31 U.S.C. § 3729(b)(1)(A).  This scienter

17  element "require[s] no proof of specific intent to defraud[.]"

18  31 U.S.C. § 3729(b)(1)(B).  Rather, "[t]he requisite intent is

19  the knowing presentation of what is known to be false."  Wang v.

20  FMC Corp., 975 F.2d 1412, 1420 (9th Cir. 1992).  An innocent or

21  negligent mistake is not "knowing" conduct.  Id.

22      Defendants rely on Gonzalez v. Planned Parenthood, 759 F.3d

23  1112 (9th Cir. 2014), petition for cert. docketed (Mar. 6, 2015),

24  in support of their theory that the existence of their

25  alternative but "reasonable" interpretation of the guidelines

26  precludes any knowing violation.  See El Dorado Mot. at 9-10.

27  But, as Relator points out, Gonzalez's facts are distinguishable

28  and the holding does not apply here.  In Gonzalez, the defendant

16

1  had openly communicated with the state agency about its billing

2  practices and the agency had never made any indication that those

3  billing practices were illegal.  759 F.3d at 1115.  The agency

4  had even commented that the billing guidelines were "conflicting,

5  unclear, or ambiguous."  Id. at 1116.  These facts, the court

6  concluded, could not support a claim of knowing falsity.  Id.

7       Here, in contrast, neither the SAC nor any judicially

8  noticed facts show that Defendants ever discussed their billing

9  practices with a government agency or received any sort of

10 governmental approval of their actions.  Nor do the allegations

11 indicate that the regulations were at all ambiguous.  To the

12 contrary, the SAC alleges that several people familiar with the

13 Medicare and Medi-Cal guidelines researched the issues and all

14 came to the same, unanimous conclusion: that Defendants'

15 practices violated those guidelines.  See, e.g., SAC ¶¶ 64-65

16 (Relator regarding supervision), 67 (Vice President of Specialty

17 Care Services regarding supervision), 68-69, 75, 77-78, 81

18 ("compliance officer" regarding supervision), 83 (Chief Operating

19 Officer regarding supervision), 92 (Relator regarding SDV use and

20 billing), 95 ( "pharmacy management" regarding SDV use and

21 billing), 97 (Director of Physician Clinical Billing regarding

22 SDV use and billing), 99-101 (Director of Physician Clinical

23 Billing regarding blood transfusion visits).  And the SAC does

24 not show that the physicians engaged in a legitimate difference

25 of interpretation.  Instead, the SAC portrays them as ignoring

26 their colleagues' concerns and summarily dictating that the

27 status quo would continue.  See, e.g., SAC ¶¶ 65 ("Dr. Soe openly

28 and loudly objected to Realtor's comments and the auditor's

findings, arguing that physicians did not need to be present or available and that he and Dr. Tsai had been practicing in that manner for years . . . ."), 72 ("Defendant Dr. Soe stated . . . 'We'll . . . just do what they want until the fire dies down and then return to the way we've always practiced.'"), 79 ("[Drs. Soe and Tsai stated in an email:] 'We will be open for discussing physician coverage when the infusions clinic starts treating larger numbers of patients[.]'"), 101 ("Dr. Soe responded that even though he did not visit the patient, he was on call . . . and that he was not going to remain on call if he was not getting paid for it because 'it was not worth it.'  Dr. Soe . . . [gave] no indication that he intended to stop the practice of illegally billing . . . [and] objected to self-reporting and refunding the money.").  The SAC thus does not show Defendants' reasoned interpretation, but instead their hasty rejection of unambiguous billing rules.

As to the Marshall Defendants' position on scienter, they argue that they were unaware that billing certain codes for blood transfusions without a physician visit was improper. Marshall Mot. at 14-15.  Defendants assert that they only "discover[ed]" that the practice was illegal during a November 2011 meeting, such that any false billing before that time was not "knowing."  Id.  Relator responds that hospital employees knew of the guidelines before the meeting, and that that knowledge should be imputed to the Marshall Defendants.  Opp. to Marshall at 14-15.

Defendants' assertion that they had no way of knowing about the proper billing practices cannot, at this stage of the

18

proceedings, be taken as true. Moreover, "[p]articipants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment." <u>United States v. Mackby</u>, 261 F.3d 821, 828 (9th Cir. 2001) ("[Defendant's] claim that he did not know of the Medicare requirements does not shield him from liability.  By failing to inform himself of those requirements . . . he acted in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question."). Defendants, as participants in Medicare and Medi-Cal, were charged with the knowledge of proper billing practices; the timing of an internal meeting where one of Marshall's employees discussed the billing practices does not change Defendants' responsibilities.

        For these reasons, the Court denies Defendants' motions on the scienter issue.

                6.   <u>SDV Allegations</u>

        The Marshall Defendants' final bases for dismissal are that the SDV billing was proper and that any misuse of the vials was not a condition of payment.  Marshall Mot. at 9-14.  Both these arguments fail.

                a.   <u>Propriety of Defendants' SDV Billing Practices</u>

        Defendants argue that the allegations do not show double billing of "waste," but rather "rounding up" in compliance with Medicare guidelines.  Marshall Mot. at 9-10.  This billing was proper, according to Defendants, because they "made no representation . . . that any drug was wasted or discarded when

1   [Defendants] allegedly billed for the [] units administered [and]

2   rounded up" and then used the remaining drug in the vial on

3   another patient.  Marshall Mot. at 10:22-23.

4        Defendants' argument is unpersuasive, because the Court must

5   take as true the allegations that Defendants billed non-discarded

6   drugs "as 'waste.'"  See SAC ¶¶ 29, 58, 108-113.  The Court must

7   also accept the allegations that instead of discarding expired

8   portions of SDVs as waste (and billing them as such), Defendants

9   pooled these portions and billed them to other patients.  See SAC

10  ¶¶ 59-60, 114-116.

11       Both of these practices are contrary to CMS guidance.  CMS

12  specifies that in addition to billing the amount of a drug

13  administered to a patient, "[a] modifier, billed on a separate

14  line, will provide payment for the amount of discarded drug or

15  biological.  . . .  Th[is] JW modifier is only applied to the

16  amount of the drug or biological that is discarded."  CMS

17  Transmittal 1962, "Discarded Drugs and Biologicals Update" (Apr.

18  30, 2010), available at http://www.cms.gov/Regulations-and-

19  Guidance/Guidance/Transmittals/downloads/R1962cp.pdf.  Medicare

20  pays for drugs billed with this modifier only if the amount is

21  "actually [] discarded and [] not [] used for another patient

22  . . . ."  Marshall RJN Exh. 9 at 4.

23       Similarly, a provider may only bill an expired or otherwise

24  unusable portion of an SDV as waste; the provider may not bill it

25  to another patient.  Id. at 3-4.  Whether Defendants in fact used

26  the JW modifier for waste and whether the drugs were in fact

27  expired or unusable cannot be resolved on this motion to dismiss.

28  These arguments for dismissal therefore fail.

1    Given that Relator's allegations demonstrate improper

2    billing, the Court does not reach her further argument that even

3    if Defendants rounded up instead of billing as waste, their

4    conduct would still violate the regulations.  See Opp. to

5    Marshall at 8-9.

6               b.   Safety of Drugs As Condition of Payment

7    The Court turns next to the issue of whether use of pooled,

8    expired, and contaminated drugs contravened any condition of

9    payment.  Defendants argue that Relator has not stated a claim

10   because the statutes and regulatory provisions they allegedly

11   violated by mishandling SDVs were not conditions of payment under

12   Medicare or Medi-Cal.  Marshall Mot. at 11-14; Marshall Reply at

13   3-5 (citing United States ex rel. Hopper v. Anton, 91 F.3d 1261

14   (9th Cir. 1996), Ebeid ex rel. United States, 616 F.3d 993, and

15   several out-of-circuit cases).  Defendants' briefs point to

16   several paragraphs of the SAC that cite FDA and CDC regulations.

17   See id.

18   Defendants are correct that an FCA claim can stand only

19   where a defendant made the false statement about a condition of

20   payment.  Ebeid ex rel. United States, 616 F.3d at 996-98

21   (distinguishing conditions of payment from conditions of program

22   participation).  But Defendants' argument nonetheless fails

23   because Relator bases her claims on 42 U.S.C. sections 1395n,

24   1395y(a)(1)(A), and 22 C.C.R section 51305.  See SAC ¶¶ 20, 45.

25   Each of these sections describes conditions of payment.  See 42

26   U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A

27   or part B of this subchapter for any expenses incurred for items

28   or services . . . [unless conditions listed are met]."); 42

21

1  U.S.C. § 1395n(a) ("[P]ayment for services described in section

2  1395k(a)(2) of this title furnished an individual may be made

3  . . . only if [conditions listed are met]."); 22 C.C.R.

4  § 51305(a) ("Outpatient physician services are covered if

5  [conditions listed are met]."); see Ebeid ex rel. United States,

6  616 F.3d at 996-98 (explaining that claims for payment that

7  failed to comply with such statutes are actionable under the FCA

8  as an "implied false certification" theory).  That the SAC

9  discusses other agency guidance beyond these statutes and

10  regulations does not invalidate Relator's claims.

11      Defendants further argue that even if Relator bases her

12  claims on statutes setting out conditions of payment, mishandling

13  SDV drugs did not violate any of the enumerated conditions.

14  Marshall Mot. at 12 n.9; Marshall Reply at 3-5.  Relator asserts

15  that the contamination and misuse of SDVs violated the condition

16  that a drug be "reasonable and necessary."  Opp. to Marshall at

17  9-12.

18      Relator is correct.  Section 1395y of Title 42 provides that

19  a drug must be "reasonable and necessary" to be covered by

20  Medicare.  See 42 U.S.C. § 1395y(a)(1)(A).  Medi-Cal uses similar

21  language, requiring any covered drugs to be "medically

22  necessary."  22 C.C.R. § 51305(a).  CMS defines the term

23  "reasonable and necessary" to include a requirement that the drug

24  be "safe and effective."  Medicare Benefit Policy Manual Ch. 15

25  § 50.4.1; 54 Fed. Reg. 37239, 37240.  A drug is not "reasonable

26  and necessary for the individual patient" if its method of

27  administration falls below the established medical standard.  See

28  Medicare Benefit Policy Manual Ch. 15 § 50.4.3 (providing

1  "examples of situations in which medications would not be

2  reasonable and necessary according to accepted standards of

3  medical practice[,]" including when a medication is "given by

4  injection . . . [but] administration . . . by mouth [] is

5  effective and is an accepted or preferred method of

6  administration"); accord Friedrich v. Sec'y of Health & Human

7  Servs., 894 F.2d 829, 831 (6th Cir. 1990) (stating the agency's

8  position that the "reasonable and necessary" standard is

9  concerned with "the method of dealing with FDA-approved drugs")

10 (emphasis in original); cf. United States ex rel. Hopper, 91 F.3d

11 at 1266 ("FCA actions have [] been sustained under theories of

12 supplying substandard products or services.") (citing United

13 States v. Aerodex, Inc., 469 F.2d 1003 (5th Cir. 1972)); United

14 States ex rel. Ruhe v. Masimo Corp., 929 F. Supp. 2d 1033, 1036

15 (C.D. Cal. 2012) ("Requesting payment for defective or goods of

16 lesser quality can constitute a cognizable FCA claim.").

17     Relator alleges that expired drugs were mixed with viable

18 drugs, such that the resulting "cocktail" was contaminated and

19 thus "improperly billed[.]"  SAC ¶¶ 60, 114-116.  Contamination

20 and expiration allegedly rendered the drugs unsafe.  See SAC

21 ¶¶ 33, 53, 59, 60, 93, 95; Relator's RJN (Doc. #58) Exh. 9 at 4

22 (describing FDA-approved method for administering avastin,

23 including the direction to "[d]iscard any unused portion left in

24 a vial, as the product contains no preservatives").  An unsafe

25 procedure is not reasonable and necessary.  Cf. United States ex

26 rel. Ruhe, 929 F. Supp. 2d at 1037 ("The use of a 'dangerously

27 inaccurate' test would not be a reasonable and necessary

28 procedure . . . .").  The Court therefore concludes that

1  Defendants' alleged administration of unsafe drugs violated

2  sections 42 U.S.C. section 1395y(a)(1)(A) and 22 C.C.R. section

3  51305(a).

4      Defendants cite numerous other cases, none of which controls

5  or directly addresses reasonableness and necessity in these

6  circumstances.  Defendants first cite Mikes, 274 F.3d at 698, for

7  the proposition that "medical necessity relates to the level of

8  care indicated and 'does not impart a qualitative element

9  mandating a particular standard of medical care.'"  Marshall Mot.

10  at 12 n.9.  In Mikes, the Second Circuit held that failure to

11  comply with a regulation mandating frequent calibration of an

12  instrument for measuring force of exhalation did not implicate

13  the medical necessity of that pulmonary test for Medicare

14  purposes.  274 F.3d at 698.  The Mikes plaintiff did not argue

15  that the calibration problem rendered the test dangerous in any

16  way and the court noted that its holding may be different if the

17  procedure was unsafe.  See id. ("[T]he requisite level of medical

18  necessity may not be met where . . . a particular procedure was

19  deleterious or performed solely for profit, or where a party

20  seeks reimbursement for a procedure that is not traditionally

21  covered[.]") (citations omitted).

22      Here, unlike Mikes, Relator alleges that Defendants'

23  practices rendered the drugs actively harmful to the patients.

24  Mikes holding is therefore inapplicable to this case, and that

25  court's dicta in fact supports Relator's theory that an unsafe

26  procedure is not medically necessary.

27      Defendants cite two further cases, both of which are

28  distinguishable.  In particular, the relators in both cases

24

1   alleged that a defendant (a pharmaceutical producer and a

2   pharmaceutical repackager, respectfully) violated FDA regulatory

3   requirements governing production and packaging of drugs.  See

4   United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694,

5   697 (4th Cir. 2014); United States ex rel. Campie v. Gilead

6   Sciences, Inc., 2015 WL 106255, at *1–*2 (N.D. Cal. Jan. 7,

7   2015).  Both courts dismissed the claims because compliance with

8   FDA regulations is not a condition of payment under Medicare.

9   See United States ex rel. Rostholder, 745 F.3d at 702; United

10  States ex rel. Campie, 2015 WL 106255, at *8.  But here, as

11  discussed above, Relator's claims adequately state a condition of

12  payment under 42 U.S.C. section 1395y(a)(1)(A) and 22 C.C.R.

13  section 51305(a).  These cases are therefore inapplicable.

14       Because the SAC sufficiently states a claim for implied

15  false certification, the Court does not consider whether the same

16  allegations state a claim for worthless services.

17                       III.   ORDER

18       For the reasons set forth above, the Court dismisses

19  Defendant Foundation without prejudice and dismisses claims VII

20  through X against the Physician and El Dorado Defendants with

21  prejudice.  The Court DENIES both motions on all other grounds.

22  Defendants' answers to the SAC are due within twenty (20) days

23  from the date of this Order.

24       IT IS SO ORDERED.

25  Dated: May 11, 2015

26

27                                   _____
                                     JOHN A. MENDEZ,
                                     UNITED STATES DISTRICT JUDGE
28