**WATERS KRAUS & PAUL**
MICHAEL L. ARMITAGE (No. 152740)
LOUISA O. KIRAKOSIAN (No. 271983)
222 N. Sepulveda Blvd.
Suite 1900
El Segundo, California 90245
Tel. 310-414-8146
Fax. 310-414-8156

**WATERS & KRAUS, LLP**
LOREN JACOBSON *pro hac vice*
3219 McKinney Ave.
Dallas, Texas 75204
Tel. 214-357-6244
Fax. 214-871-2263

Attorneys for Relator Herren

**JOSEPH, GREENWALD & LAAKE, P.A.**
Brian J Markovitz, *pro hac vice*
Matthew M. Bryant, *pro hac vice*
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, AND THE STATE OF CALIFORNIA ex  rel. COLLEEN HERREN, <br><br> Plaintiffs/Relator, <br><br> v. <br><br> MARSHALL MEDICAL CENTER, DR. LIN H. SOE, DR. TSUONG TSAI, MARSHALL FOUNDATION FOR COMMUNITY HEALTH, and EL DORADO HEMATOLOGY & MEDICAL ONCOLOGY II, INC., <br><br> Defendants. | CASE NO. 2:12-CV-0098 JAM-KJN <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO AMEND** |

## I.   INTRODUCTION

Relator, Colleen Herren, seeks leave of this Court, pursuant to Federal Rules of Civil Procedure 15 and 16[1], to amend her complaint for three reasons: First, to add clarifying factual allegations that properly reflect the full scope of her claims under the False Claims Act, ("FCA"); Second, to include newly-discovered factual allegations ascertained from Defendants recently produced discovery; and

---

[1]    The Court's June 25, 2015 Scheduling Order states that, consistent with FRCP 16, good cause be shown for leave of the Court to amend pleadings.  (ECF No. 72)

Third, to include factual allegations that will permit her to seek a subsequent order from this Court that discovery in this matter—especially in regards to her allegations concerning Defendants' failure to meet off campus provider based supervision requirements—should extend well beyond the duration of her employment at Defendant Marshall Medical Center, ("Marshall") up to the present.  Relator's supplemental factual allegations, contained herein, arise from the same nucleus of operative facts as her previous complaints, and do not change the substance of her claims nor add new ones.

Importantly, newly discovered information from Defendant Marshall's document production, in combination with Medicare claims data recently received from the fiscal intermediary in late February 2016, reveals details of additional violations of the FCA pursuant to the same fraudulent course of conduct alleged in earlier complaints.  Specifically, the document production contains, *inter alia*, patients' files demonstrating ongoing, illegal, and fraudulent conduct, which extends well into October of 2015, in violation of 42 C.F.R. Subpart 411, requiring that Defendants follow the billing requirements produced by the fiscal intermediary and sufficient to meet Medicare documentation requirements for proper billing.  *See e.g.* Second Amended Complaint ("SAC") ¶¶ 22, 23–25, 55, 64, 68, 73–78, 104–106.

Although the SAC, pleads factual allegations sufficient to support Relator's claims, she nevertheless seeks leave to amend out of an abundance of caution to establish, beyond any doubt, that her SAC sufficiently pleads these claims well beyond the term of her employment at Marshall.  In this respect, the SAC would benefit from additional factual allegations contained in the proposed Third Amended Complaint ("TAC"), which accompanies this Motion as Exhibit "A".

Defendants have been on notice of the allegations contained in Relator's proposed TAC since approximately 2013 after being approached by the Government during its investigations and provided with an earlier, redacted version of her original complaint in 2014 specifically listing 42 C.F.R. Subpart 411 as being violated.  *See e.g.*, FAC at ¶¶ 24–25; *see also e.g.*, SAC at ¶¶ 22; 62 (quoting internal memorandum regarding patient documentation errors and improper charting of patient care and services); ¶¶ 78-79 (compliance officer providing guidance to physicians to follow Medicare guidance, including "conditions for coverage and payment of therapeutic services provided" related to physician supervision, and physicians refusal to do so).

Yet, despite such notice, Defendants' recent document production contains patient files with records dated through October of 2015, which demonstrate therein, that Defendants are *still* violating the government's healthcare payor programs' conditions of payment.  In this respect, Relator believes that she has ample evidence to demonstrate that Defendants' willful misconduct did not terminate following the conclusion of her employment at Defendant Marshall, but, rather, remains ongoing through present, including violations of 42 C.F.R. Subpart 411.  For these reasons, Relator respectfully requests that the Court grant her motion for leave to amend.

## II.   RELEVANT FACTUAL BACKGROUND

### A. Amendment of Relator's Original Complaint and the SAC's Allegations

Relator originally initiated this action in January 2012 following her termination from employment as the Clinical Nursing Director for Specialty Clinics at Defendant Marshall Medical Center for having complained internally about problematic conduct and fraudulent billing by Defendant Marshall, Defendant El Dorado Hematology & Medical Oncology II, Inc. ("El Dorado"), and Defendant physicians Drs. Lin Soe and Tsuong Tsai.

On December 12, 2014, Relator filed a motion with this Court for leave to file a Second Amended Complaint, which was granted.  The purpose of the motion and the SAC was to (1) add a new Defendant that was believed to have an ownership stake in Defendant Marshall, (2) dismiss certain individual defendants, and (3) correct what counsel for Defendant Marshall had stated were factual inaccuracies in the complaint, claiming that Relator's counsel was potentially violating FRCP 11.[2] (ECF No. 37).  In this respect, Relator has not, to date, made any significant, factual changes of a substantive nature to her original complaint.

---

[2]     When drafting her original Complaint, Relator relied upon the dates included in several internal documents created by Defendants.  In October and November of 2014, prior to filing the SAC, Counsel for Defendant Marshall communicated to undersigned in a series of email messages that the dates for two of the numerical allegations in the complaint were inaccurate because Defendants' internal documents were incorrectly dated.  Unfortunately, over that series of emails, Counsel for Marshall's chosen methodology to communicate what it alleged were temporal, factual errors caused by its own client and the Defendant physicians was to raise the spectre that Relator's counsel could be subject to FRCP 11 sanctions.  Despite the fact that Defendant Marshall's counsel's FRCP 11 claims were completely baseless, Relator's counsel, in an attempt to avoid having the Court rule on an expected and protracted FRCP 11 sanctions battle (and to conserve the parties' and the Court's resources), sought a middle ground and amended her original complaint.  *Compare* FAC at ¶ 62 (noting a memo was "*written* in May of 2010") (emphasis added) *and id.* at ¶ 63 (noting a memo was "*written* in July 2011") *with* SAC at ¶ 62 (noting a memo was "*dated* May of 2010") (emphasis added) *and id.* at ¶ 63 (noting a memo was "*dated* in July 2011") (emphasis added).

Therein, the SAC alleges that Defendant Marshall's Oncology/Hematology Center, an off-campus facility, and its physician agents, fraudulently billed government payors for chemotherapy, infusion services, and injections, procedures requiring physician "direct supervision," that were provided under circumstances where the physicians were not immediately available to furnish assistance and direction throughout the performance of the procedure, which was required as a condition of payment. *See e.g.* SAC ¶¶ 23–25, 55, 64, 76, 104–106.  The SAC also demonstrates that Defendant Marshall and Defendant physicians Drs. Soe and Tsai were made aware that this failure to provide the requisite level of supervision was prohibited by Medicare's payment requirements during Relator's tenure in 2010-11, if not earlier.  But Defendants either willfully ignored and disregarded or pursued a course of intentional blind indifference to Medicare's billing requirements for services, which required the supervising physicians to be immediately available to render assistance for the government to reimburse any claims made for these services for off campus facilities like Defendant Marshall.  *See e.g.* SAC ¶¶ 65, 67–69, 72–75, 77–80.

The SAC also alleges that Defendant Marshall, and its physician agents, illegally billed government payors when the nurses at the Center impermissibly reused portions of drugs from single-dose vials, ("SDVs").  The SAC alleges that SDVs of drugs were routinely double billed to government healthcare program payors by Defendant Marshall when it would use drugs previously billed as "waste" and re-administer the "wasted" drug into its patients and subsequently bill the government for the drug as if it was administered from a separate SDV.  This resulted in the Government being billed twice, once for each patient at the full amount of the SDV such that twice the amount of the vial was billed.  *See e.g.* SAC ¶¶ 91, 108–113.  The SAC also alleges that Defendant Marshall would mix left over drugs from expired SDVs with drugs from non-expired SDVs and then administer this "cocktail" to its patients, permitting Defendants to use expired drugs unfit for patient use and bill government payors for adulterated and contaminated drugs.  *See e.g.* SAC ¶¶ 93–98, 114-116.  Finally, the SAC alleges that Defendants impermissibly billed government healthcare program payors for physician visits when patients received blood transfusions at the hospital.  *See e.g.,* SAC ¶¶ 99 – 103.

//

//

**B. Defendants' Temporal Scope Discovery Objections**

In her initial requests to Defendants, Relator sought discovery on the factual allegations contained in her SAC from January 1, 2008, through present.  Relator filed supplementary discovery requests to access additional details of the fraudulent conduct that Defendants participated in from January 1, 2008 to the present.  But despite having previously provided discovery through October of 2015, Defendants objected to Relator's second set of discovery requests as temporally improper, stating that Relator had not alleged continuing violations of the FCA after December of 2011, essentially the end of her employ. In an effort to resolve the discovery dispute, the parties jointly consented to a hearing with letter briefing before Magistrate Judge Newman to determine the appropriate temporal scope of discovery.  (ECF Nos. 81-82).

Relator was unaware that Defendants were taking the position the complaint was not properly pled past her time of employment until very recently because Defendants answered her initial interrogatories and requests for production of documents, which were sent in July 2015, up through the October of 2015.  But, in late January 2016, Defendants did a turnabout, answering Relator's second set of discovery only until her termination, resulting in the aforementioned telephonic conference before Judge Newman.  (ECF Nos. 81-83).

At the telephonic hearing on March 2, 2016, Defendants argued to Magistrate Judge Newman that the use of the past tense in the complaint equates to the complaint only being properly pled through Relator's termination in December of 2011. Judge Newman ordered that Defendants produce discovery responsive to Relator's second set of requests from the period beginning on January 1, 2008 to March 1, 2012.  (ECF No. 83).  The order was entered without prejudice to a future request to expand the scope of discovery beyond March 1, 2012, made either (1) after Relator had been granted leave to amend her SAC and sufficiently alleged factual allegations showing that Defendants' alleged wrongful conduct continued to occur beyond March 1, 2012; or (2) upon a sufficient showing by Relator that the SAC's allegations demonstrate that the alleged wrongful conduct occurred beyond March 1, 2012.  *Id.*

Presently, all parties are engaged in intense discovery into the factual allegations contained in the SAC.  Defendant Marshall has explained that it is reviewing over 300,000 documents responsive to Relators second set of requests, of which it had only produced twenty-nine (29) documents until March

8, 2015.  Subsequently, Defendant Marshall made an additional production of documents on March 8, 2015 and indicated through counsel that it will produce more responsive documents within 10-15 business days thereafter, meaning that document production discovery is still ongoing.  On March 16, 2016, Relator requested additional patient files consistent with her first request for production of documents for review.  Importantly, the deadline for the parties' experts' reports is fast approaching for May 23, 2016.  (ECF No. 92)

However, recently during discovery, Defendants disclosed to Relator documents which confirm that some of the fraudulent conduct alleged in the SAC, specifically as it relates to Relator's allegations concerning Defendants' failure to meet off campus provider based supervision requirements, continued through at least October of 2015.

Because of the Court's suggested option and Defendants' recent discovery production, Relator seeks leave to amend her SAC. Relator is amending the complaint to change the tenses of certain words to avoid any protracted motion practice on this issue and to clarify that Defendants' violations of the FCA have continued through present.  These changes are throughout the TAC.

### C. Defendants' Recent Document Productions Demonstrate A Failure to Meet Off-Campus Provider-Based- Supervision Requirement Constituting FCA Violations Through At Least October of 2015

In late February of 2016, the fiscal intermediary for Medicare produced the Medicare claims data submitted by and reimbursed to Defendants.  Relator finally had an opportunity to compare the claims data submitted by Defendants against  Defendant Marshall's  patient files, which had been produced between December 2016and January 2016.  These documents were reviewed by Relator's medical billing expert to determine whether Defendants (1) properly submitted claims for reimbursement for off campus provider based supervision requirement services, which required direct physician supervision, and (2) maintained adequate documentation to justify their claims submissions, including those consistent with 42 C.F.R. Subpart 411 requirements, in accordance with the requirements of Medicare and their Medicare fiscal intermediary, Noridian, from January 1, 2008 through present.  *Cf.* SAC at ¶ 22 (noting that 42 C.F.R. Subpart 411 requirements were not being met); *see generally id.* (noting that defendants were not following direct supervision requirements).

//

1   Review of these documents demonstrates that Defendants continued, years past Relator's tenure,

2   to violate 42 C.F.R. § 411.406(e), which requires that claims submitted and patient records be kept

3   consistent with the requirements and guidance of Medicare and the provider's fiscal intermediary.  In

4   this respect, Relator's expert's review of recently produced medical records demonstrates that

5   Defendant physicians have failed to comply until *at least October of 2015* with Medicare and

6   Noridian's requirements for reimbursing services for off campus facilities like Defendant Marshall

7   where physician's must make themselves immediately available.  This failure to follow clear guidance

8   from the fiscal intermediary and Medicare on these claims is, in and of itself, an FCA violation,

9   demonstrating that FCA violations continued on these claims at least to October of 2015.[3]

## III.   STANDARD OF REVIEW

11   "Once the district court ha[s] filed a pretrial scheduling order pursuant to Federal Rule of Civil

12   Procedure 16[,] which establishe[s] a timetable for amending pleadings[,] that rule's standards

13   control[.]"  *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607–08 (9th Cir.1992).  "Rule 16(b)'s

14   'good cause' standard primarily considers the diligence of the party seeking amendment."  *Id.* at 609.

15   "Although the existence or degree of prejudice to the party opposing the modification might supply

16   additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for

17   seeking modification."  *Id.*  In this regard, the district court may modify the pretrial schedule "if it

18   cannot reasonably be met despite the diligence of the party seeking the extension."  *Id.*; *id.* at 608

19   ("'good cause' means scheduling deadlines cannot be met despite party's diligence") (citing 6A Wright,

20   Miller & Kane, *Federal Practice and Procedure* § 1522.1 at 231 (2d ed. 1990)).

21   If good cause is found, the court must then evaluate the request to amend the complaint in light

22   of Rule 15(a)'s liberal standard.  *Johnson*, 975 F.2d at 608.  Courts commonly consider four factors

23   when deciding whether to grant a motion for leave to amend a complaint under FRCP 15(a): bad faith,

24   undue delay, prejudice, and futility of amendment.  *Roth v. Marquez,* 942 F.2d 617, 628 (9th Cir. 1991).

25   [3]   *See e.g. U.S. v. Bourseau*, 2006 WL 2961105 at *10 (S.D. Cal. Sept. 29, 2006) (explaining that "legal obligations of

26   participating providers [includes] . . . know[ing] the information contained in HHS-CMS and fiscal intermediary notices, including manual issuances, bulletins, and other written guides and directives") (quoting 42 C.F.R. § 411.406), *aff'd*, 531

27   F.3d 1159 (9th Cir. 2008), *cert. denied* 555 U.S. 1212 (2009); *Bourseau*, 2006 WL 2961105 at *13 ("a provider that fails to inform itself of the reimbursement requirements acts in reckless disregard of the truth of its claims" under the FCA); *U.S. v.*

28   *Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) ("Participants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment" and failing to do so constitutes "reckless disregard or deliberate indifference").

MEMORANDUM OF POINTS AND AUTHORITIES ISO FOR LEAVE TO AMEND

But, as this Court has explained several times, "[b]ecause Rule 16(b)'s 'good cause' inquiry essentially incorporates the first three factors, if a court finds that good cause exists, it should then deny a motion for leave to amend only if such amendment would be futile." *E.g Baisa v. Indymac Fed. Reserve,* 2010 WL 2348736 at *1 (E.D. Cal. June 7 2010);  *see e.g. McNamee v. Roman Catholic Diocese of Sacramento*, 2013 WL 5739098 at *2 (E.D.Cal. 2013);  *J & J Sports Productions, Inc. v. Maravilla*, 2013 WL 4780764 at *1 (E.D.Cal. 2013).

"Finally, if the trial court determines that refusal to allow a modification of the pretrial order could result in injustice, while allowing the modification would cause no substantial injury to the opponent and no more than a slight inconvenience to the court, modification is appropriate." *Opthalmic Imaging Systems v. Fukuhara*, 2006 WL 229793 at *3 (E.D. Cal. Jan. 26, 2006) (*citing United States v. First Nat. Bank of Circle,* 652 F.2d 882 (9th Cir.1981)).

## IV.   ARGUMENT

### A. Relator Meets FRCP 16's Good Cause Standard to Modify the Court's Scheduling Order to Permit Her to Amend the SAC

The simple fact is that Defendants have been in possession of most of the information (such as patient medical records), set forth in Relator's proposed TAC.  Importantly, portions of this information, such as patient medical records demonstrating FCA violations relating to proper physician supervision *did not even exist until almost four months after the scheduling order was issued* on June 25, 2015 (ECF No. 72) because some patients (whose medical records were produced to Relator) had not had their off-campus visits/services provided until October of 2015.  In this respect, it was *temporally impossible*, at the time the scheduling order was issued, for Relator to have alleged these factual allegations in support of her already existing improper physician supervision, FCA claims in the SAC.  This alone is sufficient to grant the requested relief sought by Relator as good cause and would be *sufficient to add new claims*, let alone support for the already existing ones sought here.  *See* Wright & Miller Modifying Scheduling Orders, 6A Fed. Prac. & Proc. Civ. § 1522.2 (3d ed.) ("In general, if the party seeking relief can show that the deadlines cannot reasonably be met despite the party's diligence, relief may be given. . . . Applying these principles, courts have allowed scheduling orders to be amended so as to permit amended pleadings alleging *new* claims") (emphasis added); *e.g. Kuschner v. Nationwide Credit, Inc.,*

256 F.R.D. 684, 687 (E.D. Cal. 2009):

> Good cause may be found to exist where the moving party shows that it diligently assisted the court with creating a workable scheduling order, that it is unable to comply with the scheduling order's deadlines due to matters that could not have reasonably been foreseen at the time of the issuance of the scheduling order, and that it was diligent in seeking an amendment once it became apparent that the party could not comply.

It is beyond dispute that Relator has been extremely diligent in her efforts to conduct discovery and prove her case within the Court's established deadlines.  She seeks leave less than three weeks after this Court issued an order noting that such relief may be appropriate[4] (ECF No. 83) and approximately two months after Defendants first raised a temporal limitation argument to Relator's second set of discovery responses, after Defendants partially answered her first set of requests through 2015.  And, she seeks such relief mere weeks after records were produced to permit her to make a determination of the extent of the temporal scope of the allegations, and less than two weeks after her expert reviewed Defendants' medical records, finding specific examples that Defendants failed to meet off campus provider based supervision requirements and that such violations were ongoing through October of 2015.  Allowing an amendment based upon discovery, like here, is sufficient good cause.  *See e.g.* *Orozco v. Midland Credit Management Inc.*, 2013 WL 3941318 at *4-5 (E.D. Cal. July 30, 2013) (plaintiff was diligent and good cause found to add new claims and support existing ones as "plaintiff's reasons for seeking amendment are compelling" because "[u]ntil defendant submitted its amended discovery responses" the information was only in defendant's possession); *McNamee v. Roman Catholic Diocese of Sacramento*, 2013 WL 5739098 at *3-4 (E.D. Cal. Oct. 22, 2013) ("Plaintiff meets the good cause standard [to add a new claim because she] has clearly been diligent in seeking amendment, as Plaintiff obtained the relevant information . . . between June and August and filed a motion for leave to amend the complaint in early September").[5]

---

[4]   *See Inge v. Rock Financial Corp.*, 281 F.3d 613, 626 (6th Cir. 2002) (reversing district court's refusal to allow an amendment after the deadline set in the scheduling order in large part because "Plaintiff's request to amend was a prompt effort to remedy pleading deficiencies identified by the district court in the dismissal order").

[5]   *See also e.g. Mailing and Shipping Systems, Inc. v. Neopost USA, Inc.*, 292 F.R.D. 369, 374 (W.D. Tex. 2013) ("good cause" shown under FRCP 16 to add additional claim because "it is not obvious, in the Court's view, that Plaintiff would necessarily have learned of Defendant's alleged breach of this contractual obligation prior to the deposition of Defendant's vice president"); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1333 (Fed. Cir. 2012) ("good cause" shown under FRCP 16 to amend the complaint to add new claims after deposition of witness revealed additional claims); *Anzures v. Prologis Texas I LLC*, 886 F. Supp. 2d 555, 568 (W.D. Tex. 2012) (good cause under Fed. R. Civ. P. 16(b) met

In this respect, any potential assertions by Defendants as being prejudiced simply would be unfounded as the amendments are largely based upon (with the exception of changing the tense of words) their own records, some of which were created post-scheduling order. *See e.g. McNamee*, 2013 WL 5739098 at *3 (defendant not prejudiced as (1) new claims based upon information gleaned from defendant's discovery, (2) discovery period did not close for several months, and (3) like here "[p]laintiff ha[d] not yet been deposed"). In fact, if anyone would be prejudiced here, it would be the Government and the taxpayers if this motion is denied because Relator will be precluded from potentially holding Defendants responsible for their recent and possibly *ongoing* FCA violations. *E.g. U.S. ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 720 (9th Cir. 1994) ("United States is the real party in interest in any False Claims Act suit, even where it permits a *qui tam* relator to pursue the action on its behalf") (citation omitted)). The fact that the TAC may bring to light facts unfavorable to Defendants' defenses is not the type of prejudice appropriate to preclude good cause here.

As noted above, Defendant Marshall's counsel interjected FRCP 11 into 2014 discussions regarding a prior amendment to the complaint, which in large part led to Relator seeking leave for the SAC. As the Court is aware, FRCP 11 requires that factual contentions have evidentiary support or "will likely have evidentiary support after reasonable opportunity for further investigation or discovery." *Id.* So, while Relator had sufficient reasons to believe that direct supervision FCA claims were ongoing at that time, including violations of 42 C.F.R. Subpart 411, requiring that Defendants follow proper billing requirements and that the Defendant physicians, despite notice, were actively choosing not to follow such supervision billing requirements (*e.g.* SAC ¶¶ 22–25, 55, 62–64; 68, 73–78, 104–106), restraint dictated that she refrain from making full allegations until the claims could be set forth appropriately under FRCP 11. Consequently, while some information relevant here was generally known to Relator, further discovery was necessary to fully shape certain aspects of this case, including that off campus physician supervision FCA violations were ongoing. *Cf. Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984) ("Under the modern federal rules, it is enough that a

---

because "[u]pon discovering through depositions that Southern Roof could be potentially liable, Plaintiff diligently filed the instant motion to amend"); *McNeal v. City of Hickory Valley, Tennessee*, 2002 WL 1397249 at *1–2 (W.D. Mich. June 4, 2002) (granting plaintiff's motion for leave to amend as sufficient under FRCP 16(b) for good cause shown as the amendment was a further explanation and clarification of the allegations in the original complaint, thus defendant was on notice and not prejudiced).

MEMORANDUM OF POINTS AND AUTHORITIES ISO FOR LEAVE TO AMEND

complaint put the defendant on notice of the claims against him.  It is the function of discovery to fill in the details"), *cert. denied,* 469 U.S. 1211 (1985).

To this end, a district court opinion from this circuit, *Pacific Scientific Energetic Materials Co. (Arizona) LLC v. Ensign-Bickford Aerospace & Defense Co.*, 281 F.R.D. 358 (D. Ariz. 2012), is very instructive and helpful here.  Similar to Relator's circumstances, in *Pacific,* the defendant moved to amend its pleading based upon facts gleaned from discovery, after the court suggested, through an order, that the defendant amend its answer to include a counterclaim.  Prior to conducting discovery, the defendant was sensitive to FCRP 11 and its applicability to amending its pleadings and it delayed doing so until it conducted additional discovery.  *Id.* at 359-60.  The court held that the defendant satisfied FRCP 16's "good cause" requirement because, much like here, it was cautious due to the spectre of FRCP 11 and had acted quickly after the court's suggestion to seek leave to amend, using what it had recently learned in discovery.  *Id.* at 363 ("Erring on the side of avoiding Rule 11 sanctions at the risk of waiving its counterclaim, the defendant diligently sought discovery . . .. Consequently, I **FIND** good cause to amend the scheduling order to allow the defendant to amend its answer and file a counterclaim") (emphasis in original).  Accordingly, and as similar to the circumstances in *Pacific*, Relator here has shown good cause under FRCP 16 and should be granted leave to amend the SAC.  For the reasons stated above, the TAC should be docketed.

**B.  Defendants Cannot Show That Allowing Relator Leave to Amend Will Be Futile Under FRCP 15**

"A proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim."[6]  *E.g. Miller v. Rykoff–Sexton, Inc.,* 845 F.2d 209, 214 (9th Cir. 1988).  The party opposing amendment bears the burden of proving futility. *E.g. Goudlock v. Thompson*, 2011 WL 1167545 at *8 (S.D. Cal. Jan. 28, 2011); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Defendants cannot meet their burden to show futility.  Plaintiff is simply clarifying the factual allegations supporting her claims, which this Court has already found to be sufficiently pled to survive a motion to dismiss (ECF. No. 67), to demonstrate that the fraud alleged herein goes beyond March of

---

[6]     As noted *supra*, once the FCRP 16 good cause threshold has been met, only futility can preclude a court from granting leave to amend.

2012 to at least October 2015 based upon recent discovery produced by Defendants and the fiscal intermediary to Medicare.  If proposed amendments allege legally sufficient claims, as Relator's TAC does here, leave to amend should be granted.  *See Miller*, 845 F.2d at 214; *accord Ewert v. eBay, Inc.*, 602 Fed.Appx. 357, 359-60 (9th Cir. 2015) ("A court may deny leave to amend due to futility . . . if the amendment would fail a motion to dismiss under Rule 12(b)(6)).

As to the legal sufficiency of Relators' factual allegations, physicians are "expected to have known[,]" that services are not covered by Medicare if they do not follow the requirements of the carrier, in this case Noridian, or of Medicare.  *See* 42 C.F.R. § 411.406(e).  So, when carrier and Medicare requirements are not followed, such services are considered "not reasonable nor medically necessary" for claims to be paid by Medicare.  *Id.*; *id.* at §411.15(k) (excluding "services that are not reasonable and necessary for . . . the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"); *see also e.g.* SAC at ¶¶ 21–22 (noting that 42 C.F.R. Subpart 411, including 42 C.F.R. §411.15(k), must be met); *see generally* SAC (explaining physicians were not following off campus provider based supervision requirements).

Noridian, consistent with Medicare requirements, specifically requires that for off-campus facilities, like Defendant Marshall's clinic, the physician be present and immediately available to furnish assistance and direction throughout the performance of the procedure.  However, the medical documentation often, especially and almost as a matter of course with respect to injections, failed to detail which physician was (1) supervising, (2) onsite, and (3) immediately available.  In fact, upon review of some of the patient files recently produced by Defendants, Relator's medical billing expert determined that Defendants *continue* to fail to demonstrate that Defendant physicians Soe and Tsai met Medicare's and Noridian's billing requirements for off campus provider based supervision requirements through at least October of 2015.  Thus, because the additional factual allegations to be added to Relator's SAC allege legally sufficient claims, granting Relator's motion for leave to amend the SAC will not be futile.

**C. Denial of Relator's Motion for Leave to Amend the SAC Would Cause Injustice**

Where "the court determines that refusal to allow a modification might result in injustice while allowance would cause no substantial injury to the opponent and no more than slight inconvenience to

the court, a modification should ordinarily be allowed." *U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 887 (9th Cir. 1981). Injustice would result if the modification is not allowed.  In this action, the claims are the Government's.  It is, therefore, the taxpayers that would be greatly harmed if the complaint is not amended to include the alleged, recent fraudulent actions of Defendants, including those that occurred after the scheduling order was issued.  Moreover, the only "slight inconvenience" to the Court, if there is one, is that the TAC would be docketed.  No other changes to the scheduling order are sought here.

There also would be no "substantial injury" to the Defendants.  Defendants have already produced discovery to Relator's first set of discovery well into 2015.  And, furthermore, Defendants, as of October of 2015 are alleged to have violated the FCA so they cannot claim "substantial injury" when there is good documentary evidence that at least some of their FCA violations have continued well past 2012.  Finally, Defendants are on notice of the claims against them and discovery is ongoing so there is no prejudice.  For these reasons, injustice would occur if the motion is not granted, and the TAC should be docketed.

## V.  **CONCLUSION**

For the foregoing reasons, this Court should grant Relator's Motion for leave to amend her SAC as she satisfies the good cause requirement of FRCP 16 and amending the SAC will not be futile under FRCP 15.  Relator has been extremely diligent in seeking amendment of her complaint shortly after this Court's order suggesting that leave to amend may be appropriate, and after Defendants' production of documents demonstrate that already alleged fraudulent actions relating to off campus provider based supervision requirements have continued through at least December of 2015.  Relator's proposed amended pleading does not change the nature of this action, nor add new parties or claims.  The proposed TAC simply clarifies that the fraudulent allegations are ongoing, largely based upon Defendants' own documents recently produced in 2016, thus demonstrating good cause.  The proposed amendments are also not futile as they further substantiate Relator's existing claims that have already passed FRCP 9(b) muster.  As the information on which the proposed amended complaint is based has been in Defendants' possessions and certain documents were newly created after the scheduling order

//

//

1   was issued here, Defendant's cannot claim that prejudice or surprise will result.  Moreover, discovery is

2   still ongoing so Defendants still have sufficient time to conduct discovery.  For these reasons, this Court

3   should grant Plaintiff's instant Motion for Leave to Amend Plaintiff's Complaint.

4

5   DATED:  March 22, 2016                          Respectfully submitted,

6

7   _____

8   **WATERS KRAUS & PAUL**
    MICHAEL L. ARMITAGE (No. 152740)
    LOUISA O. KIRAKOSIAN (No. 271983)
9   222 N. Sepulveda Blvd.
    Suite 1900
10  El Segundo, California 90245
    Tel. 310-414-8146
11  Fax. 310-414-8156

12

13  **WATERS & KRAUS LLP**
    LOREN JACOBSON, *pro hac vice*

14

15  **JOSEPH, GREENWALD & LAAKE, P.A.**
    BRIAN J. MARKOVITZ, *pro hac vice*
    MATTHEW M. BRYANT, *pro hac vice*
16  6404 Ivy Lane, Suite 400
    Greenbelt, MD 20770
17  Tel. (301) 220-2200
    Fax. (301) 220-1214
18

19                          ***ATTORNEYS FOR RELATOR HERREN***

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

1  **WATERS KRAUS & PAUL**
   MICHAEL L. ARMITAGE (No. 152740)
2  LOUISA O. KIRAKOSIAN (No. 271983)
   222 N. Sepulveda Blvd.
3  Suite 1900
   El Segundo, California 90245
4  Tel. 310-414-8146
   Fax. 310-414-8156
5
6  **WATERS & KRAUS, LLP**
   LOREN JACOBSON *pro hac vice*
7  3219 McKinney Ave.
   Dallas, Texas 75204
8  Tel. 214-357-6244
   Fax. 214-871-2263
9
   Attorneys for Relator Herren
10

**JOSEPH, GREENWALD & LAAKE, P.A.**
Brian J Markovitz, *pro hac vice*
Matthew M. Bryant, *pro hac vice*
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)

11              **UNITED STATES DISTRICT COURT FOR THE**
12                 **EASTERN DISTRICT OF CALIFORNIA**
                        **SACRAMENTO DIVISION**
13

14  UNITED STATES OF AMERICA, AND THE STATE     **CASE NO. 2:12-CV-0098 JAM-KJN**
    OF CALIFORNIA ex  rel. COLLEEN HERREN,
15                                              **THIRD AMENDED COMPLAINT**

16                Plaintiffs/Relator,           Pursuant to 31 U.S.C. § 3730 (False Claims Act) and
                                                California Government Code § 12650 et seq.
17          v.                                  (California False Claims Act)

18  MARSHALL MEDICAL CENTER, DR. LIN H. SOE,    DEMAND FOR JURY TRIAL
    DR. TSUONG TSAI,  and EL DORADO
19  HEMATOLOGY & MEDICAL ONCOLOGY II,           Filed on: 1/12/2012
    INC.,
20                                              Honorable: Judge Mendez
                  Defendants.
21

22

23          1.      Relator-Plaintiff Colleen Herren, ("Relator"), by and through undersigned counsel,
24  brings this False Claims Act Amended Complaint on behalf of the United States of America and the
25  State of California against Defendants Marshall Medical Center, ("Marshall"), El Dorado Hematology
26  & Oncology II, Inc., ("El Dorado II"), Dr. Lin Soe, and Dr. Tsuong Tsai.  This action is brought by
27  Relator on behalf of the United States and the State of California to recover civil penalties and treble
28

damages under the Federal False Claims Act, 31 U.S.C. §§ 3729-33, ("FCA"), and the California False Claims Act, CAL.GOV'T CODE §§ 12650-12656, ("CFCA").

2.     Defendants intentionally defrauded, and continue to defraud, the United States of America by knowingly submitting fraudulent reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq.*, Medicaid, 42 U.S.C. §1396 *et seq.*, TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, and other federally-funded government healthcare programs (hereinafter collectively referred to as "Government Healthcare Programs"). Defendants defrauded and continue to defraud the Government by billing Medicare, Medicaid, TRICARE/CHAMPUS, and other federally-funded government healthcare programs: (a) for services and supplies that Defendant Marshall was not authorized to bill for, as such practices compromised patient safety and violated conditions of payment under those Government Healthcare Programs; (b) for billing the Government for services and supplies that were adulterated, expired and/or substandard; (c) for performing treatments at the Marshall Hematology Oncology Infusion Center without the requisite physician supervision necessary to ensure proper safety of patients such that these Government Healthcare Programs were illegally billed in violation of their conditions of payment; and (d) for physician office visits in the hospital that did not occur.

3.     Through these same actions that defrauded and continue to defraud the federal government, Defendant Marshall Medical Center fraudulently deprives the State of California of state monies through its respective Medicaid programs under Medi-Cal.

4.     Relator is the former Clinical Nursing Director for Specialty Clinics. That position allowed Relator to have first-hand knowledge of Defendant Marshall Medical Center's fraudulent practices and to review documents related to the treatment and billing of patients on these Government Healthcare Programs. These documents included internal audits and memoranda written by and to the highest-level officers at Defendant Marshall Medical Center, which detailed the illegal billings to the Government Health Care Programs.

5.     Additionally, Relator brings this action as a *qui tam* action for herself pursuant to 31 U.S.C. § 3730(h), CAL. CODE § 12653, as well as other State of California causes of action for being retaliated against by Defendant Marshall Medical Center. Relator was retaliated against, including by being terminated from employment, for both refusing to be complicit in illegal activities

and attempting to have Defendants stop illegal practices and come into compliance with the billing and safety requirements of the Government Health Care Programs.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732, including state law claims under 31 U.S.C. § 3732(b).  This court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a) because: (1) Defendant Marshall Medical Center is a doing business in this district, (2) and/or many acts by Defendant Marshall Medical Center proscribed by 31 U.S.C. § 3729 occurred in this district; (3) and/or some of the individual Defendants reside in this district.

## THE PARTIES

8.      The Plaintiffs are the United States of America and the State of California.

9.      Relator-Plaintiff, Colleen Herren, is an adult citizen and resident of the State of California.  Relator holds a Masters of Business Administration, a Bachelors of Science in nursing, and is a registered and oncology-certified nurse.  Relator was hired on or about June of 2010 as the Clinical Nursing Director for Specialty Clinics, meaning that she was the supervisor of all nurses at Defendant Marshall's clinics, including the Hematology/Oncology Center of Defendant Marshall in Cameron Park, California.  In December of 2011, as a direct result of and after making repeated attempts to have Defendant Marshall come into compliance with patient safety and billing requirements and reporting such infractions to the highest-level officers at Defendant Marshall, Relator was informed that she was being terminated and that her last day of work was December 29, 2011.  Relator discovered Defendant Marshall's fraudulent practices while working in this position.  Relator has direct knowledge of Defendant Marshall's fraudulent billing practices, having been in meetings with the fraudulent agents of Defendant Marshall while discussions of the fraudulent acts occurred, directly witnessed fraudulent acts, and reviewed patient records.

10.      Defendant Marshall is a California Corporation with its principal place of business (main hospital) located at 1100 Marshall Way, Placerville, CA 95667.  Defendant Marshall is an independent,

nonprofit community healthcare provider that includes Marshall Hospital, a facility with at least a 105 beds at all times pertinent to this Complaint, located in Placerville, CA, several outpatient facilities, including the Hematology/Oncology Center located at 3102 Ponte Merino Drive, Suite 100, Cameron Park, CA 95682 that is the subjects of this complaint, and Marshall Physician Clinic Services. Defendant Marshall has approximately 200 affiliated physicians, including Defendants Soe and Tsai, and over 1200 employees providing healthcare services to more than 150,000 residents of El Dorado County, CA.  Defendant Marshall is a participant in the Government Healthcare Programs mentioned above and bills to those programs, including for services provided at the Hematology/Oncology Center.

11.     Defendant El Dorado Hematology & Medical Oncology II, Inc., is the medical corporation owned, operated, and managed by Defendant Dr. Lin Soe and Defendant Dr. Tsuong Tsai. It is through this company that Defendant physicians Soe and Tsai contract with Defendant Marshall.

12.     Defendant Dr. Lin Soe is a physician who runs Defendant Marshall's Hematology/Oncology Center along with Defendant Dr. Tsuong Tsai, who was Dr. Soe's partner until Dr. Tsai left the practice in August 2013.  Drs. Soe and Tsai signed contracts between El Dorado II and Defendant Marshall and have clinical privileges at Defendant Marshall.  They are not and have never been employees of Defendant Marshall.  In 2001, Dr. Soe, along with Dr. Tsai, founded El Dorado Hematology and Medical Oncology, a Medical Corporation ("El Dorado I") performing the same services, including chemotherapy and infusions, now performed at Defendant Marshall's Hematology/Oncology Center.  Defendants Soe and Tsai also performed the same fraudulent acts that are the subject of this complaint while operating El Dorado I.  In 2007, El Dorado Hematology and Medical Oncology was dissolved and merged into Defendant Marshall, and Defendants Soe and Tsai, as agents of the newly formed El Dorado II, became contractual workers of Defendant Marshall.

## THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS

*Federal False Claims Act (FCA)*

13.     The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim, to the Government is

liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of

damages the Government sustained.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

14.     For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . .

(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § (b).

"[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.  *Id.*

*California False Claims Act ("CFCA")*

15.     The California False Claims Act is modeled after the Federal False Claims Act.  The

CFCA works very much like its Federal model in that it provides that any person who causes a false

claim to be submitted to the State of California is liable for a civil penalty of up to $10,000 per claim

plus three times the amount of damages the state sustained.  California Government Code § 12651(a).

For purposes of the CFCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information;

or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 12650(b)(1)(B)(ii)(3).

"[N]o proof of specific intent to defraud is required" for a successful claim under the California FCA.

*Id.*

## **FEDERAL AND STATE GOVERNMENT HEALTHCARE PROGRAMS**

*MEDICARE*

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health

Insurance for the Aged and Disabled Program, more popularly known as the Medicare program.

17.     The Medicare program is a federally operated and funded program.  It is administered by

the Secretary of Health and Human Services ("HHS") through the Health Care Financing

Administration ("HFCA"), a department of HHS now known as the Centers for Medicare and Medicaid

Services ("CMS").

18.     The Medicare program is comprised of four parts, but only Parts A and B are involved in

this action.  Part A provides basic insurance for the costs of hospitalization and post-hospitalization

care.  42 U.S.C. §§ 1395c-1395i-2 (1992).  Part B is a federally subsidized, voluntary insurance program

that covers a percentage (typically eighty percent) of the fee schedule amount of physician and laboratory services.  42 U.S.C. §§ 1395k, 1395l, 1395x(s).

19.     To participate in Medicare, providers must certify that their services are provided economically and only when, and to the extent they are, medically required, or "reasonable and necessary."  42 U.S.C. § 1395n; 42 USCS § 1395y(a)(1)(A).  Medicare will only pay for "reasonable and necessary" services and for diagnoses that are covered, and not expressly excluded, under the Medicare program.

20.     A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 C.F.R. 411.15(k).  In other words, the treatment sought under Medicare must be medically necessary, which is a condition of payment that is critical for billing Medicare properly while seeking payment.  *Id.*

21.     A participant billing Medicare for medically unnecessary treatment is illegal, fraudulent, and violates a condition of payment.  42 C.F.R. § 411.15 (delineating that "[p]articular services excluded from coverage") ; *id.* at § 411(b)(1) (stating that "[t]his subpart identifies: (1) The particular types of services that are excluded" from coverage); 42 C.F.R. Subpart 411 (titled "Exclusions From Medicare and Limitations on Medicare Payment").

22.     Moreover, a participant billing Medicare is required to familiarize itself with the legal requirements for payment pursuant to 42 C.F.R. § 411.406(e).  And 42 C.F.R. § 411.406(e) requires that claims submitted and patient records be kept consistent with the requirements and guidance of CMS and the provider's fiscal intermediary, if applicable.

23.     Noridian is the fiscal intermediary that manages the claims submitted by Defendants on behalf of Medicare.

24.     The Hematology/Oncology Center at Defendant is an "off campus," outpatient facility as defined by 42 C.F.R. § 413.65.

25.     CMS and Noridian require that all bills submitted on behalf of Medicare contain documentation establishing that the off-campus provider met the supervision requirements for the delivery of therapeutic services.

*Medicare's Requirements For Physician Supervision For Therapeutic Services*

26.     Medicare states that "drugs or biological that are not usually self-administered" such as chemotherapy, infusions, and certain injections are considered "services and supplies for Medicare." 42 C.F.R. § 410.26(a)(7).  And pursuant to Medicare's regulations, "**[s]ervices and supplies must be furnished under the <u>direct supervision</u> of th***e physician (or other practitioner)." Id. (emphasis added).*

27.     "Direct supervision" for services at an "off-campus" facility is defined as:

> For services furnished in the hospital or CAH, or in an outpatient department of the hospital or CAH, both on and off-campus, as defined in § 413.65 of this subchapter, **'direct supervision' means that the physician** or nonphysician practitioner **must be <u>immediately available</u> to furnish assistance and direction throughout the performance of the procedure**.  It does not mean that the physician or nonphysician practitioner must be present in the room when the procedure is performed;

42 CFR 410.27(a)(1)(iv)(A).

28.     In this respect, physicians must be "immediately available" to assist patients receiving services such as chemotherapy, infusions, or certain injections.  Further guidance on what constitutes "immediately available" for off-campus facilities like Hematology/Oncology Center is explained in Medicare Benefit Policy Manual, Pub. 100-02, Chapter 6, §20.5.2.

> Immediate availability requires the immediate physical presence of the *supervisory* physician or nonphysician practitioner.  CMS has not specifically defined the word 'immediate' in terms of time or distance; however, an example of a lack of immediate availability would be situations where the supervisory physician or nonphysician practitioner is performing another procedure or service that he or she could not interrupt.  Also, for services furnished on-campus, the supervisory physician or nonphysician, practitioner may not be so physically far away on-campus from the location where hospital/CAH outpatient services are being furnished that he or she could not intervene right away.  *The hospital or supervisory practitioner must judge the supervisory practitioner's relative location to ensure that he or she is immediately available.*

*Id.* (emphasis in original).

29.     In this respect, Medicare Parts A & B cannot be billed if the physician is somewhere or is doing something that does not allow him or her to render assistance immediately.  *Id.*  For instance, availability by telephone does not suffice.

> With respect to telecommunication, we note that direct supervision requires the ability to be physically present immediately, and to be able to furnish assistance and direction throughout the performance of the procedure (74 FR 60580).  **We do not see how a practitioner who is only**

**remotely available by phone or other means of telecommunication could fulfill these requirements and, therefore, we do not consider availability by means of telecommunication to be an acceptable means of providing direct supervision**.

2011 OPPS Final Rule, published in Federal Register, 75 FR 71800, 72008, (Nov. 24, 2010) (emphasis added).

30.     Therefore, a condition of payment for Medicare Parts A & B is that the supervising physician be in a position to be "immediately available" to furnish assistance to the patient receiving chemotherapy or an infusion, should they need it, in an off-campus setting like Defendant Marshall's Hematology/Oncology Center.  If a physician is not "immediately available" by not being anywhere in the area, then such services rendered are not eligible for Medicare payment.

31.     Medicare and Noridian require, as a condition of payment, that providers indicate in their supporting medical documentation that a physician was on-site during the provision of "service and supplies" for which direct supervision is required such that the supervising physician is immediately available.

***Medicare's Requirements For Single Use Vials Of Drugs And Biologicals***

32.     The Medicare Benefit Policy Manual requires for payment that "[u]se of [a] drug or biological must be safe and effective and otherwise reasonable and necessary."  Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and Other Health Services, Section 50.4.1 – Approved Use of Deg (Rev. 1, 10—01-03); *id.* at § 50 ("Generally, drugs and biologicals are covered only if all of the following requirements are met:  . . . They are reasonable and necessary for the diagnosis or treatment of the illness or injury for which they are administered according to accepted standards of medical practice (see § 50.4)").

33.     For single use vial or single use packages ("SDV") of drugs, including chemotherapy and other drugs used to treat cancer, Medicare will cover the amount of drug that was administered and that portion of the remainder of the drug is to be discarded as "waste."  Medicare Claims Processing Manual, Chapter 17, Section 40, Discarded Drugs and Biologicals.  If, after administering a dose of SDV to a Medicare patient, some amount is left over and therefore must be discarded, Medicare will provide payment for the amount of SDV discarded as "waste," up to the total amount of the drug or biological as indicated on the vial or package label.  *Id.*  Medicare will not pay for more than the total amount in the

SDV nor will it pay for unused amounts as "waste" that exceed the dose administered (*i.e.* billing unit). *Id.*; *CMS Transmittal 1962* ("the program provides payment for the amount of drug or biological discarded as well as the dose administered, up to the amount of the drug or biological as indicated on the vial or package label"); *id.* ("when the billing unit is equal to or greater than the total actual dose and the amount discarded, the use of JW Modifier (code for billing waste) is not permitted").

34.     Specifically, the Medicare guidance provides examples and states:

> When a physician, hospital or other provider or supplier must discard the remainder of a single use vial or other single use package after administering a dose/quantity of the drug or biological to a Medicare patient, the program provides payment for the amount of drug or biological discarded as well as the dose administered, up to the amount of the drug or biological as indicated on the vial or package label.

> [L]ocal contractors may require the use of the modifier JW to identify unused drug or biologicals from single use vials or single use packages that are appropriately discarded.  This modifier, billed on a separate line, will provide payment for the amount of discarded drug or biological. For example, a single use vial that is labeled to contain 100 units of a drug has 95 units administered to the patient and 5 units discarded.  The 95 unit dose is billed on one line, while the discarded 5 units may be billed on another line by using the JW modifier.  Both line items would be processed for payment.

> The JW modifier is only applied to the amount of drug or biological that is discarded.  A situation in which the JW modifier is not permitted is when the actual dose of the drug or biological administered is less than the billing unit.  For example, one billing unit for a drug is equal to 10mg of the drug in a single use vial.  A 7mg dose is administered to a patient while 3mg of the remaining drug is discarded.  The 7mg dose is billed using one billing unit that represents 10mg on a single line item. The single line item of 1 unit would be processed for payment of the total 10mg of drug administered and discarded.  Billing another unit on a separate line item with the JW modifier for the discarded 3mg of drug is not permitted because it would result in overpayment.  Therefore, when the billing unit is equal to or greater than the total actual dose and the amount discarded, the use of the JW modifier is not permitted.

***Medicare Claims Processing Manual, Chapter 17, Section 40, Discarded Drugs and Biologicals.***

Guidance issued by the Fiscal Intermediaries who oversee reimbursement of Medicare claims on behalf of the Government make clear that the Government will not pay for any unused portion of an SDV that is used on another patient, as such use is prohibited because it is unsafe.  A newsletter from Trailblazer, a Fiscal Intermediary, makes clear that any amount billed as "wasted" "must not be administered to another patient or billed again to Medicare."  Moreover, "[r]esidual amounts of these medications . . . must *never* be pooled with medication from another vial or syringe."  Trailblazer Medicare Part B

Newsletter, Oct. 31, 2007 (emphasis added).  Other Fiscal Intermediaries have made similar determinations.

35.     To this end, once an SDV has been used, if an amount that remains is below a "billing unit," it is not usable and can only be billed under the JW modifier as "waste" to Medicare and cannot be billed as anything else. Medicare Claims Processing Manual, *supra*.

36.     Additionally, Medicare requires that hospitals provide "pharmaceutical services that meet the needs of the patients." *Medicare State Operations Manual – Appendix A- Survey Protocol, Regulations and Interpretive Guidelines for Hospitals*, § 482.25 (2011).  In order to meet patient needs, the hospital must "have a pharmacy directed by a registered pharmacist or a drug storage area under competent supervision." *Id.*  These pharmaceutical services "must meet the needs of the patients' therapeutic goal[s] by promoting a safe medication use process that ensures optimal selection of medications, dose, dosage form, frequency, route, duration of therapy and that substantially reduces or eliminates adverse drug events and duplication of treatment." *Id.*  Each hospital must develop policies and procedures that are based on "accepted professional principles" to ensure the minimization of medication errors. *Id.*

37.     "Accepted professional principles" include, among others, all applicable Federal and State laws and regulations, "as well as standards or recommendations promoted by nationally recognized professional organizations." *Id.* at § 482.25(a).  The Centers for Disease Control and Prevention (the "CDC") have made recommendations concerning single-dose and single-use vial medications.  The CDC recommends that single-dose or single-use vial medications should be discarded when the "vial has been opened or accessed (e.g., needle-punctured), [and] the vial should be discarded according to the time that manufacturer specifies for the opened vial or at the end of the case/procedure for which it is being used, whichever comes first.  **It should not be stored for future use.**" CDC, *Questions about Single-dose/ Single-Use Vials*, *available at* www.cdc.gov. (Emphasis added.)

38.     The Medicare Interpretive Guidelines for Hospitals also gives specific examples of professional principles that a hospital may use to maintain standards.  One of those principles is "maintaining control over drugs and medications including the floor stock and those of the pharmacy or drug room." *Medicare State Operations Manual* at § 482.25(a).  Additionally, "[t]he hospital must have

a pharmacy labeling, inspection, and inventory management system that ensures that outdated, mislabeled, or otherwise unusable drugs and biologicals are not available for patient use." *Id.* at § 482.25(b)(3).  As such, a hospital must maintain control over drugs both in the pharmacy and on the hospital floor such that the hospital must ensure that no patient receives expired medications both in the pharmacy or administered by a physician.  *Id.*

39.     Medicare specifically prohibits healthcare facilities from re-using single-dose vials unless the vial has been repackaged into a smaller dose under certain specified sterile conditions.  CMS Office of Clinical Standards and Quality/Survey & Certification Group, *Safe Use of Single Dose/Single Use Medications to Prevent Healthcare-associated Infections*, June 12, 2012, *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-12-35.pdf.

*Medicare's Requirements for Physician Office Visits ("Established Outpatient Visit")*

40.     Physician office visits (established outpatient visits) are billed under the CPT codes in the 99211-215 range.  The CPT codes at issue in this case are 99214 and 99215.  Both codes require that a physician see the patient in order to be legally billed to Medicare.  If the physician does not see the patient, then neither code can be legally billed to Medicare for payment.

41.     CPT code 99214 is appropriately used when the physician spends approximately twenty-five (25) minutes with the patient to treat a moderate or high severity problem, and when the physician can identify two out of the three following components: the physician performed a detailed patient medical history, the physician performed a detailed exam on the patient, or the treatment of the patient requires a medical decision of moderate complexity.

42.     CPT code 22915 is appropriately used when the physician spends approximately forty (40) minutes with the patient to treat a moderate to high severity medical problem, and when the physician can identify two out of the three following components: the physician performed a comprehensive patient medical history, the physician performed a comprehensive exam on the patient, or the treatment of the patient requires a medical decision of high complexity.

*MEDICAID*

43.     In 1965, Congress established Medicaid when it enacted title XIX of the Social Security

Act.  *See* 42 U.S.C. §§ 1396–1396v; *Schweiker v. Gray Panthers* 453 U.S. 34, 36, (1981).  Medicaid is a joint federal-state program that provides health care benefits for certain groups; primarily the poor and disabled

44.     Medicaid is a cooperative venture where the Federal Government provides financial assistance to participating States to assist them in providing health care to needy persons.  Each state administers its own Medicaid program while CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.

45.     The federal government portion provided is known as the Federal Medical Assistance Percentage ("FMAP"), and is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  In some states Medicaid is subcontracted to private health insurance companies, while other states pay providers (*i.e.*, doctors and hospitals) directly.  Participation in Medicaid is voluntary, however "once a State elects to participate, it must comply with the requirements of Title XIX."  *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 809, 69 P.3d 927, 935 (2003) (quoting *Harris v. McRae*, 448 U.S. 297, 308 (1980)).

46.     Like Medicare, a "claim" under Medicaid is only "covered" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member".  42 C.F.R. § 402.3.  Services "excluded from Medicare Part B" or that are "not a defined Medicare Part B benefit" are not covered by Medicaid.  *Id.*

***MEDI-CAL***

47.     In 1966, California elected to participate in Medicaid and California's program eventually became known as Medi-Cal.  *Medi-Cal Overview* available at:http://www.dhcs.ca.gov/dataandstats/statistics/Pages/RASS_Medi-Cal_Overview.aspx Currently, Medi-Cal provides health insurance for 6.8 million low-income and disabled Californians.

48.     In order for California to receive Medicaid funding, Medi-Cal must "'comply with requirements imposed both by the [Social Security] Act itself and by the Secretary[of Health and Human Services]. . . .'"  *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 810, 69 P.3d 927, 935 (2003) (quoting *Elizabeth Blackwell Health Center v. Knoll*, 61 F.3d 170, 172 (3d Cir.1995)).

49.     Accordingly, providers receiving Medi-Cal reimbursements are required to comport with

Federal regulations, including those that regulate physician care.  To this end, California has enacted requirements for Medi-Cal, including that a service is "medically necessary" or a "medical necessity" when it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst. Code § 14059.5  Similarly, California's regulations make clear that "Outpatient physician services are covered if they are medically necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  22 CCR § 51305.

***TRICARE/CHAMPUS***

50.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel.  *Id.*

51.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS.  *See* 32 C.F.R. §§ 199.4, 199.17(a*).*  Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

52.     The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers."  32 C.F.R. § 199.17(a)(1).  The TRICARE Management Activity ("TMA") oversees this program.

53.     The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West.  Defendant Marshal currently serves patients from the West region.  TRICARE health services are provided through both network, and non-network, participating providers.  Providers who are Medicare-certified providers are considered TRICARE-authorized provider.  TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

54.     "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, who enter into an agreement with the region's managed care contractor, and

provide services for an agreed reimbursement rate.  32 C.F.R. § 199.14(a).  "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations.  *Id.*

55.  The TRICARE managed care contractor for the West region is TriWest Health Alliance. TriWest Health Alliance currently lists Defendant Marshall as a Network Provider.  To obtain status as a TRICARE Network Provider, Defendant signed a contract with this managed care contractor accepting TRICARE's negotiated rates.

56.  Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

## OVERVIEW OF FRAUDULENT ACTIONS BY DEFENDANT MARSHALL AND ITS AGENTS

57.  At Defendant Marshall's Hematology Oncology Infusion Center, Defendant Marshall, on a daily basis and as a matter of course, committed and continue to commit the following fraudulent acts in violation of the Federal and California False Claims Acts and conditions of payment for services under the Government Healthcare Programs:

a.  Chemotherapy and infusion procedures and certain injections [such as injections of procrit, neupogen, neulasta, and xgeva that cannot be self-administered] were performed daily on multiple patients without the presence of a physician in the area, let alone anywhere near the facility, such that such services were provided and billed to the Government Healthcare Programs without physician supervision, without a physician being immediately available to furnish assistance and direction throughout the performance of those procedures, and without indicating in their supporting documentation for reimbursement that a physician was present;

b.  SDVs of drugs were routinely double billed to the Government Healthcare Programs by rounding up the amounts used for such drugs when billing them, *i.e.* a 100 MG vial of a drug was split between two patients but the Government Healthcare Programs were

billed twice, once for each patient at 100 MG, for a total of 200 MG;

c.  SDVs of drugs were routinely double billed to the Government Healthcare Programs by billing remaining amounts properly as "waste" but then illegally billing a second patient for the remaining amount again, *i.e.* 460 MG of a 500MG vial of a drug was used on one patient and the remaining 40 MG were billed as "waste" for the first patient, but the Government Healthcare Programs were also then billed a second time for the remaining 40MG for use on a second patient. This means that a total of 540 MG was billed for the 500MG vial;

d.  SDVs of drugs were impermissibly used for more than one patient, and often after a first use, also were allowed to expire (go beyond their date and/or time after being used on one patient) and then were used on another patient(s) and billed as if viable instead of being billed as "waste;"

e.  After initially having an office visit with patients, Defendants Drs. Tsai and Soe, as agents of Defendant Marshall, billed a second physician visit for patients referred to Defendant Marshall's hospital for performance of blood transfusion treatments, despite the fact that no physician actually saw those patients at the hospital while the treatments were occurring there;

f.  Defendants submitted and continue to submit bills to Medicare, Medi-Cal, and TRICARE in violation of the off campus provider based supervision requirements because Defendants do not properly document and account for physician presence, necessary to demonstrate that the physicians were immediately available to render assistance to patients such that the visit/service was properly billed;  and

g.  Defendant's agents —both physician and non-physician corporate officers—purposefully failed to correct the inappropriate billings that were and are direct threats to patient safety and that were and are resulting in illegal higher charges to the Government Healthcare Programs.  They failed to correct the fraudulent billing and practices despite being warned multiple times, not only by Relator, but by Defendant Marshall's highest level compliance official, Gloria McNeil, and by managers at Defendant Marshall's pharmacy.

THIRD AMENDED COMPLAINT

15

# FACTS COMMON TO ALL CLAIMS

## *El Dorado Hematology and Medical Oncology*

58.     In 2001, Defendants Drs. Soe and Tsai founded El Dorado Hematology and Medical Oncology ("El Dorado I"), a Medical Corporation in Cameron Park, California.   El Dorado I ran as a single specialty group of physicians who practiced in the same areas of specialization — namely, hematology and oncology.   Dr. Soe was the President and Dr. Tsai was the Secretary.   At El Dorado, Defendants Soe and Tsai performed and had staff perform the same types of services, including chemotherapy, infusions, and certain types of non self-administered injections that are now performed at Defendant Marshall's Hematology Oncology Infusion Center and billed these services to the Government Healthcare Programs.

59.     Unfortunately, Defendants Soe and Tsai also committed the same illegal conduct while operating El Dorado I that is now occurring at Defendant Marshall's Oncology Hematology Center.[1] From 2001 through 2007, at El Dorado I, on a routine basis, chemotherapy and infusions, as well as certain injections [such as procrit, neupogen, neulasta, and xgeva that cannot be self-administered], were performed without a physician on site on patients such that they were not immediately available to furnish assistance and direction.   These procedures, that lacked adequate physician coverage, were then billed to the Government Healthcare Programs.   Additionally, at El Dorado I on a routine basis, expired SDVs of drugs, including for chemotherapy, were used on patients and billed to the Government Healthcare Programs as good, viable drugs instead of waste.   Also, at El Dorado I on a routine basis, SDVs of drugs were routinely double billed to the Government Healthcare Programs by rounding up the amount used on such drugs such that a vial of a drug that was used between two patients was billed at twice the total amount.

60.     In January 2008, the corporation and operations at El Dorado I were merged into Defendant Marshall.   At that time, El Dorado I ceased operations, and as agents of the newly formed corporate entity El Dorado II, Drs. Soe and Tsai signed contracts with Defendant Marshall for physician privileges, and operations began to run at the Hematology/Oncology Center of Defendant Marshall at its

---

[1] Relator is aware of these prior practices because Defendants Soe and Tsai would routinely justify their current illegal actions by explaining that they were performing procedures and services and billing the Government Healthcare Programs in the same manner that they had previously while operating El Dorado.

Cameron Park, California facility.

***Operations at Defendant Marshall's Hematology/Oncology Center Overview***

61.     From January2008 until the present, at the Hematology/Oncology Center of Defendant Marshall at its Cameron Park, California facility, Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El Dorado II, illegally billed or ordered Defendant Marshall's staff to illegally bill the Government Healthcare Programs as explained below.  Specifically, these acts were violations of conditions of payment for infusions and chemotherapy treatments, as well as injections [such as procrit, neupogen, neulasta, xgeva injections that cannot be self-administered], as these procedures occurred without physicians being present nor immediately available to furnish assistance and direction throughout the performance of those procedures.  These procedures, that lacked adequate physician coverage, were then billed to the Government Healthcare Programs and Defendants further failed to properly indicate in medical documentation that a supervising physician was onsite.

62.     Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El Dorado II, also illegally double billed or ordered Defendant Marshall's staff to illegally double bill the Government Healthcare Programs in violation of conditions of payment for SDVs of drugs by rounding up the amounts of such drugs, [*i.e.* a 100 MG vial of a drug was split between two patients but the Government Healthcare Programs were billed twice, once for each patient at 100 MG for a total of 200 MG].

63.     Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El Dorado II, also illegally billed or ordered staff to illegally bill the Government Healthcare Programs in violations of conditions of payment for SDVs of drugs by using them on multiple patients.  These drugs, at times, would be mixed with other properly used drugs, thus contaminating the "cocktail" mix, resulting in the entire amount of all drugs in the cocktail being contaminated and improperly billed to the Government Healthcare Programs.

64.     Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El Dorado II, also often illegally billed or ordered staff to illegally bill the Government Healthcare Programs for these drugs after they expired (go beyond their date and/or time after being used on one patient), used them on another patient(s), and billed the programs as if good, viable drugs had been used.  This was done instead of billing such drugs initially as "waste."  These expired drugs, at times, would be mixed with

other properly used drugs, thus contaminating the "cocktail" mix, resulting in the entire amount of all drugs in the cocktail being contaminated and improperly billed to the Government Healthcare Programs.

65.     Finally, Defendants Tsai and Soe, as agents of Defendant Marshall and Defendant El Dorado II, also routinely, illegally billed or ordered staff to illegally bill the Government Healthcare Programs in violations of conditions of payment for a second office visit for infusions performed at Defendant Marshall's hospital even though no physician saw those patients for the procedure performed at the hospital.

66.     Importantly, by Defendants Drs. Soe's and Tsai's own account, the operations at the Hematology Oncology Infusion Center in Cameron Park, California threaten patient safety and health. In one memo dated May of 2010 to Rick Vance, who was then Marshall's Vice President of Specialty Care Services, Defendants Soe and Tsai state there is:

> [A]n alarming frequency of errors in various aspect[s] of chemotherapy administration at Marshall Oncology infusion room in Cameron Park. The incidents ranging from charting errors to serious chemotherapy extravasations [escape of a chemotherapy drug into the extravascular space] at concerning frequency. Some errors are direct threat to patients' safety and others like documentation errors which could lead to wrong medical decisions and endanger patient's care.

> We have discussed about this issue previously in board meetings . . . but incidences have increased rather than decreased.   . . . [W]e feel correcting this in urgent manner before patients' health and lives are endangered.   . . .

> We urge the administration to look at this seriously in urgent manner. At this rate of increasing frequency of errors, we as physicians will have to make decision about safe chemotherapy administration quickly.

67.     In a follow up memo dated  July 2011 and titled "Chemotherapy errors at Marshall Oncology outpatient infusion clinic," Defendants Drs. Soe and Tsai wrote to Vance, with courtesy copies to James Whipple, Marshall's CEO, Shannon Truesdell, Marshall's former Assistant Administrator and current Chief Operating Officer, and Kathryn Krejci, Marshall's Chief Nursing Officer, that

We are experiencing number mistakes since the end of 2010. . . . Unfortunately, the medication errors have continued and in the month of June alone, we had four medication errors. . . . Some are major errors potentially endangering the patient's health and life.

***Lack of Physician Presence at the Hematology Oncology Infusion Center in Cameron Park***

68.    Relator's tenure at Defendant began in June 2010.  She immediately noticed and was told by several nurses that physicians often were not only absent from the Center during procedures, but were routinely miles away during chemotherapy sessions, infusion treatments, and certain injections [such as procrit, neupogen, neulasta, and xgeva injections that are not self-administered] being performed on patients at the Hematology Oncology Infusion Center in Cameron Park, California.  Relator recognized that this failure to have physicians immediately available was a violation of conditions of payment under the Government Healthcare Programs and threatened patient safety for these procedures.

69.    As part of Relator's job duties, she reviewed internal audits from prior years, detailing how physicians were not present in those years to perform the chemotherapy sessions, infusions, and certain injections that cannot be self-administered.  Concerned that illegal billing and threats to patient safety were occurring, at the Center's February 2011 "Board of Directors" meeting which Defendants Soe and Tsai attended Relator insisted that physicians be present or at least within the area to supervise and provide assistance to patients.  Relator also stated that employees and agents of Defendant Marshall, including her, should not be part of a practice that did not follow regulations.  At this meeting, Defendant Dr. Soe openly and loudly objected to Relator's comments and the auditor's findings, arguing that physicians did not need to be present or available and that he and Dr. Tsai had been practicing in that manner for years at their prior practice.  Relator was stunned by Defendants Soe's and Tsai's objections to being present for these procedures.  This was especially shocking  as these same doctors  had repeatedly stated, including in writing, that the facility was not operating in a safe manner for patients, making their immediate availability all the more urgent.

70.    Despite receiving an unwelcome response at the February 2011 meeting when trying to get the Center to come into compliance, Relator continued to insist that physicians be present for those procedures.  In 2011, Relator had several meetings with Rick Vance, her supervisor and the Vice

President of Specialty Care Services, in which she insisted that physicians be present for those procedures.

71.     Relator's persistence resulted in Vance researching the legal requirements for proper billing of the Government Healthcare Programs.  On or about July 17, 2011, Vance sent an email to Kathryn Krejci, Director of Nursing, Shannon Truesdell, Marshall's Chief Operating Officer, Gloria McNeill, the compliance officer, and Relator, among others, titled "oncology compliance issues." Defendant Vance specifically noted, "we have reconfirmed with the infusion department that they cannot start infusions unless a physician is in the office."

72.     In response to the July 17, 2011 email, on July 18, 2011, the compliance officer, Ms. McNeill, sent an email to Vance, Krejci, Truesdell and Relator, among others, reconfirming that "the reg states that these practitioners must be immediately available and interruptible in order to step in."

73.     Approximately a week later, on or about July 25, 2011, Ms. McNeill sent Relator an email in which she attached multiple-pages of billing requirements under Medicare for physician availability from the "Medicare Manual."  Ms. McNeill noted in the email that she left Relator a voicemail message regarding the same and wrote "[a]ttached is the excerpt from the Federal Register. In a nutshell, physician must provide direct supervision, by being readily available.  The preamble discusses that communication via telephone is not meeting this requirement."

74.     Relator and Ms. McNeill continued to have discussions in writing and orally over the next few months regarding the need for physicians to be immediately available during the chemotherapy sessions, certain injections, and infusions.  Relator also continued to receive complaints from nurses under her supervision who worked at the Center that on a daily basis no physicians were present, nor were they immediately available for many of the infusions and chemotherapy sessions and the injections that could not be self-administered that were being performed on patients.

75.     In August of 2011 (from approximately August 8-18, 2011), the pharmacy, in large part due to the persistence of Relator, performed an announced audit of the Center.  During this very limited time period of about ten days, Defendant Marshall briefly stopped the practice of providing patients with chemotherapy, infusions, and certain injections without the proper physician coverage.  The pharmacy issued "Pharmacy Finding and Recommendations" on or about September 28, 2011, however,

and did find that "patients should not be scheduled to receive chemotherapy earlier in the morning because a physician must be onsite" because "[t]here were instances of patients arriving for chemo at 0900, but waited until 1030 to receive it because there was not a physician onsite."

76.     Shortly after the completion of the pharmacy's audit, the Center resumed its illegal practices of performing those procedures without having adequate physician coverage instead of making a patient wait for the doctor to arrive.  In fact, one of the infusion nurses at the Center, Vickie Bomar, explained to Relator a conversation she had with Defendant Dr. Soe with respect to physician coverage. Defendant Dr. Soe stated to Nurse Bomar that "We'll [Dr. Soe and Dr. Tsai] just do what they want until the fire dies down and then return to the way we've always practiced."

77.     On or about August 25, 2011, after going to the Center and personally witnessing a Medicare patient receiving an infusion without any physician available, Relator voiced her concerns in an email to Ms. McNeill and courtesy copied Krejci, Truesdell, and Vance, stating:

> I am very concerned with the inconsistency of physician oversight when we have patients being treated.  Today is the second time recently I have witnessed Dr. Tsai leave early when he was the only physician on site and we still had patient infusing.  I was told he was going to the bank.  He did not stop thru the infusion room to check nor did he return.  We still had one pt who did not finish her infusion until 4:08pm, Dr. Tsai left at 3:39pm.

> . . . I do not know about the other times nor do I think there is a discrepancy in the regulations. I was on the understanding there is to be direct or immediate physician coverage during infusion, then a handoff – 'to another physician' qualified if not immediately available- not a nurse.

> This has been a concern with staff and compliance for some time.  There was a meeting with the physicians about this with [Vance] and myself and they both agreed to their contracted hours of being here onsite during treatment hours.  The staff do their diligence to complete patients by 5pm, however – the physicians are not necessarily staying till 5pm or the hours they agreed.

> Please advise.

78.     On August 30, 2011, a "Cancer Strategic Planning Meeting" was held at the Center with Relator and Vance, Truesdell, and Dr. Soe, among others, in attendance.  The lack of physician coverage was discussed.  The meeting minutes note that Relator "stated that there continues to be issues with physician coverage during patient treatments" and "her biggest concern was in the afternoon and the physicians leaving while patients are in the middle of treatment."  Importantly, Vance admitted "that the physicians interpreted the regulations as they could leave once treatment has begun."  Another

attendee noted that "[t]he physicians take 3-week vacations" resulting in "chaos" at the Center and "not enough coverage for Infusion."  The minutes note that Vance "will review the regulations and follow-up with the physicians."

79.    On or about August 31, 2011, Ms. McNeil responded to Relator's August 25, 2011 email.  Ms. McNeill "clarify[ied] the regs" and that "non-chemo infusions require direct supervision by physician, but once the physician deems that it is safe to hand off, this must be documented in the patient's chart, and then the patient is under 'general supervision."  (Emphasis in original.)  She then specifically noted that physicians, however, cannot just "go home."

80.    On or about September 1, 2011, Relator responded to Ms. McNeill via email noting that Dr. Tsai "walked out and we saw him drive away" with respect to the prior day.  She then requested that Ms. McNeill check the regulations because the physicians believe they can leave the facility without any physician available.  Relator also specifically relayed another instance that she witnessed where Dr. Tsai left the facility to go to the bank without any physician available and a patient who was receiving chemotherapy was left without physician coverage for "over 60 minutes" until the treatment was completed.  Relator, concerned for her staff, also relayed that she was worried that nursing licenses could be in jeopardy.

81.    That same day, on September 1, 2011, Ms. McNeill responded by email to Relator stating:

> **Nursing licensing is not in jeopardy, but billing for service is.  I've been instructed by Shannon [Truesdell] to write a letter to the docs giving them the regs.**  As far as confusion of the hand off, it can be to a nurse but the doc has to be there for initiating, and then documenting when the patient is stabilized for hand off.  **Your example was RN initiating non-chemo injections.  Those are not part of the extended services where hand off is possible.  That still requires supervision.**

(emphasis added.)

82.    On September 9, 2011, in response to Relator's constant pressure regarding the failure of physician coverage at the Center, a "Memorandum" titled "Physician Supervision of Therapeutic Services" was provided to Defendants Drs. Soe and Tsai from Ms. McNeill with courtesy copies to James Whipple, Shannon Truesdell, Kathryn Krejci, and Rick Vance.  The memorandum begins by stating "Marshall's Executive Leadership has requested that I provide you some regulatory information

regarding Medicare's conditions for coverage and payment of therapeutic services provided in the Hematology/Oncology clinic and the corresponding requirement for physician supervision of these services."  It then goes into exhaustive detail for several pages citing and quoting regulations and Medicare guidance explaining that physicians need to be "immediately available" for the procedures occurring at the Center.  The memorandum concludes by stating:

> As you can see from the sources I have quoted, **supervision of outpatient services is an important payment requirement for hospitals.  Medicare believes that this is one way to ensure it is purchasing a minimum level of safe, quality care for its beneficiaries.**

> I would be happy to meet with you to discuss this matter further should you require further clarification of the regulation.

(emphasis added.)

83.     On or about September 20, 2011, Defendants Soe and Tsai sent a memorandum to Cancer Strategic Planning Committee, including Relator, and courtesy copied Whipple, Truesdell, and Krejci.  In this memorandum, Defendants Soe and Tsai detail several serious mistakes that occurred at the Center, including "chemotherapy dose errors," "chemotherapy extravasations occurring at an alarming rate," "giving wrong drugs," and setting infusion pumps incorrectly such that patients received chemotherapy in "half [the] time" of physician's orders.  Remarkably, Defendants Soe and Tsai explained that "[n]one of the mistakes were caused by lack of adequate physician coverage" and instead blamed the nurses.  In this memorandum, **Defendants Drs. Soe and Tsai reveal that the lack of physician coverage for these procedures is occurring because their concern is really about the money and not patient safety**, writing:

> We have had discussions about this numerous times in the past 8-10 months; with various people-Colleen Leger, Rick Vance, Shannon Truesdell, Cathy Krejci, at various forums-board meetings, post Root Cause Analysis (RCA) meeting, and now at cancer committee.

> Our response has always been the same.  Infusion room has twelve chairs.  If fully staffed and efficiently scheduled it can easily be used to treat three to four patients per chair, totaling 36 to 48 patients a day at current level of physician coverage.  **Our chemotherapy infusion volume is averaging only 6-10 day currently.  So we are utilizing less than one-third of its capacity.  Therefore, our conclusion is that it is not a coverage issue, it is efficiency issue.**

> **We hope that this letter will once and for all put a stop on this issue.  We will be open for discussing physician coverage when the infusions clinic starts treating larger numbers of patients in infusions room, i.e. more than 36 patients per day.**

(emphasis added)

84.    At the beginning of October 2011, Nurse Bomar, who was frustrated with the lack of physician coverage, began to keep a calendar of infusions and chemotherapy treatments that she personally witnessed where the physicians were not immediately available.  She kept this calendar through October, November, and the beginning of December 2011, which she then provided to Relator.

85.    On or about October 7, 2011, Gloria McNeill, as a compliance officer, clearly worried about the Defendant Marshall's wrongful conduct with respect to not having proper physician coverage at the Center and recognizing the liability Defendant Marshall faced, wrote an email to Relator, Vance and Truesdell entitled "recent development."  In the email, Ms. McNeill wrote **"Hospital Settles False Claims Act Case Re: Physician Supervision."**  (emphasis in original.)  The email then contained details about a hospital in Michigan that had settled a False Claims Act case where "chemotherapy had been administered at an oncology center without appropriate supervising practitioner present."

86.    During the coming months, up to her termination in December of 2011, Relator continued to bring complaints and concerns to her supervisors, including Truesdell and Vance, about the inadequate physician coverage.  As she continued to complain, Relator's relationship with Defendants Drs. Soe and Tsai deteriorated rapidly.  As Relator tried to get Defendants Drs. Soe and Tsai comply with the legal requirements, they began to voice louder complaints to her superiors about her job performance.

87.    On or about November 29, 2011, Vickie Bomar, the infusion nurse, sent Relator an email titled "Dr. turning over chemo infusions to RN."  In this email, Nurse Bomar explained that on Wednesday, November 21, 2011, Defendant Dr. Soe left a patient treating with chemotherapy with a nurse and no physician immediately available.  That same day, November 29, 2011, Relator forwarded the email complaint by Nurse Bomar to Truesdell, Vance, andMcNeill.  Relator also wrote:

> It is my understanding that a physician can only 'transfer supervision' to another qualified provider - not a nurse.  A physician is to be 'immediately' available during treatments - meaning in the building.  A nurse is NOT a qualified provider.
>
> Please advise.

THIRD AMENDED COMPLAINT
24

(emphasis in original.)  That same day, November 29, 2011, Shannon Truesdell, the Chief Operating Officer, responded to Relator and courtesy copied Defendant Vance and Ms. McNeill, writing "That is my understanding also. Gloria, Rick comments?"

88.     On or about December 5, 2011, Relator had a routine meeting with Rick Vance.  She again discussed her and the staff's concerns with doctors illegally leaving the facility while patients were being treated.  She specifically discussed the calendar that had been kept of the physicians' absences by Nurse Bomar.  Vance became upset and told Relator that she "shouldn't have done that" because it would "make the doctors angry at [her]" and would "destroy [her] relationship with [the physicians]."  He specifically noted that keeping track of physician absences was above both of their "pay grades" and instructed her to follow up with Truesdell, the COO.

89.     On the morning of December 6, 2011, Relator sent a longer email complaint to Truesdell, per Vance's instructions, about the illegal absence of physician coverage at the Center and attached a synopsis of the absence of coverage documented on Nurse Bomar's calendar.  Specifically Relator wrote:

> Physicians oversight is an increasing problem.  As we had discussed it has filtered into how they manage their schedules which in return affects patient care and satisfaction.  Per our discussion, below are a number of dates where there was no physician coverage when patients were scheduled.  If the clinic is scheduled to be open for service at 8:30am and the physicians state per their contract they do not have to be there until 9am but don't arrive even much later; how is this providing good patient service?

> [A]ttached is a short breakdown of the 1st physician arrival times on site which is the go ahead that infusion can start to treat pts.  There are a number of pt complaints due to pts having to reschedule or be delayed in getting their treatments because there was no doctor on site. These are not all my observations, however, I have spoken with a number of patients regarding their complaints.  The infusion staff try very hard to keep pts happy while they wait, bring them in so they are more comfortable, explain the doctor is 'still at the hospital seeing pts' but it is frustrating and has caused nursing staff overtime because of treatment length, having all the pts needing to be started at once and not getting the pt started in a timely manner in relation to their scheduled time.

> please advise

> do you think we need to consider bringing Dr. Rice [Medical Director at Defendant Marshall] in this matter

90.     Later that same day, December 6, 2011, in the evening and after not getting a response from Truesdell, Relator followed up with an email to her, writing:

Have you discussed patient concerns and data with Drs Soe & Tsai? I know it's challenging when one MD is on vacation as it only leaves one to manage call, inpatients, clinic, etc. We may need to look at patient scheduling and staffing differently when one of the MDs is off.

91.     Around this time in early December 2011, Nurses at the Center became increasingly frustrated with the physicians not properly covering procedures and some voiced those concerns to Relator during staff interviews, which were documented on a monthly basis on an internal document called a "staff log" or "staff rounding." On or about December 1, 2011, Nurse Bomar, when asked "[d]o you have the basic tools and equipment to do your job?", responded, "No" and said "we need the doctors here when we treat patients" and "they need to be here on time and until all patients are done." Approximately a week later, on or about December 8, 2011, another infusion nurse, Jeannie Tice, when interviewed and asked the same question, said "No," and that the nurses "need the doctors to be here during scheduled treatment" and that patients were getting upset because doctors were not present.

92.     On December 8, 2011, two days after sending the emails and the calendar synopsis to Truesdell and despite receiving a good performance review from Vance only a few months earlier, Relator was called into a meeting with Truesdell and Vance and terminated. Relator noted in the meeting that she was being terminated for trying to get the physicians to comply with the legal requirements.

93.     On the morning of December 9, 2011, Relator memorialized her frustration to Truesdell about being terminated for retaliatory reasons, writing in an email string titled "Dr. turning over chemo infusions to RN":

I discussed this with Rick [Vance] and was told it was above my pay grade and I was to go thru you Shannon.

This [lack of physician coverage] was on my topics for discussion yesterday which we did not discuss. I wanted permission and support to build that relationship back up. I was told many times by [Defendant Vance] not to approach them [the physicians] now I'm bring (sic) let go for it.

94.     During the applicable time period, Noridian, the fiscal intermediary, requires that supervising physicians include within the medical documentation proof that they were properly supervising the off-campus clinic. However, the physicians routinely and as a matter of course failed to and continue to fail to properly include within the medical documentation proof that would have

1  demonstrated that they were immediately available to render assistance if and when such assistance was

2  necessary.

3        95.      As a result, the Defendants improperly billed government payors or caused them to be

4  improperly billed for these services and visits.  Given this long-standing requirement from Noridian,

5  which is easily locatable on its website and is sent to participating providers, Defendants at minimum

6  recklessly disregarded and/or were deliberately indifferent to, if not outright intentionally ignored, these

7  billing requirements such that the Defendant physicians location and availability could not be

8  determined when such services/visits were rendered.  This failure, in and of itself, resulted in numerous

9  false claims in violation of the FCA being submitted, and upon information and belief, was part of a

10  larger, intentional scheme by the Defendant physicians to conceal their location when billing for

11  services and visits provided.

*Improper Billing of Single Use Vials of Drugs and Biologicals ("SDVs") at the Hematology*
12  *Oncology Infusion Center in Cameron Park, California*

13        96.      In 2011 and as part of her duties, Relator began to review Defendant Marshall's practices

14  with respect to using and billing the Government Healthcare Programs for SDV drugs used on patients

15  at the Center.  Relator found a series of what had become routine, illegal billing practices that violated

16  conditions of payment.  These violations of conditions of payment occurred first at the El Dorado I

17  facility and then continued upon its merger into Defendant Marshall in 2007.

18        97.      For instance, Relator found that the Center was illegally billing more than the allotted

19  amount of SDV drugs on patients in violation of conditions of payment as stated above.  Relator found

20  that SDVs of drugs were routinely double billed to the Government Healthcare Programs by rounding

21  up the amount used between two patients.  This resulted in the Government Healthcare Programs being

22  billed twice, once for each patient at the full amount of the vial, such that twice the amount of the vial

23  was billed.  She also found that SDVs of drugs were routinely double billed to the Government

24  Healthcare Programs by billing remaining amounts as "waste" and then billing for a second patient for

25  the remaining amounts that had already been billed to the first patient as "waste."

26        98.      Additionally, using SDV drugs on multiple patients like at the Center is prohibited and

27  not reimbursable by the Government Healthcare Programs, except under limited circumstances not

28

applicable here.  Moreover, use of SDV drugs on a subsequent patient(s) by mixing them in a cocktail of drugs would contaminate the entire amount of the cocktail being used on those subsequent patient(s), making the entire cocktail of drugs not reimbursable by the Government Healthcare Programs.

99.     Relator also found unsafe practices that directly threatened the safety of chemotherapy patients.  Relator checked the "redbook," an internal drug log book that recorded the national drug code[2], patient names, and the stock numbers of SDVs dating back to 2003.  Most disturbing was that her review of the "redbook" and patient records demonstrated that SDVs of drugs were allowed to expire (go beyond their date and/or time after being used on one patient) and then were used on another patient(s) and billed as if viable instead of being billed as waste.  This meant that not only were the Government Healthcare Programs paying for expired drugs as if they were good, but that chemotherapy patients were receiving medicine that was expired and potentially not effective and/or harmful to them.  Mixing these expired drugs into subsequent patient(s)' drug cocktails would similarly contaminate the entire cocktail, making them not reimbursable by the Government Healthcare Programs.

100.     Relator interviewed nurses at Marshall about these billing practices with the SDVs, and the nurses confirmed that they were routinely occurring.

101.     In part, because of these illegal billing practices and patient safety issues with respect to SDVs, Relator pushed for the pharmacy to perform an audit of the Center, which occurred in August of 2011.  Both Dr. Robert DiPonti, Director of Pharmacy Services for Marshall Medical Center Pharmacy, and Arthur Gonzalez, Clinical and Ambulatory Care Pharmacist, were involved in the audit of the Center that was announced and pre-arranged and lasted from approximately August 8-18, 2011.  On or about September 28, 2011, the pharmacy management issued a report titled "Pharmacy Finding and Recommendations."  The pharmacy found that the SDVs were being billed illegally and in violation of regulations, constituting a "critical" failure.  With respect to SDVs, the pharmacy specifically wrote in the report:

---

[2] The national drug code ("NDC") is an eleven-digit number that identifies drugs, including their properties, vendor, and package size.

Issue:  **CONFUSION WITH SINGLE DOSE VIALS (SDV) VS. MULTIPLE DOES VIALS (MDV)**.  Found single dose vials saved and reused after initial use.  **PRIORITY CRITICAL**

    i.  RECOMMENDATION: Re-educate staff on policy and differences between SDV and MDV use.  This is a regulatory mandate.  This practice must cease.

(emphasis in original.)

102.    Throughout 2011, Relator kept checking the "redbook" and patient records and found numerous patients had SDVs improperly billed or that patients had been given expired drugs that were then illegally billed as viable.

103.    Throughout 2011, Relator reported these problems to both her supervisors and members of the pharmacy, as well as to Melanie Hadsell, Director of Physician Clinical Billing.  Ms. Hadsell explained to Relator that she was correct that the Center's billing practices with respect to "waste" for SDVs was not consistent with regulatory requirements.  In fact, on or about December 9, 2011, the day after Relator was terminated, Ms. Hadsell, as part of their ongoing dialogue, sent Relator an email detailing how to properly bill SDVs for "waste" under "Medicare guidelines."

104.    As of late December 2011, Relator reviewed documents and saw SDVs sitting out past their expiration date that were being used on patients.

***Billing For a Second Physician Office Visit For Blood Transfusions Without Patients Seeing a Physician***

105.    On or about November 28, 2011, the Marshall Hematology Oncology Infusion Center management had a meeting, which included Defendants Tsai and Soe, as well as Rick Vance, Melanie Hadsell, Director of Physician Clinic Billing for Defendant Marshall.  During this meeting, it was discussed that Defendants Tsai and Soe, as agents for Defendant Marshall, had been illegally and fraudulently billing the Government Healthcare Programs for a second physician office visit at the hospital when referring patients they had seen in the Center to Defendant Marshall's hospital for blood transfusions.  The blood transfusions were not performed with a physician seeing the patient at all, but were billed as if the patients had seen a physician for a second visit.

106.    Specifically discussed at this meeting were situations where Defendants Drs. Soe and Tsai saw patients in the Center prior to the patient's receipt of the blood transfusion treatment at the

THIRD AMENDED COMPLAINT
29

hospital. In addition to billing the Government Healthcare Programs for the office visit at the Center, Defendants Drs. Soe and Tsai routinely charged the Government HealthCare Programs for an "E&M" [evaluation and management] office visit for the transfusion despite no physician seeing those patients at the hospital.

107. At the meeting, Ms. Hadsell explained that Defendants Drs. Soe and Tsai frequently used CPT codes 99214 and 99215 when billing Medicare for the blood transfusions and that such actions were wrong as physician visits never occurred. Dr. Soe responded that even though he did not visit the patient, he was on call and responsible for the patient's care if anything went wrong during the procedure, and that he was not going to remain on call if he was not getting paid for it because "it was not worth it." Dr. Soe continued to argue with Ms. Hadsell, giving no indication that he intended to stop the practice of illegally billing under CPT codes 99214 and 99215 for the transfusions. Ms. Hadsell explained that Medicare had to be refunded money but Dr. Soe objected to self-reporting and refunding the money.

108. For both CPT code 99214 and code 99215 a physician must spend some amount of time (approximately 25 minutes and 40 minutes respectively) with a patient as a condition of payment. As Defendants Drs. Soe and Tsai spent no minutes on those infusions performed, and the procedures did not meet any of the medical necessity requirements of these CPT codes, those charges were fraudulent.

109. At the time of the filing of the initial Complaint in this matter, to the best of Relator's present knowledge, a refund for this illegally upcoding of CPT codes 99214 and 99215 had not occurred.

## SPECIFIC PATIENT EXAMPLES OF DEFENDANT MARSHALL'S ILLEGAL BILLING

*Billing of Patients Without A Physician Immediately Available*

110. On or about the end of July 2011, Defendants represented that, and billed Medicare for, patient G.R., a Medicare recipient, with medical record #047860 as being provided chemotherapy for approximately one and half hours until completion without any physician present at the Center nor anywhere in the vicinity such that a physician was not immediately available for this procedure that was billed to Medicare.

111.    On or about August 25, 2011, Defendants represented that, and billed Medicare for, patient J.M., a Medi-Cal recipient with medical record #246252, as being given both chemotherapy and an infusion of Zometa, and Dr. Tsai left the facility before completion, leaving no doctor immediately available for this procedure that was billed to Medi-Cal.

112.    On or about December 6, 2011, Defendants represented that, and billed Medicare for, patient D.B., a Medicare and Tricare recipient with medical record #197481, as being initially treated by Defendant Dr. Soe for an infusion but Dr. Soe left the facility leaving no doctor immediately available such that patient D.B. completed his treatment for at least a total of 20 minutes without proper physician supervision of the procedure.  This procedure was billed to Medicare and Tricare.

113.    On or about December 3, 2012, Defendants represented that, and billed Medicare for, patient M.T., a Medicare recipient with medical record # 048585, as being treated by Defendant Dr. Soe for a chemotherapy injection of Prolia, which is a claim requiring the supervising physician's direct supervision and documentation to support said direct supervision.  However, patient M.T.'s medical records lack the requisite evidence to support said supervising physician documentation as required by Medicare and Noridian.

114.    On or about May, 11, 2015, August 17, 2015, September 21, 2015 and October 19, 2015, Defendants represented that, and billed Medicare for, patient E.L., a Medicare recipient with medical record # 090655, as being treated by Defendant Dr. Soe for chemotherapy injections of Velcade on each visit and each of these Defendants' claims submitted for these treatments require are claims requiring the supervising physician's direct supervision and documentation to support said direct supervision. Specifically, patient E.L.'s medical records lack the requisite supervising physician documentation as required by Medicare and Noridian for all four visits.

115.    Between June 2015 and October 2015, Defendants represented that, and billed Medicare for, patient F.A., a Medicare recipient with medical record # 017593, as being treated by Defendant Dr. Soe for injections of Granix on more than 40 visits. **GRANIX** is a prescription medication given to people with certain types of cancer (nonmyeloid malignancies) who are receiving chemotherapy that affects the bone marrow to decrease the length of time that certain white blood cells (neutrophils) are very low (severe neutropenia). During each of the 40 visits in 2015 billed to Medicare and held on or

about June 1, June 4, June 8, June 11, June 15, June 18, June 22, June 25, June 29, July 2, July 6, July 9, July 13, July 16, July 20, July 23, July 27, July 30, August 3, August 6, August 10, August 13, August 17, August 20, August 24, August 27, August 31, September 3, September 10, September 14, September 17, September 21, September 24, September 28, October 1, October 5, October 9, October 12, October 15, October 19, October 22, October 26 and October 29, Defendants' failed to properly document direct supervision as required by Medicare in patient F.A.'s records.  These 41 claims are only representative of claims failing to meet direct supervision requirements in patient F.A.'s records.

116.    Similarly, between 2009 and 2015, Defendants represented that, and billed Medicare for, patient N.H., a Medicare recipient with medical record # 097242, as being treated by Defendant Dr. Soe for hormonal chemotherapy injections of Faslodex on average once every 6 weeks.  A review of patient N.H.'s records reveals a substantial majority of the claims submitted for these treatments to Medicare by Defendants failed to include documentation supporting the claims submitted as required by Medicare.  Specifically, patient N.H.'s medical records also lack the requisite evidence of the supervising physician's direct supervisions as required by Medicare and Noridian for all four visits.

117.    These are only a few representative samples of Defendants' illegal and fraudulent conduct, which was not limited to only these instances, but constituted a pervasive pattern and practice.

***Illegal Billing of SDVs***

118.    On or about April 5, 12, and 18, 2011, Defendants represented that, and billed Medicare for, patient E.G., a Medicare recipient with medical record #50004, as being provided rituxan[3] as chemotherapy at 560MG.  Defendant Marshall billed Medicare for 560MG for patient E.G. and then billed Medicare for 40MG of "waste" for a total of 600MG billed to Medicare for patient E.G. for each time stated above.  Defendant Marshall then illegally billed a second patient for 40MG of the remaining rituxan on each treatment stated above, that had already been billed as waste for patient E.G., such that for each of the dates above 640MG total between the two patients was billed to Medicare for only 600MG.

119.    On or about January 5, 2011, February 1, 2011, March 2, 2011, and April 28, 2011,

---

[3] Rituxan (Rituximab) is a chemotherapy drug that is supplied in 100mg/10ml and 500mg/50ml single dose vials.  Once opened, it has a shelf life of twenty-four hours before the drug's stability is compromised and it expires.  Rituxan is billed in 100MG increments under code J9310.

1   Defendants represented that, and billed Medicare for, patient G.B., a Medicare recipient with medical

2   record #0044127, as being provided rituxan as chemotherapy at 690MG.  Defendant Marshall billed

3   Medicare for 690MG for patient G.B. and then billed Medicare for 10MG of "waste" for a total of

4   700MG billed to Medicare for patient G.B. for each time stated above.  Defendant Marshall then

5   illegally billed a second patient for 10MG of the remaining rituxan on each treatment stated above, that

6   had already been billed as "waste" for patient G.B., such that for each of the dates above 710MG total

7   between the two patients was billed to Medicare for only 700MG.

8          120.    On or about March 16, and 23, 2011, and April 6, 2011, Defendants represented that, and

9   billed Medicare for, patient F.S., a Medicare recipient with medical record #071535, as being provided

10  rituxan as chemotherapy at 573MG.  Defendant Marshall billed Medicare for 573MG for patient F.S.

11  and then billed Medicare for 27MG of "waste" for a total of 600MG billed to Medicare for patient F.S.

12  for each time stated above.  Defendant Marshall then illegally billed a second patient for 27MG of the

13  remaining rituxan, that was already billed for patient F.S. as waste, such that for each of the dates above

14  627MG total between the two patients was billed to Medicare for only 600MG.

15         121.    On or about April 27, 2011, and May 4, 11, and 18, 2011, Defendants represented that,

16  and billed Medicare for, patient C.R., a Medicare recipient with medical record #146835, as being

17  provided rituxan as chemotherapy at 710MG.  Defendant Marshall billed Medicare for 710MG for

18  patient C.R. and then billed Medicare for 90MG of "waste" for a total of 800MG billed to Medicare for

19  patient C.R. for each time stated above.  Defendant Marshall then illegally billed a second patient for

20  90MG of the remaining rituxan, that was already billed for patient C.R. as waste, such that for each of

21  the dates above 890MG total between the two patients was billed to Medicare for only 800MG.

22         122.    On or about February 14, 2011 and March 28, 2011, Defendants represented that, and

23  billed Medicare for, patient G.R., a Medicare recipient, with medical record #200945, as being provided

24  rituxan as chemotherapy at 810MG.  Defendant Marshall billed Medicare for 810MG for patient G.R.

25  and then billed Medicare for 90MG of "waste" for a total of 900MG billed to Medicare for patient G.R.

26  for each time stated above.  Defendant Marshall then illegally billed a second patient for 90MG of the

27  remaining rituxan, that was already billed for patient G.R., such that for each of the dates above 990MG

28  total between the two patients was billed to Medicare for only 900MG.

123.    On or about February 3 and 8, 2011, March 16, 2011, and May 24, 2011, Defendants represented that, and billed Medicare for, patient L.S., a Medicare recipient, with medical record #187565, as being provided rituxan as chemotherapy at 710MG.  Defendant Marshall billed Medicare for 710MG for patient L.S. and then billed Medicare for 90MG of "waste" for a total of 800MG billed to Medicare for patient L.S. for each time stated above.  Defendant Marshall then illegally billed a second patient for 90MG of the remaining rituxan, that had already been billed as "waste" for patient L.S. such that for each of the dates above 890MG total between the two patients was billed to Medicare for only 800MG.

124.    On or about January 5, 2011, Defendants represented that, and billed Medicare for, patient M.E., a Medicare recipient, with medical record #087950, as being given 13 mg of avastin from a 100-mg SDV vial, and then was given another 475 mg of avastin from a 400 mg SDV vial.  In other words, he was given at least 13 mg of avastin from one single-use vial, 400 mg from another single-use vial, and 75 mg from a third single-use vial.  No other patients were given avastin on this day.  Thus, this patient was impermissibly given at least two doses of the drug that were from single-dose vials used on patients from previous days.  Defendant Marshall billed for these treatments, and in so doing, impermissibly billed Medicare for the unused portions of single-use vials that should have been discarded as waste.  Moreover, Defendants mixed the portions of the single-use vials that should have been discarded with drugs from a third SDV vial such that the mixture provided to M.E. was adulterated, contaminated and substandard and ought not have been billed and reimbursed by Medicare.

125.    On or about January 27, 2011, Defendants represented that, and billed Medicare for, patient A.F., a Medicare recipient, with medical record #007079, as being given 295 mg of avastin from a 400-mg SDV vial, 200 mg of avastin from two 100-mg SDV vials, and also was given another 275 mg of avastin from a single 100-mg SDV vial.  In other words, he was inappropriately given 295 mg of avastin from a 400 mg vial and was also somehow impossibly provided 275 mg from a single 100 mg vial.  No other patients were given avastin on this day nor was any waste recorded for that day for this drug.  Thus, this patient was impermissibly given at least one dose of the drug that was from a single-dose vial used on a patient from the previous days.  Defendant Marshall billed for these treatments, and in so doing, impermissibly billed Medicare for the unused portions of single-use vials that should have

been discarded as waste.  Moreover, Defendants mixed the portions of the single-use vials that should have been discarded with drugs from the other SDV vials such that the entire mixture provided to G.B. was adulterated, contaminated and substandard and ought not have been billed and reimbursed by Medicare.

126.    On or about January 12, 2011, Defendants represented that, and billed Medicare for, patient J.S., a Medi-Cal recipient, with medical record #33619, as being given 230 mg of Cytoxan from a 500-mg SDV vial and then 1120 mg of Cytoxan from a single 500-mg SDV vial.  In other words, he was inappropriately given 230 mg of Cytoxan from a 500 mg vial, since he needed a total dose of 1,350 mg, and therefore should have been given drug from at least two 500-mg vials. J.S. also was impossibly provided 1120 mg from a single 500 mg vial.  No waste was recorded for that day for this drug.  Thus, this patient was impermissibly given at least one dose of the drug that was from a single-dose vial used on another patient.  Defendant Marshall billed for these treatments, and in so doing, impermissibly billed Medi-Cal for the unused portions of single-use vials that should have been discarded as waste. Moreover, Defendants mixed the portions of the single-use vials that should have been discarded with drugs from the other SDV vials such that the entire mixture provided to J.S. was adulterated, contaminated and substandard and ought not have been billed and reimbursed by Medi-Cal.

127.    These are only a few representative samples of Defendants' illegal and fraudulent conduct, which was not limited to only these instances, but constituted a pervasive pattern and practice.

### COUNT I

### False Claims Act 31 U.S.C. §3729(a)(1)(a)

128.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

129.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims, and continue to do so, to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### False Claims Act 31 U.S.C. §3729(a)(1)(b)

130.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

131.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b), and continue to do so.

## COUNT III

### False Claims Act 31 U.S.C. §3729(a)(1)(c)

132.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

133.    By virtue of the acts described above, all Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(a), (b) in violation of 31 U.S.C. § 3729(a)(1)(c), and continue to do so.

## COUNT IV

### California False Claims Act CAL. GOV. CODE § 12651(a)(1)

134.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

135.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of California for payment or approval in violation of Cal. Gov. Code § 12651(a)(1), and continue to do so.

## COUNT V

### California False Claims Act CAL. GOV. CODE § 12651(a)(2)

136.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

137. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the State of California in violation of Cal. Gov. Code § 12651(a)(2), and continue to do so.

## COUNT VI

### California False Claims Act CAL. GOV. CODE § 12651(a)(3)

138. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

139. By virtue of the acts described above, all Defendants conspired to commit violations of Cal. Gov. Code §§ 12651(a)(1), (2) in violation of Cal. Gov. Code §§ 12651(a)(3), and continue to do so.

## COUNT VII

### False Claims Act

### WRONGFUL TERMINATION FOR RELATOR (31 U.S.C. § 3730(h))

140. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

141. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)(a), (b), and (c) and have damaged the United States by their actions in an amount to be determined at trial.

142. Defendant Marshall wrongfully terminated Relator. Relator was a dependable, hard working, skilled, and committed employee. Relator received no reprimands, complaints or negative evaluations of her employment performance and received a good performance evaluation only a few months prior to her termination.

143. Defendant Marshall terminated Relator because she actively took steps to stop Defendant Marshall from illegally billing the Government Healthcare Programs in violation of the FCA and to stop the remaining Defendants from assisting Defendant Marshall in its illegal billing schemes, also violations of the FCA.

144. 31 U.S.C. § 3730(h) protects any employee whose employment is adversely affected as a result of taking actions to further the FCA.

145.    Relator is "entitled to all relief necessary to make the employee whole" including "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."

WHEREFORE, the Relator demands judgment against Defendant Marshall in an amount to be determined at trial including actual and punitive (special) damages, and that the Court award the Relator reasonable attorneys' fees and the costs of this matter, and that the Court award such other and further relief as the cause of justice may require.

## COUNT VIII

### California False Claims Act

### WRONGFUL TERMINATION FOR RELATOR (CAL. GOV. CODE § 12653)

146.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

147.    As set forth in the preceding paragraphs, Defendants knowingly violated Cal. Gov. Code §§ 12651(a)(1), (2) and (3) and have damaged the State of California by their actions in an amount to be determined at trial.

148.    Defendant Marshall wrongfully terminated Relator.  Relator was a dependable, hard working, skilled, and committed employee.  Relator received no reprimands, complaints or negative evaluations of her employment performance and received a good performance evaluation only a few months prior to her termination.

149.    Defendant Marshall terminated Relator because she actively took steps to stop Defendant Marshall from illegally billing the Government Healthcare Programs, including the State of California's Medi-Cal program, in violation of the CFCA and to stop the remaining Defendants from assisting Defendant Marshall in its illegal billing schemes, also violations of the CFCA.

150.    Cal. Gov. Code §§ 12653 protects any employee whose employment is adversely affected as a result of taking actions to further the CFCA.

151.    Relator is entitled to "all relief necessary to make [her] whole" including "two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination", "punitive damages" , and "litigation costs and reasonable attorneys' fees".

WHEREFORE, the Relator demands judgment against Defendant Marshall in an amount to be determined at trial including actual, special, and punitive damages, and that the Court award the Relator reasonable attorneys' fees and the costs of this matter, and that the Court award such other and further relief as the cause of justice may require.

### COUNT IX

### WRONGFUL TERMINATION (CAL. LABOR CODE § 1102.5)

152.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

153.     As set forth in the preceding paragraphs, Defendants knowingly violated both the FCA and the CFCA and have damaged the Government and the State of California by their actions in an amount to be determined at trial.

154.     Defendant Marshall wrongfully terminated Relator.  Relator was a dependable, hard working, skilled, and committed employee.  Relator received no reprimands, complaints or negative evaluations of her employment performance and received a good performance evaluation only a few months prior to her termination.

155.     Defendant Marshall terminated Relator because she actively took steps to stop Defendant Marshall from illegally billing the Government Healthcare Programs at both the federal and state level in violation of the FCA and the CFCA and to stop the remaining Defendants from assisting Defendant Marshall in its illegal billing schemes, also violations of the FCA and CFCA.  Relator also objected to agents and employees of Defendant Marshall, including herself, participating in Defendants' illegal billing scheme and reported her reasonable suspicions about illegal, non-compliant, and unsafe care and conditions of patients at Defendant Marshall's Hematology Oncology Infusion Center to her supervisors, including Defendants Vance and Truesdell.

156.     Cal. Lab. Code §§ 1102.5 protects any employee whose employment is adversely affected "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

157.     As detailed above, Relator engaged in a protected activity when she noted her objection to participating in Defendants' illegal billing schemes, tried to get Defendant Marshall to comply with

1   federal and state billing and safety requirements for the Government Healthcare Plans, and when she

2   reported her reasonable suspicions about illegal, non-compliant, and unsafe care and conditions of

3   patients at Defendant Marshall's Hematology Oncology Infusion Center to her supervisors.

4       158.    As a result of Relator's refusal to participate in the illegal billing schemes of Defendants

5   and reporting her reasonable suspicions about illegal, non-compliant, and unsafe care and conditions of

6   patients at Defendant Marshall's Hematology Oncology Infusion Center to her supervisors, Relator was

7   terminated by Defendant Marshall.

8       WHEREFORE, the Relator demands judgment against Defendant Marshall for damages and

9   civil penalty brought against it in an amount to be determined at trial pursuant to Labor Code §1102.5,

10  including statutory penalties and fines as further defined by California Labor Code Section 2699 et seq.,

11  actual, special, and punitive damages, including loss of income and future income loss, and that the

12  Court award the Relator reasonable attorneys' fees and the costs of this matter and such other and

13  further relief as the cause of justice may require.

## COUNT X

### WRONGFUL TERMINATION (CAL. HEALTH & SAFETY CODE § 1278.5)

16      159.    Relator realleges and incorporates by reference the allegations contained in the foregoing

17  paragraphs of this Complaint.

18      160.    As set forth in the preceding paragraphs, Defendants knowingly violated and continue to

19  violate both the FCA and the CFCA and have damaged the Government and the State of California by

20  their actions in an amount to be determined at trial.  Defendant Marshall also took actions that have

21  caused unsafe care and conditions of patients at Defendant Marshall's Hematology Oncology Infusion

22  Center.

23      161.    At all material times herein, Health & Safety Code § 1278.5 provided protection from

24  discrimination and retaliation for health care workers, like Relator, who reported suspected unsafe care

25  and conditions of patients in health care facilities like Defendant Marshall's Hematology Oncology

26  Infusion Center.

27      162.    As recently as December of 2011, Relator reported her reasonable suspicions about

28  illegal, non-compliant, and unsafe care and conditions of patients at Defendant Marshall's Hematology

Oncology Infusion Center to her supervisors, including Defendants Vance and Truesdell, who called Relator into a meeting that same month and terminated her.

163.    Defendant Marshall violated Section 1278.5 of the Health and Safety Code by engaging in a continuous and ongoing pattern and practice of discrimination and retaliation against Relator, culminating in her termination because she engaged in whistleblowing activity protected by Section 1278.5 of the Health and Safety Code.

164.    Because Relator was terminated during the month when she made reports of unsafe conditions for patients, and certainly within one hundred and twenty days (120) of making such reports, there is a rebuttable presumption that her termination is retaliatory.

WHEREFORE, the Relator demands judgment against Defendant Marshall for damages against it in an amount to be determined at trial, including lost wages and work benefits caused by the acts of Defendant Marshall pursuant to Section 1278.5(g) of the Health and Safety Code, and that the Court award the Relator reasonable attorneys' fees and the costs of this matter and such other and further relief as the cause of justice may require.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays, on behalf of the United States and herself that, on final trial of this case, judgment be entered in favor the United States, the State of California, and Relator and against Defendants as follows:

1.    On the First Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

2.    On the Second Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

3.    On the Third Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

//

4.      On the Fourth Cause of Action under the California False Claims Act for the amount of the State of California's damages, multiplied as required by law, and for such civil penalties as are allowed by law;

5.      On the Fifth Cause of Action under the California False Claims Act for the amount of the State of California's damages, multiplied as required by law, and for such civil penalties as are allowed by law;

6.      On the Sixth Cause of Action under the California False Claims Act for the amount of the State of California's damages, multiplied as required by law, and for such civil penalties as are allowed by law;

7.      On the Seventh Cause of Action under the False Claims Act, as amended, for the amount of the Relator's damages, including economic damages, as are allowed by law;

8.      On the Eighth Cause of Action under the California False Claims Act for the amount of the Relator's damages, including economic damages, as are allowed by law;

9.      On the Ninth Cause of Action under the California Labor Code for the amount of the Relator's damages, including economic damages, as are allowed by law;

10.     On the Tenth Cause of Action under the California Health and Safety Code for the amount of the Relator's damages, including economic damages, as are allowed by law; and

11.     For the costs or this action, prejudgment interest, interest on the judgment and for any other and further relief to which Plaintiffs, the United States and the State of California, and Relator may be justly entitled.

DATED: March 22, 2016                   Respectfully submitted,

By: _____

**WATERS KRAUS & PAUL**
MICHAEL L. ARMITAGE (No. 152740)
armitage@waterskraus.com
LOUISA O. KIRAKOSIAN (No. 271983)
lkirakosian@waterskraus.com

**WATERS & KRAUS LLP**
LOREN JACOBSON (admitted *pro hac vice*)
ljacobson@waterskraus.com

**JOSEPH, GREENWALD & LAAKE, P.A.**
Brian J. Markovitz *(admitted pro hac vice)*
bmarkovitz@jgllaw.com
Matthew M. Bryant *(admitted pro hac vice)*
mbryant@jgllaw.com

## DEMAND FOR JURY TRIAL

Relator demands a trial by jury on all issues of triable fact in the foregoing Second Amended Complaint.

DATED: March 22, 2016                    Respectfully submitted,

_____

**WATERS KRAUS & PAUL**
MICHAEL L. ARMITAGE (No. 152740)
LOUISA O. KIRAKOSIAN (No. 271983)

**WATERS & KRAUS LLP**
LOREN JACOBSON, *pro hac vice*

**JOSEPH, GREENWALD & LAAKE, P.A.**
BRIAN J. MARKOVITZ, *pro hac vice*
MATTHEW M. BRYANT, *pro hac vice*

***ATTORNEYS FOR RELATOR HERREN***